# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| M.C. 1 and M.C. 2, by and through their legal guardian NICOLE REISBERG, and M.C. 3 and M.C. 4, by and through their legal guardian LILA BYOCK, individually and on behalf of all others similarly situated, | Civ. No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CURRICULUM ASSOCIATES, LLC | |
| Defendant. | |

# TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................6

II.     JURISDICTION AND VENUE .........................................................10

III.    THE PARTIES ...................................................................................11

IV.     FACTUAL ALLEGATIONS ...........................................................12

A.   Education is "the world's most data-mineable industry by far." ............................... 12

B.   Curriculum Associates is a multibillion-dollar EdTech company specializing in the
     collection and analysis of student data. ..................................................................... 14

C.   Curriculum Associates takes Plaintiffs' personal information as they use its Products. ....... 16

     1.   M.C. 1 used the i-Ready Diagnostic and Diagnostic Reports, Standards Mastery and
          Standards Mastery Reports, and Personalized Instruction Products......................... 16

     2.   M.C. 2 used Curriculum Associates' i-Ready Diagnostic and Diagnostic Reports
          Product. ........................................................................................................ 21

     3.   M.C. 3 used Curriculum Associates' i-Ready Diagnostic and Diagnostic Reports and
          Personalized Instruction Products. ................................................................... 23

     4.   M.C. 4 used Curriculum Associates' i-Ready Diagnostic and Diagnostic Reports and
          Personalized Instruction Products. ................................................................... 27

     5.   Curriculum Associates creates and collects a sweeping array of data from students who
          use its Products, including Plaintiffs. ................................................................ 32

     6.   The personal information taken from Plaintiffs far exceeds "education records." .......... 37

7.    Curriculum Associates unlawfully denied Plaintiffs access to their own data. ................. 37

D.    Curriculum Associates uses and shares student data for commercial purposes. ................... 39

1.    Curriculum Associates admits that it uses student data to develop, market, support, and improve its own products. ............................................................................................... 40

2.    Curriculum Associates collects, generates, and uses student data to build intimate data profiles. ................................................................................................................................ 45

3.    Curriculum Associates shares student data with third parties for commercial purposes.  50

4.    Forensic analysis revealed that Curriculum Associates shares Plaintiffs' data with third parties in real time. .......................................................................................................... 53

E.    Curriculum Associates fails to obtain effective consent for its sweeping generation, extraction, use, and disclosure of students' personal information. ....................................... 69

1.    Any purported consent was not informed. ............................................................ 70

2.    Any purported consent was not freely given. ...................................................... 71

3.    Any purported consent was not obtained by a person with authority. ............................... 72

F.    Curriculum Associates makes false and misleading statements about its data practices. ...... 74

1.    Curriculum Associates falsely states that COPPA does not require schools to obtain parental consent before providing data to Curriculum Associates. ............................................. 74

2.    Curriculum Associates falsely states that schools may use its Products in compliance with FERPA. .................................................................................................................. 75

3.    Curriculum Associates makes misleading statements about its disclosure of student-assessment results and usage metrics. ............................................................................ 76

G. Curriculum Associates' nonconsensual data practices harm students, including Plaintiffs. 77

   1. Curriculum Associates harms children, including Plaintiffs, by invading their privacy. . 77

   2. Curriculum Associates harms children, including Plaintiffs, by compromising the

   security of their personal information. ........................................................................... 78

   3. Curriculum Associates harms children by affecting their access to information,

   opportunities, and other basic rights through algorithmic profiling. .......................... 79

   4. Curriculum Associates harms children by forcing them to choose between their right to

   an education and other fundamental rights.................................................................. 81

**V.     CLASS ACTION ALLEGATIONS** ............................................................**82**

**VI.    TOLLING OF THE STATUTE OF LIMITATIONS**....................................**86**

**VII.   CAUSES OF ACTION**..............................................................................**87**

**COUNT I: Violation of the Federal Wiretap Act, U.S.C. § 2510 *et seq.*** ...................**87**

**COUNT II: Violation of the California Invasion of Privacy Act ("CIPA") Cal. Penal**

**Code § 631**.............................................................................................................**90**

**COUNT III: Violation of the California Invasion of Privacy Act ("CIPA"), Cal. Penal**

**Code § 632**.............................................................................................................**92**

**COUNT IV: Violation of the Comprehensive Computer Data Access and Fraud Act**

**("CDAFA"), Cal. Penal Code § 502 *et seq.*** ............................................................**98**

**COUNT V: Violation of the Comprehensive Computer Data Access and Fraud Act**

**("CDAFA"), Cal. Penal Code § 502 *et seq.*** ............................................................**96**

**COUNT VI: Violation of the Massachusetts Right to Privacy Act ("MRPA"), Mass. Gen. Laws Ann. ch. 214, §1B**..................................................................................................**100**

**COUNT VII: Unjust Enrichment**........................................................................................**104**

**COUNT VIII: Negligence**.....................................................................................................**106**

**COUNT IX: Violation of the Massachusetts Consumer Protection Act ("MCPA"), Mass. Gen. Laws Ann. ch. 93A**............................................................................................................**111**

**VIII.    RELIEF REQUESTED**.............................................................................................**114**

**IX.    JURY TRIAL DEMAND**............................................................................................**115**

# I.    INTRODUCTION

1.      M.C. 1[1] and M.C. 2, by and through their mother and legal guardian, Nicole Reisberg, and M.C. 3 and M.C. 4, by and through their mother and legal guardian, Lila Byock ("Plaintiffs"), individually and on behalf of all other similarly situated individuals, by and through their attorneys, bring this class action complaint ("Complaint") for injunctive and monetary relief under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) against Defendant Curriculum Associates, LLC ("Curriculum Associates") and make the following allegations based upon knowledge as to themselves and the acts of themselves, and upon information and belief as to all other matters.

2.      Curriculum Associates makes digital products that students in kindergarten through twelfth grade ("K–12") use for school, with much data collected from children under the age of 13.

3.      Curriculum Associates' core business is generating and collecting as much information about the students who use its products as is technologically possible and monetizing that information.

4.      The products that are the subject of this Complaint are the "i-Ready" suite of products, which provide student assessment, instruction, and data analytics.

5.      Through these products, Curriculum Associates creates and extracts reams of personal information from K–12 students. Using that data, Curriculum Associates creates detailed data profiles of students that are used to predict and influence their behavior and guide decision-making about them. It further uses that information for commercial purposes, including developing, marketing, and delivering its own products.

6.      Curriculum Associates also allows numerous third parties to access the information it

---

[1] The minor children's names have been anonymized, and they will be referred to herein as Minor Child ("M.C.").

obtains from K–12 students for the commercial benefit of both Curriculum Associates and those parties.

7.     Curriculum Associates admits that it takes, uses, and shares personal information from students, including Plaintiffs, who use Curriculum Associates' products at their respective schools. As alleged herein, forensic analysis of i-Ready products used by M.C. 3 and M.C. 4 and monitoring the hypertext transfer protocol ("HTTP") traffic generated by Curriculum Associates' products reveals that Curriculum Associates generates, records, and transmits information about Plaintiffs to third parties in real time as they use its products.  The third-party recipients of information belonging to Plaintiffs include advertising companies, marketing companies, and identity-resolution companies.

8.     Moreover, Curriculum Associates' Diagnostic and Personalized Instruction products generate, record, and transmit personal information about students in real time to third parties, without the knowledge or consent of the students or their parents. When a student interacts with the i-Ready platform for a diagnostic assessment or a personalized-instruction lesson, those interactions cause information about the student and the student's activity to be generated, recorded, and instantaneously transmitted to third parties outside of Curriculum Associates. Google is one of those third parties, as further detailed herein.

9.     Plaintiffs allege that Curriculum Associates fails to obtain effective consent before doing so and that its data practices thus violate students' state and federal rights.

10.     Thus, there is one question at the heart of this case: Does Curriculum Associates obtain effective consent before taking, using, and disclosing *any* personal information from students in the compulsory setting of K–12 education, let alone vast troves of it, as Curriculum Associates admits to doing?

11.    Plaintiffs allege that any purported consent obtained by Curriculum Associates is not effective.

12.    In order for consent to serve as a defense to tortious conduct, it must—at minimum—be informed, voluntary, and provided by a person with authority to do so. None of those essential elements are met here.

13.    First, any purported consent obtained by Curriculum Associates is not informed: because schools create i-Ready accounts for students, Curriculum Associates does not even provide its terms of service or privacy policies to students or their Parents.[2] Curriculum Associates also fails to explain its data practices in a reasonably understandable manner.

14.    Second, any purported consent is not voluntary: because children are required to attend school, they are coerced into submitting to Curriculum Associates' data practices rather than freely consenting to those practices. Students' use of i-Ready products in a compulsory environment does not unambiguously manifest their or their Parents' assent to Curriculum Associates taking and using their personal information.

15.    Third, any purported consent was not provided by a person with authority to do so: Curriculum Associates' student users are minors, and Curriculum Associates does not claim that it obtains consent from students' Parents, or even from students themselves. To the extent Curriculum Associates purports to obtain consent, it relies on the consent of school personnel alone. But school personnel do not have authority to consent to data harvesting of minor students by a private company; only Parents do. Indeed, the interests of school administrators may not be aligned with those of students, disqualifying them from serving as students' agents in this context. That is why the law highly restricts what kinds of information that even a *school* may collect from students and

---

[2] "Parent" as used herein refers broadly to a student's legal guardian.

how school personnel may use such information, let alone what a private vendor may do.

16.     That Curriculum Associates has been collecting and using student information for years without effective consent does not confer legality on its business practices. There is no adverse possession of the law: violations are violations, regardless of whether a practice has been generally accepted within an industry or conferred some benefit upon those whose information has been unlawfully taken.

17.     Privacy is a fundamental right. Children have a right to privacy in the information that is generated and taken from them. Parents have a right to determine who may access that information and for what purpose, and the right to determine whether certain information is created in the first place—especially intimate behavioral profiles of their children.

18.     Curriculum Associates' data practices force students to entirely forgo their rights in order to receive the education to which they are legally entitled. And Parents, by sending their children to school as is their right and duty, are forced to surrender their longstanding authority to make critical decisions about their children's personal information. Curriculum Associates must be held to account for operating as though the fundamental rights of children and their Parents do not exist.

19.     Plaintiffs are among the millions of school children whose information was unlawfully taken and used by Curriculum Associates. Through students' use of Curriculum Associates' products, Curriculum Associates has obtained vast amounts of their personal information, such as their name, contact information, identifying demographic information, assignment submissions, assessment scores, behavioral and interaction data, IP addresses, and browser and device data, to cite just a few examples.

20.     Neither Plaintiffs nor their Parents consented to Curriculum Associates taking any of this personal information. They were not notified of Curriculum Associates' data practices, nor were

they provided an opportunity to refuse to consent.

21.    Instead, Plaintiffs were required to use Curriculum Associates' products at school, enabling Curriculum Associates to gain virtually unfettered access to their personal information. Curriculum Associates then took their personal information and monetized it, including creating new information about them to derive behavioral analytics about them.

22.    Through this lawsuit, Plaintiffs seek to hold Curriculum Associates accountable for its surreptitious and unlawful data practices, obtain redress for the millions of school-aged children whose personal information has been unfairly exploited, and restore to students and Parents their basic right to be free from unwanted intrusion into their lives.

## II.    JURISDICTION AND VENUE

23.    This Court has original jurisdiction over the action under the Class Action Fairness Act ("CAFA") of 2005. Pursuant to 28 U.S.C. sections 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative Class members exceed $5 million, exclusive of interests and costs, and at least one member of the proposed Class is a citizen of a different state than Defendant Curriculum Associates.

24.    This Court also has subject matter jurisdiction over this action under 28 U.S.C. section 1331 because this Complaint alleges a question of federal law, specifically the ECPA (18 U.S.C. § 2510, *et seq*.).

25.    Venue is proper in this District under 28 U.S.C. section 1391 because Curriculum Associates is subject to personal jurisdiction here, is a citizen of this Commonwealth, regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

26.    Further, the unlawful conduct alleged in this Complaint occurred in, was directed to, and/or

emanated in part from this District. Curriculum Associates is a citizen of this Commonwealth, has sufficient minimum contacts with this Commonwealth, and sufficiently avails itself of the markets of this Commonwealth through its promotion, sales, licensing, activities, and marketing within this Commonwealth. Curriculum Associates purposely availed itself of the laws of Massachusetts and engaged and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including persons Curriculum Associates knew or had reason to know are located in Massachusetts, including in this District.

### III.    THE PARTIES

27.    Plaintiff M.C. 1 is a minor. At all relevant times, she has been a citizen of the state of California. M.C. 1 attended school in a California school district. As part of her schooling, she was required to access and use Curriculum Associates' i-Ready suite of products, which she accessed and used from her school-issued device.

28.    Plaintiff M.C. 2 is a minor. At all relevant times, he has been a citizen of the state of California. M.C. 2 attended school in a California school district. As part of his schooling, he was required to access and use Curriculum Associates' i-Ready suite of products, which he accessed and used from his school-issued device.

29.    Nicole Reisberg is the mother and legal guardian of Plaintiffs M.C. 1 and M.C. 2. At all relevant times, she has been a citizen of the state of California.

30.    Plaintiff M.C. 3 is a minor. At all relevant times, he has been a citizen of the state of California. M.C. 3 attended school in a California school district. As part of his schooling, he was required to access and use Curriculum Associates' i-Ready suite of products, which he accessed and used from his school-issued device.

31.    Plaintiff M.C. 4 is a minor. At all relevant times, he has been a citizen of the state of California. M.C. 4 attended school in a California school district. As part of his schooling, he was required to access and use Curriculum Associates' i-Ready suite of products, which he accessed and used from his school-issued device.

32.    Lila Byock is the mother and legal guardian of Plaintiffs M.C. 3 and M.C. 4. At all relevant times, she has been a citizen of the state of California.

33.    Defendant Curriculum Associates is a Massachusetts corporation. Its headquarters are located at 153 Rangeway Road, North Billerica, Massachusetts 01862.

## IV.    FACTUAL ALLEGATIONS

34.    Curriculum Associates both generates and collects vast troves of personal information belonging to millions of students, including Plaintiffs, without effective consent in violation of state and federal law.

35.    Curriculum Associates then monetizes that information by using it to build, market, deliver, and improve its own products.

36.    Curriculum Associates also shares student information with myriad third parties for the commercial benefit of both Curriculum Associates and those third parties. Its use and disclosure of students' personal information further violates state and federal law.

37.    Curriculum Associates admits that it generates, collects, uses, and shares personal information belonging to millions of K–12 students across the country. But it fails to obtain effective consent before doing so. Plaintiffs have been harmed by Curriculum Associates' nonconsensual generation, collection, use, and disclosure of their personal information.

### A.  Education is "the world's most data-mineable industry by far."

38.    Student data is extremely valuable in today's data economy.

39.     Like consumer data, student data is valuable because it can be used to develop, deliver, and improve products and services; personalize and target marketing; identify and manage risk; and predict future behaviors and trends.[3]

40.     By generating, collecting, and monetizing student information, education technology, or "EdTech,"[4] has become a $250 billion global industry that is projected to nearly triple by 2027.[5] Investors have taken note. Investments in EdTech surged from $500 million in 2010 to $16.1 billion in 2021.[6]

41.     Education has been described by a leading executive as "the world's most data-mineable industry by far."[7] As one leading EdTech investor explained, these investments are not philanthropic: the purpose of these private EdTech ventures "isn't a social mission . . . . They're there to create return."[8]

42.     The result is that EdTech has overtaken K–12 education. School districts access an average of nearly 3,000 EdTech tools during a school year. A single student accesses approximately 50

---

[3] Hamed Ghorban Tanhaei, "Predictive analytics in customer behavior: Anticipating trends and preferences" (2024), https://www.sciencedirect.com/science/article/pii/S2666720724000924.

[4] Although the term "educational technology" can be defined broadly to include purely theoretical or pedagogical practices, this Complaint uses "EdTech" to refer generally to "all the privately owned companies currently involved in the financing, production and distribution of commercial hardware, software, cultural goods, services and platforms for the educational market with the goal of turning a profit." *EdTech Inc.: Selling, Automating and Globalizing Higher Education in the Digital Age*, Tanner Mirrlees and Shahid Alvi (2019).

[5] Louise Hooper, *et al.*, *Problems with Data Governance in UK Schools*, Digital Futures Commission, 5Rights Foundation (2022), https://eprints.lse.ac.uk/119736/.

[6] Alex Yelenevych, *The Future of EdTech*, Forbes (December 26, 2022), https://www.forbes.com/councils/forbesbusinesscouncil/2022/12/26/the-future-of-edtech/?streamIndex=0.

[7] Stephanie Simon, *The big biz of spying on little kids*, Politico (May 15, 2014), https://www.politico.com/story/2014/05/data-mining-your-children-106676.

[8] *Id.*

EdTech tools per year.

### B. Curriculum Associates is a multibillion-dollar EdTech company specializing in the collection and analysis of student data.

43.     Curriculum Associates is an EdTech company that markets and sells a suite of products to K–12 schools and school districts that provide student assessment, instruction, and data analytics. They are marketed as the i-Ready suite of products. The following products are the subject of this Complaint ("i-Ready Products" or "Products"):

   a. **i-Ready Diagnostic and Diagnostic Reports** is (1) a collection of diagnostic assessments generally administered three times per school year and used to purportedly measure students' proficiency in reading and mathematics, and (2) a series of reports generated by Curriculum Associates based on students' assessment results and purporting to provide conclusions and predictions regarding students' skill levels and growth potential.

   b. **i-Ready Standards Mastery and Standards Mastery Reports** is (1) a collection of assessments used "for formative assessment processes" or "interim assessment" and purportedly revealing students' performance on key standards in reading and mathematics, and (2) a series of reports generated by Curriculum Associates based on students' assessment results and purporting to provide conclusions and predictions regarding students' skill levels and growth potential.

   c. **i-Ready Personalized Instruction** is a platform providing (1) personalized lessons based on students' individual performance on i-Ready assessments, and (2) a series of reports generated by Curriculum Associates based on students' lesson participation and including information about the time students spent on lessons, whether they passed

lessons, and a determination about whether they need further support in any academic areas.

44. Plaintiffs' school districts are among the thousands that use i-Ready Products.

45. By persuading schools to implement its Products, Curriculum Associates gains virtually unfettered access to the personal information of the children who attend those schools, including Plaintiffs.

46. The i-Ready Products do not merely serve as a digital filing cabinet in which K–12 schools may store education records or locally stored digital workbooks. Rather, Curriculum Associates uses these Products among others to generate, collect, store, share, and analyze data about students. These functions are core to Curriculum Associates' business model.

47. Given the significant value of student data in today's data economy, numerous private investment firms have made substantial investments in Curriculum Associates, including private equity firms Berkshire Partners LLC in 2017, Permira in 2019, and Hellman & Friedman in 2022.[9] Curriculum Associates is currently valued at approximately $4 billion.[10]

48. Curriculum Associates has thus created a significant return for investors by taking and exploiting school-aged children's data at the expense of children's privacy, including Plaintiffs' personal information as described in this Complaint.

---

[9] *Berkshire Partners Announces Investment in Curriculum Associates*, Berkshire Partners, https://berkshirepartners.com/berkshire-partners-announces-investment-in-curriculum-associates/ (Sept. 14, 2017); *Curriculum Associates*, Permira, https://www.permira.com/portfolio/our-portfolio/curriculum-associates (last visited Oct. 24, 2025); *Curriculum Associates*, Hellman & Friedman, https://hf.com/portfolio/curriculum-associates/ (last visited Oct. 24, 2025); *Curriculum Associates on the investment by Hellman & Friedman*, Torch Partners, https://www.torchpartners.com/deals/curriculum-associates-hellman-friedman (Jan. 2022).

[10] *Curriculum Associates on the investment by Hellman & Friedman*, Torch Partners, https://www.torchpartners.com/deals/curriculum-associates-hellman-friedman (Jan. 2022).

**C. Curriculum Associates takes Plaintiffs' personal information as they use its Products.**

49.    Plaintiffs use or have used i-Ready Products at their respective schools, including i-Ready Diagnostic and Diagnostic Reports, i-Ready Standards Mastery and Standards Mastery Reports, and i-Ready Personalized Instruction.

**1.    M.C. 1 used the i-Ready Diagnostic and Diagnostic Reports, Standards Mastery and Standards Mastery Reports, and Personalized Instruction Products.**

50.    Plaintiff M.C. 1 took assessments within the i-Ready Diagnostic and Diagnostic Reports and Standards Mastery and Standards Mastery Reports Products, and she received lessons within the i-Ready Personalized Instruction Product. She used these Products throughout her second-grade year in 2023-2024 and into her third-grade year in 2024.

51.    Specifically, M.C. 1 used the Diagnostic and Diagnostic Reports Product for reading assessments in August 2023, as well as January, April, and May 2024. She used the Product for a mathematics assessment in August 2024. M.C. 1 used the Standards Mastery and Standards Mastery Reports Product on at least ten different days in April 2024 for reading and mathematics assessments. She used the Personalized Instruction Product on at least one day in September 2023 for reading lessons.

52.    School personnel created the i-Ready account for M.C. 1. Neither M.C. 1 nor her parents were provided with any terms or policies pertaining to i-Ready, nor were they provided an opportunity to withhold consent to Curriculum Associates' data practices.

53.    In participating in the reading assessments within the i-Ready Diagnostic product, all K–12 students, including Plaintiffs, are presented with a series of vocabulary, literature

comprehension, and informational-text comprehension questions. Students are sometimes also assigned phonics, phonological awareness, and high-frequency word items, as M.C. 1 was in this case. An example of one type of reading assessment question is the following:



**Read the paragraph.**

The family stood on the railroad platform surrounded by a pile of luggage. The train would <u>transport</u> them all the way across the country. The voyage would take a week, and they were excited to see the sights along the way.

The prefix *trans-* means "across," and the root *port* means "carry." Based on this information, what does the word <u>transport</u> mean in the paragraph?

- to move to a another part of the country
- to go on a journey to a place far away
- to travel for a long amount of time
- to bring things from one place to another

54.     In mathematics assessments within the i-Ready Diagnostic Product, students are presented with a series of questions in the domains of number and operations, algebra and algebraic thinking, measurement and data, and geometry. M.C. 1 was presented with questions in all four of these subject-matter domains. An example of one type of mathematics-assessment question is:



55.     In reading or mathematics assessments within the Standards Mastery Product, students are presented with questions regarding specific, targeted standards or skills. For example, one of the mathematics standards for which M.C. 1 completed a Standards Mastery assessment was "Subtract Three-Digit Numbers." An example of one of the reading standards for which M.C. 1 completed a Standards Mastery assessment was "Context, Roots, and Reference Materials." Here is an example of a mathematics question from Standards Mastery assessments:



56.    Here is an example of a reading question from Standards Mastery assessments:



57.    After each assessment, Curriculum Associates automatically generates a report purporting to provide conclusions and predictions regarding the student's skill levels and growth potential. On information and belief, these reports were automatically generated about M.C. 1 after each one of her assessments.

58.    The i-Ready Personalized Instruction Product uses the results of the students' assessments to purportedly provide personalized lessons based on the student's individual skill level. Each lesson has a short quiz at the end. The reading lessons performed by M.C. 1 within the Personalized Instruction Product focused on phonics and were called "Read Two-Syllable Words with Closed Syllables" and "Read Two-Syllable Words with Open Syllables."

59.    The i-Ready Personalized Instruction Product also provides accompanying reports at the student, class, and school-district levels that include data about the time a student spent on lessons,

the number of lessons in progress or completed by the student, the number of lessons the student passed, and any alerts indicating when a student needs additional support. On information and belief, these reports were generated about M.C. 1 based on her participation in lessons in i-Ready Personalized Instruction.

60.     The types of question formats in all of the i-Ready Products include multiple choice, short answer, and drop-down menu choices. Other formats are more interactive, requiring that students match, categorize, or sort items, and manipulate virtual tools to arrive at the answers to questions.

61.     In completing her required assessments and lessons, M.C. 1 submitted information to Curriculum Associates through i-Ready in all of these formats.  The data submitted by and generated about Plaintiff M.C. 1 through i-Ready is highly personal. Curriculum Associates used it to produce purported insights and predictions regarding her skill mastery, strengths and weaknesses, depth of understanding, and comprehension challenges.

62.     Curriculum Associates has thus generated and collected vast troves of academic and behavioral data belonging to M.C. 1, including her personal information, through her use of its Products.

63.     Curriculum Associates further used that data to build an academic, psychographic profile of M.C. 1, for the purposes of predicting and influencing her behavior and guiding decision-making about her.

64.     Neither M.C. 1 nor her parents consented to Curriculum Associates' generation, collection, or use of M.C. 1's personal information.

65.     Ms. Reisberg requested access to her children's data from Curriculum Associates, but Curriculum Associates denied her request, instead referring her to her school district in violation of the Children's Online Privacy Protection Act ("COPPA"). 15 U.S.C. § 6502; 16 C.F.R. § 312.6.

**2.    M.C. 2 used Curriculum Associates' i-Ready Diagnostic and Diagnostic Reports Product.**

66.    Plaintiff M.C. 2 took assessments within Curriculum Associates' i-Ready Diagnostic and Diagnostic Reports Product at his school. He used the Product when he was in his second-grade year in 2024-2025.

67.    M.C. 2 took at least one mathematics assessment and one reading assessment within the Product in August 2024.

68.    School personnel created the i-Ready account for M.C. 2. Neither M.C. 2 nor his parents were provided with any terms or policies pertaining to i-Ready, nor were they given an opportunity to withhold their consent.

69.    In participating in the reading assessments within the i-Ready Diagnostic Product, M.C. 2 was presented with a series of vocabulary, literature comprehension, and informational-text comprehension questions. He was also assigned phonics, phonological awareness, and high-frequency word items. An example of one type of reading assessment question is the following:



70.    In mathematics assessments within the i-Ready Diagnostic Product, students are presented with a series of questions in the domains of number and operations, algebra and algebraic thinking, measurement and data, and geometry. M.C. 2 was presented with questions in all four of these

subject-matter domains. An example of one type of mathematics-assessment question is:



71.    The types of question formats include multiple choice, short answer, and drop-down menu choices. Other formats are more interactive, requiring that students match, categorize, or sort items or manipulate virtual tools to arrive at the answers to questions.

72.    In completing his required assessments, M.C. 2 has submitted information to Curriculum Associates through i-Ready in all of these formats.

73.    After each assessment, Curriculum Associates automatically generates a report purporting to provide conclusions and predictions regarding the student's skill levels and growth potential. On information and belief, these reports were automatically generated about M.C. 2 after each one of his assessments.

74.    The data submitted by and generated about M.C. 2 through i-Ready is highly personal. Curriculum Associates used it to generate purported insights and predictions regarding his skill mastery, strengths and weaknesses, depth of understanding, and comprehension challenges.

75.    Curriculum Associates has thus generated and collected vast troves of data belonging to

M.C. 2, including his personal information, through his use of its Products.

76.    Curriculum Associates further used that data to build an invasive academic, psychographic profile of M.C.2, which it used to predict and influence M.C. 2's behavior and guide decision-making about him.

77.    Neither M.C. 2 nor his parents consented to Curriculum Associates' generation, collection, or use of his personal information.

78.    Ms. Reisberg requested access to her children's data from Curriculum Associates, but Curriculum Associates denied her request, instead referring her to her school district in violation of COPPA.

> **3.    M.C. 3 used Curriculum Associates' i-Ready Diagnostic and Diagnostic Reports and Personalized Instruction Products.**

79.    Plaintiff M.C. 3 took assessments within the i-Ready Diagnostic and Diagnostic Reports Product, and he received lessons within the i-Ready Personalized Instruction Product. He used these Products throughout his fifth-grade year in 2023-2024.

80.    Specifically, M.C. 3 used the Diagnostic and Diagnostic Reports Product for both reading and mathematics assessments in August 2023, January 2024, and May 2024. M.C. 3 used the Personalized Instruction Product at least 26 times during his 2023-2024 school year to complete reading-comprehension lessons and at least 30 times during that same time frame to complete mathematics lessons.

81.    School personnel created the i-Ready account for M.C. 3. Neither M.C. 3 nor his parents were provided with any terms or policies pertaining to i-Ready, nor were they provided an opportunity to withhold consent to Curriculum Associates' data practices.

82.    In participating in the reading assessments within the i-Ready Diagnostic Product, all K–

12 students, including Plaintiffs, are presented with a series of vocabulary, literature comprehension, and informational-text comprehension questions. M.C. 3 was also assigned phonics and high-frequency word items. An example of one type of reading assessment question is the following:



83.     In mathematics assessments within the i-Ready Diagnostic Product, students are presented with a series of questions in the domains of number and operations, algebra and algebraic thinking, measurement and data, and geometry. M.C. 3 was presented with questions in all four of these subject-matter domains. An example of one type of mathematics-assessment question is:



84.    After each assessment, Curriculum Associates automatically generates a report purporting to provide conclusions and predictions regarding the student's skill levels and growth potential. On information and belief, these reports were automatically generated about M.C. 3 after each one of his assessments.

85.    The i-Ready Personalized Instruction Product uses the results of the students' assessments to purportedly provide personalized lessons based on the student's individual skill level. The reading lessons performed by M.C. 3 within the Personalized Instruction Product focused on reading comprehension. A few examples of the reading-comprehension lessons M.C. 3 undertook include "Understanding Historical Texts," "Comparing and Contrasting Characters," and "Understanding Perspective in Literature."

86.    The mathematics lessons performed by M.C. 3 within the Personalized Instruction Product focused on geometry, "measurement and data," "number and operations," and algebra and algebraic thinking. Examples of the mathematics lessons M.C. 3 undertook include "Understand

the Coordinate Plane" (geometry), "Understand and Measure Volume" (measurement and data), "Understand Fractions as Division" (number and operations), and "Understand Algebraic Expressions" (algebra and algebraic thinking).

87.    The i-Ready Personalized Instruction Product also provides accompanying reports at the student, class, and school-district levels that include data about the time a student spent on lessons, the number of lessons in progress or completed by the student, the number of lessons the student passed, and any alerts indicating when a student needs additional support. These reports were generated about M.C. 3 based on his participation in lessons in i-Ready Personalized Instruction.

88.    The types of question formats in all of the i-Ready Products include multiple choice, short answer, and drop-down menu choices. Other formats are more interactive, requiring that students match, categorize, or sort items or manipulate virtual tools to arrive at the answers to questions.

89.    In completing his required assessments and lessons, M.C. 3 submitted information to Curriculum Associates through i-Ready in all of these formats.

90.    The data submitted by and generated about Plaintiff M.C. 3 through i-Ready is highly personal. Curriculum Associates uses it to produce purported insights and predictions regarding his skill mastery, strengths and weaknesses, depth of understanding, and comprehension challenges.

91.    Curriculum Associates has thus generated and collected vast troves of data belonging to M.C. 3, including his personal information, through his use of its Products.

92.    Neither M.C. 3 nor his parents consented to Curriculum Associates' generation or collection of M.C. 3's personal information.

93.    Ms. Byock requested access to her child's data from Curriculum Associates, but Curriculum Associates failed to produce any information in response to her request in violation of

COPPA.

94.    At the beginning of the 2025-2026 school year, Ms. Byock—who had long been outspoken with her school district regarding her concerns about i-Ready—demanded that her children be exempt from i-Ready requirements, which involved written correspondence and meetings with school administrators and teachers at M.C. 3 and M.C. 4's respective schools. Although her children were still required to participate in diagnostic testing at the beginning of the year, the schools permitted them to forgo i-Ready assessments going forward. On information and belief, Curriculum Associates still retains, uses, and discloses the data it has collected from Plaintiffs without effective consent, which it generated and collected without effective consent.

95.    However, other Parents in their school communities report being unable to opt their children out of any i-Ready requirements, despite reasonable efforts.

### 4.    M.C. 4 used Curriculum Associates' i-Ready Diagnostic and Diagnostic Reports and Personalized Instruction Products.

96.    Plaintiff M.C. 4 has taken assessments within the i-Ready Diagnostic and Diagnostic Reports Product, and he completes lessons within the i-Ready Personalized Instruction Product. He currently uses these Products in his fifth-grade year, and he also used the Products throughout his third-grade year in 2023-2024 and his fourth-grade year in 2024-2025.

97.    Specifically, M.C. 4 has used the Diagnostic and Diagnostic Reports Product by taking a total of 15 assessments to date, including both a math and reading assessment in September 2023; January, May, August, and December 2024; and May 2025, and one math and two reading assessments in August 2025.

98.    M.C. 4 used the Personalized Instruction Product at least 35 times during his 2023-2024 school year to complete reading lessons and at least 21 times during that same time frame to

complete mathematics lessons. During his 2024-2025 school year, he used the Product at least 35 times to complete reading lessons and at least 28 times to complete mathematics lessons. So far in his 2025-2026 school year, he has used the Product to complete one reading lesson.

99.      School personnel created the i-Ready account for M.C. 4. Neither M.C. 4 nor his parents were provided with any terms or policies pertaining to i-Ready, nor were they provided an opportunity to withhold consent to Curriculum Associates' data practices.

100.      In participating in the reading assessments within the i-Ready Diagnostic Product, all K–12 students, including Plaintiffs, are presented with a series of vocabulary, literature comprehension, and informational-text comprehension questions. M.C. 4 was also assigned phonics and high-frequency word items in all of his reading assessments from 2023 through the date of the filing of this Complaint. An example of one type of reading assessment question is the following:

101.    In mathematics assessments within the i-Ready Diagnostic Product, students are presented with a series of questions in the domains of number and operations, algebra and algebraic thinking, measurement and data, and geometry. M.C. 4 was presented with questions in all four of these subject-matter domains in all of the mathematics assessments he took from 2023 through the date of the filing of this Complaint. An example of one type of mathematics-assessment question is:



102.    After each assessment, Curriculum Associates automatically generates a report purporting to provide conclusions and predictions regarding the student's skill levels and growth potential. On information and belief, these reports were automatically generated about M.C. 4 after each one of his assessments.

103.    The i-Ready Personalized Instruction Product uses the results of the students' assessments to purportedly provide personalized lessons based on the student's individual skill level. The reading lessons performed by M.C. 4 within the Personalized Instruction Product in his third-grade year in 2023-2024 focused on reading comprehension, vocabulary, and phonics. Examples of some

of the reading lessons M.C. 4 undertook that year are "Understanding Technical Texts" (reading comprehension), "Determine Word Meanings Using Context Clues" (vocabulary), and "Reading Multisyllabic Words with Prefixes" (phonics).

104.    The mathematics lessons performed by M.C. 4 within the Personalized Instruction Product in his third-grade year in 2023-2024 focused on geometry, "measurement and data," "number and operations," and algebra and algebraic thinking. Examples of the mathematics lessons M.C. 4 undertook that year include "Divide Shapes Into Three Equal Parts" (geometry), "Solve Problems About Liquid Volume" (measurement and data), "Fractions on a Number Line" (number and operations), and "Division Word Problems" (algebra and algebraic thinking).

105.    In M.C. 4's fourth-grade year in 2024-2025 he performed reading lessons within the Personalized Instruction Product that focused on reading comprehension and vocabulary. Examples of the reading lessons M.C. 4 undertook that year include "Describing Settings and Events" (reading comprehension) and "Determine the Meanings of Related Words in a Word Family" (vocabulary).

106.    The mathematics lessons performed by M.C. 4 within the Personalized Instruction Product in his fourth-grade year in 2024-2025 focused on geometry, "measurement and data," and "number and operations." Examples of the mathematics lessons M.C. 4 undertook that year include "Classify and Compare Quadrilaterals" (geometry), "Understand Subtraction Using Number Lines" (measurement and data), and "Multiply Two-Digit Numbers" (number and operations).

107.    In M.C. 4's fifth-grade and current schoolyear, he performed a reading lesson within the Personalized Instruction Product that focused on vocabulary and was called "Determine Word Meanings Using Context Clues."

108.    The i-Ready Personalized Instruction Product also provides accompanying reports at the

student, class, and school district levels that include data about the time a student spent on lessons, the number of lessons in progress or completed by the student, the number of lessons the student passed, and any alerts indicating when a student needs additional support. These reports were generated about M.C. 4 based on his participation in lessons in i-Ready Personalized Instruction.

109.    The types of question formats in all of the i-Ready Products include multiple choice, short answer, and drop-down menu choices. Other formats are more interactive, requiring that students match, categorize, or sort items or manipulate virtual tools to arrive at the answers to questions.

110.    In completing his required assessments and lessons, M.C. 4 submitted information to Curriculum Associates through i-Ready in all of these formats.

111.    The data submitted by and generated about Plaintiff M.C. 4 through i-Ready is highly personal. Curriculum Associates uses it to produce purported insights and predictions regarding his skill mastery, strengths and weaknesses, depth of understanding, and comprehension challenges.

112.    Curriculum Associates has thus generated and collected vast troves of data belonging to M.C. 4, including his personal information, through his use of its Products.

113.    Neither M.C. 4 nor his parents consented to Curriculum Associates' generation or collection of M.C. 4's personal information.

114.    Ms. Byock requested access to her child's data from Curriculum Associates, but Curriculum Associates failed to produce any information in response to her request in violation of COPPA.

115.    At the beginning of the 2025-2026 school year, Ms. Byock—who had long been outspoken with her school district regarding her concerns about i-Ready—demanded that her children be exempt from i-Ready requirements, which involved written correspondence and meetings with

school administrators and teachers at M.C. 3 and M.C. 4's respective schools. Although her children were still required to participate in diagnostic testing at the beginning of the year, the schools permitted them to forgo i-Ready assessments going forward. On information and belief, Curriculum Associates still retains, uses, and discloses the data it has collected from Plaintiffs without effective consent, which it generated and collected without effective consent.

116.    However, other Parents in their school communities report being unable to opt their children out of any i-Ready requirements, despite reasonable efforts.

**5.    Curriculum Associates creates and collects a sweeping array of data from students who use its Products, including Plaintiffs.**

117.    Curriculum Associates creates and collects a sweeping array of data from students who use its Products, including Plaintiffs.

118.    As evidenced by Curriculum Associates' terms of service, documents produced by Curriculum Associates regarding M.C. 1 and M.C. 2, and documents produced by Plaintiffs' schools, Curriculum Associates collects at least the following information from Plaintiffs and other students who use its i-Ready Products:

    a.  **Plaintiffs' direct PII and demographic data:**

        i.   Student first and last name;

        ii.  Student's date of birth;

        iii. Student's gender;

        iv.  Student's state identification;

        v.   Student's user name;

        vi.  Whether student is Hispanic or Latino;

        vii. Student's race; and

     viii.  Student's identification number.

b.  **Plaintiffs' enrollment data:**

     i.  Student's grade level;

     ii.  Student's academic year;

     iii.  Student's school enrollment;

     iv.  Student's class enrollment;

     v.  Name of student's teacher;

     vi.  State identification number of student's school;

     vii.  Whether student is an English-language learner;

     viii.  Whether student is in Special Education;

     ix.  Student's English-language classification; and

     x.  The language in which student's assessment or lesson was conducted.

c.  **Plaintiffs' assessment process and behavioral data:**

     i.  Student's "activity ID";

     ii.  Plaintiffs' responses to questions;

     iii.  Whether student answers each question in an assessment correctly or incorrectly;

     iv.  Start and completion dates of each i-Ready assessment student undertakes and each question within the assessment student answers;

     v.  The time student spends on each question in an assessment;

     vi.  The time it takes student to complete an entire assessment or lesson;

     vii.  Whether student appears to have rushed on any question in an assessment;

     viii.  Whether student appears to have rushed through an assessment as a whole; and

     ix.  Whether the "read aloud" function was turned on during an assessment.

d. **Plaintiffs' psychometric and outcome data:**

    i. Completion date of each i-Ready personalized-instruction lesson student undertakes;

    ii. The "norming window" that an i-Ready Diagnostic assessment covers, i.e., Fall, Winter, Spring;

    iii. Whether an assessment taken is a baseline diagnostic for the student;

    iv. Whether an assessment taken is the most recent diagnostic taken that year by the student;

    v. The difficulty level of each question student answers in an assessment;

    vi. Student's overall scale score during an assessment;

    vii. Student's "overall placement" during an assessment, i.e., early, mid, or late in a given grade level;

    viii. Student's "overall relative placement" during an assessment, i.e., "early on grade level," "mid or above grade level," etc.;

    ix. Percentile of student's performance on assessment;

    x. The "quantile measure" of student's performance on an assessment;

    xi. The "quantile range" of student's performance on an assessment;

    xii. Student's score in each subject-matter domain tested in an assessment;

    xiii. Student's scale score in each subject-matter domain tested in an assessment;

    xiv. Student's placement in each subject-matter domain tested in an assessment;

    xv. Student's relative placement in each subject-matter domain tested in an assessment;

    xvi. Student's "diagnostic gain" after an assessment;

    xvii. Student's "annual typical growth measure" after an assessment;

xviii.  Student's "annual stretch growth measure" after an assessment;

xix.  Student's "percent progress to annual typical growth" after an assessment;

xx.  Student's "percent progress to annual stretch growth" after an assessment;

xxi.  Student's "mid on grade level scale score" after an assessment;

xxii.  "National norm" of student's performance on the test compared to peers nationwide;

xxiii.  The "lexile measure" of student's performance on a reading assessment;

xxiv.  The "lexile range" within which student's performance on a reading assessment falls;

xxv.  The "quantile measure" of student's performance on a mathematics assessment;

xxvi.  The "quantile range" within which student's performance on a mathematics assessment falls;

xxvii.  The "reading difficulty indicator," which identifies whether a student seems to be at risk for a significant reading difficulty, such as dyslexia;

xxviii.  Conclusions, recommendations, and predictions regarding student's progress, performance, and proficiency based on student's performance on assessments [and lessons], i.e., "results indicate that [student name] is decoding accurately, but the Vocabulary score suggests that substantial gaps in word knowledge are making it very hard to read for meaning";

xxix.  Identity and number of other students in student's class that Curriculum Associates recommends educators group with student for further instruction based on student's performance on assessments;

xxx.  Name of lesson or standards-mastery assessment student undertakes;

    xxxi.   Student's lesson grade;

    xxxii.   Student's lesson score;

    xxxiii.   Student's lesson level;

    xxxiv.   Student's lesson identification;

    xxxv.   The objective of student's lesson;

    xxxvi.   Whether student passed lesson; and

    xxxvii.   Whether student's teacher assigned the lesson.

    e.  **Plaintiffs' device and usage data:**

      i.   Unique device identifier;

      ii.   Device type;

      iii.   IP address;

      iv.   Browser type;

      v.   Browser settings; and

      vi.   Operating system information.

119.    In addition to the data described herein, Curriculum Associates also obtains the following data from every student using i-Ready at one or both of Plaintiffs' school districts:

    a.  Student's email address;

    b.  Student's ethnicity;

    c.  Student's foster-youth status;

    d.  Whether student is disabled;

    e.  Identification number of student's school district;

    f.  Name of school student attends;

    g.  State in which student's school is located;

h.  "[R]elevant student usage and achievement information";

i.  "Data which can be probed to get item level and student historical data";

j.  "Detailed information regarding students' skills and standards mastery"; and

k.  "Activity data" that "may include assessment results, messages sent, resources created, coursework including external/resource links utilized, assignments, files uploaded, submissions, and other activities of the instructional tool as applicable."

120.    Neither Plaintiffs nor their parents consented to Curriculum Associates taking this data from them.

### 6.  The personal information taken from Plaintiffs far exceeds "education records."

121.    The data Curriculum Associates generates and extracts from students who use its Products, including Plaintiffs, far exceeds what could be legally or traditionally characterized as "education records."

122.    Even if certain data could be characterized as education records, Plaintiffs—like all students—retain significant rights over the personal information contained in such records, which are protected by state and federal law.

123.    Further, the amount of data Curriculum Associates collects about children, including children under 13, far exceeds that reasonably necessary for children to participate in any school activity that is facilitated by i-Ready Products in violation of COPPA.

124.    That i-Ready Products are not designed to optimize for student privacy is an intentional, self-interested choice that comes at the expense of children's privacy, safety, and autonomy.

### 7.  Curriculum Associates unlawfully denied Plaintiffs access to their own data.

125.    Curriculum Associates refused to disclose to Plaintiffs' parents the data it collected from

or about Plaintiffs and how that data was used and shared.

126.    Under COPPA, Curriculum Associates is required to grant Parents of children under 13 access to this information. However, Curriculum Associates has a policy and practice of refusing to accommodate those requests.[11]

127.    For example, Plaintiffs M.C. 1 and M.C. 2 are under 13. When Ms. Reisberg requested access to their personal information collected by Curriculum Associates, Curriculum Associates confirmed receipt of her request but refused to provide her access to her children's information. It falsely informed her that she was required to direct her request to her school in violation of COPPA.

128.    Only after Ms. Reisberg retained counsel and after months of pressure did Curriculum Associates eventually disclose certain data belonging to M.C. 1 and M.C. 2 in violation of COPPA's requirement that such requests not be unduly burdensome to Parents.

129.    On information and belief, Curriculum Associates did not disclose all the information they obtained from and about M.C. 1 and M.C. 2.

130.    The data eventually disclosed by Curriculum Associates included only raw data showing results from diagnostic and standards mastery assessments and lessons taken by M.C. 1 and M.C. 2, as well as certain behavioral data collected from them as they used its Products. It did not provide any accompanying reports—which are automatically generated by Curriculum Associates based on assessment results—or any other materials generated using the children's data.

131.    Plaintiffs M.C. 3 and M.C. 4 are also under 13 years of age. When Ms. Byock requested access to their personal information collected by Curriculum Associates, a representative responded that one of Curriculum Associates' "team members" had contacted Plaintiffs' schools

---

[11] *i-Ready Platform Data Handling and Privacy Statement*, Curriculum Associates, https://www.curriculumassociates.com/support/privacy-and-policies/i-ready-data-handling-privacy (last updated March 7, 2025).

"and advised them of [her] request," and stated that they would await further instruction from the schools.

132.    School personnel at each school confirmed that a representative did contact the schools and that the schools confirmed Ms. Byock's identity and approved the release of her children's data to her. To date, Ms. Byock has never received further communication or information from Curriculum Associates.

133.    Curriculum Associates has a policy and practice of denying Parents access to information about their children to which they are entitled in violation of federal law.

134.    Consequently, students and Parents do not and cannot know the full extent of the personal information Curriculum Associates generates and collects from them, whether that data is accurate, how that data is stored, how long that data is retained, who has accessed that data, or how that data or data-derivative information or products are used by Curriculum Associates or third parties.

135.    Although Plaintiffs cannot know the full extent of the personal information taken from them by Curriculum Associates, they base their allegations on the information Curriculum Associates did provide them, Curriculum Associates' own terms and policies describing its data practices, their own personal experience using its Products, and expert forensic analysis of its Products.

### D.  Curriculum Associates uses and shares student data for commercial purposes.

136.    In addition to generating and collecting vast troves of student data, including Plaintiffs' personal information, Curriculum Associates uses and shares that information for a host of commercial purposes, enabling Curriculum Associates to monetize that information.

137.    Curriculum Associates refuses to disclose how it uses and shares the data of any individual student to the student or their Parent in violation of COPPA. Thus, Plaintiffs' allegations are based

on Curriculum Associates' own statements, as well as expert analysis of Curriculum Associates' Products when in use.

> **1.    Curriculum Associates admits that it uses student data to develop, market, support, and improve its own products.**

138.    Curriculum Associates admits that it uses student data to develop, market, support, and improve its products for commercial purposes.

139.    Curriculum Associates' products are designed to collect data on every aspect of a student's persona and then aggregate and analyze that data to predict and influence the student's performance and behavior. Those data-derived products are then marketed to Curriculum Associates' current and prospective customers to increase profits for Curriculum Associates.

140.    Curriculum Associates states that it uses student data in the following ways:[12]

    a.    To provide services and make i-Ready available to each student;

    b.    To allow i-Ready to function as an adaptive learning solution;

    c.    To improve its products;

    d.    To generate reports based on students' usage information and provide the reports and services to schools, school districts, educators, and administrators;

    e.    To support its products, including allowing its "Partner Success, Customer Service, and Tech Support" teams to provide services; and

    f.    For research and development purposes, including using it and sharing it for use in research studies and in research regarding the efficacy and development of its products

---

[12] *i-Ready Platform Data Handling and Privacy Statement*, Curriculum Associates, https://www.curriculumassociates.com/support/privacy-and-policies/i-ready-data-handling-privacy (last updated March 7, 2025).

and services.[13]

141.    Plaintiffs allege that Curriculum Associates does what it says: it uses student data in the foregoing ways, including Plaintiffs' personal information. Neither Plaintiffs nor their parents consented to Curriculum Associates using their personal information.

142.    Data flows freely between various Curriculum Associates products in a system designed to continuously collect, analyze, and use student data for personalized instruction and other purposes.

143.    Fueled by its ever-growing trove of student data, Curriculum Associates' suite of cloud-based online products now includes at least eighteen data-extracting and data-derived products. In addition to the Products that are the subject of this Complaint, other products include as follows:

    a.  **i-Ready Learning Games** – a suite of interactive digital mathematics-related activities provided to students based on their performance in assessments or previous games, and a series of reports generated by Curriculum Associates based on assessment results and purporting to provide conclusions and predictions regarding students' skill levels and growth potential.

    b.  **i-Ready Growth Monitoring and Growth Monitoring Reports** – a suite of assessments for students in grades K–8 purporting to determine whether students are likely to meet annual growth goals, and a series of reports generated by Curriculum Associates based on assessment results and purporting to provide conclusions and predictions regarding students' skill levels and growth potential.

    c.  **i-Ready Classroom Mathematics** – assessments and instructional materials purportedly analyzing and developing students' mathematical skills, and reports

---

[13] *See i-Ready Stretch Growth as a Path toward Proficiency*, Curriculum Associates, https://cdn.bfldr.com/LS6J0F7/at/th7652vwgsftmjjbvns3rgk/iready-stretch-growth-executive-summary-BTS-2023.pdf (Nov. 2022).

generated by Curriculum Associates based on assessment results and purporting to provide conclusions and predictions regarding students' skill levels and growth potential.

d. **i-Ready Assessment of Spanish Reading** – assessments purporting to measure Spanish-reading skills for students in grades 7–8, and reports generated by Curriculum Associates based on assessment results and purporting to provide conclusions and predictions regarding students' skill levels and growth potential.

e. **i-Ready Evaluación Diagnóstica de lectura en español** – assessments purporting to measure Spanish-reading skills for students in grades K–6, and reports generated based on assessment results and purporting to provide conclusions and predictions regarding students' skill levels.

f. **Ready Reading** – multiple-day reading comprehension lessons and ongoing assessments to monitor student progress in grades K–8.

g. **Ready Writing** – instructional materials for writing lessons for students in grades 2–5.

h. **Ready Mathematics** – instructional materials and assessments in mathematics for students in grades K–8.

i. **Magnetic Literacy, Magnetic Foundations, and Magnetic Comprehension** – a suite of assessments and lessons that purport to foster different levels of reading skills and literacy, and reports generated by Curriculum Associates providing "clear insights" and "clear, actionable data" collected from students' use of the Products.

j. **BRIGANCE Early Childhood products** – a suite of screening and assessments for young children purportedly revealing children's skills in a variety of subject-matter

42

domains, and reports and instructional materials generated by Curriculum Associates purportedly identifying and addressing the children's strengths and weaknesses.

k. **Stile** – a science curriculum for middle-school children including assessments, "real-time data and insights," interactive activities, lessons, and other materials and services.

l. **CARS/STARS series** – a series of assessments purportedly identifying students' strengths and weaknesses in reading, and a series of instructional materials purporting to address the students' needs based on the results.

m. **CAMS/STAMS series** – a series of assessments purportedly identifying students' strengths and weaknesses in mathematics, and a series of instructional materials purporting to address the students' needs based on the results.

n. **Mosaico Fundamentos por i-Ready** – instructional materials purporting to develop Spanish-reading fluency in young students.

o. **Ellevation** – a software platform combining "real-time student data," progress monitoring, and reporting to purportedly help educators create personalized instruction for English-learning students.

144.    On information and belief, student data collected through Curriculum Associates' products, including the Products that are the subject of this Complaint, is not segregated, and the collection and use of that data is not limited to only the platforms and Products licensed by schools. Rather, Curriculum Associates consolidates student data to create a highly detailed, dynamic profile of each child. In other words, Curriculum Associates' unification of data from multiple sources enables more targeted purported insights and predictions about the student's aptitudes, cognition, and behavior.

145.    Curriculum Associates also uses student data, including Plaintiffs' personal information, to

develop its artificial-intelligence ("AI") technologies, which Curriculum Associates has incorporated and continues to incorporate into its suite of products. For example, in November 2023, Curriculum Associates expanded its AI capabilities by acquiring SoapBox Labs, an AI-powered voice engine incorporating speech-recognition technology into Curriculum Associates' assessment and instructional programs and generating "immediate and granular insights for educators."[14] In August 2025, Curriculum Associates announced the launch of AI Labs Curriculum Associates, its dedicated AI research and innovation team.[15]

146.    Curriculum Associates also purports to reserve an unlimited license to use student data, which includes Plaintiffs' personal information, for its own benefit and without compensation to students.

147.    Specifically, in its terms and conditions, Curriculum Associates purports to grant itself "a worldwide, royalty-free license to use the Customer Data during the term of [the school district's] agreement with Curriculum Associates" and "a worldwide, royalty-free, perpetual license to use the Customer data in de-identified format only for product development, research, and other purposes."[16]

148.    Plaintiffs allege that Curriculum Associates does what it says: it uses "Customer Data," which includes student data, to build, develop, support, improve, and market its products as

---

[14] *Curriculum Associates Expands Student-Focused AI Capabilities with Purchase of Speech-Recognition Leader SoapBox Labs*, Curriculum Associates, https://www.curriculumassociates.com/about/press-releases/2023/11/curriculum-associates-expands-student-focused-ai-capabilities (Nov. 28, 2023).

[15] *About AI Labs*, Curriculum Associates, https://www.curriculumassociates.com/about/ailabs (last visited Oct. 24, 2025).

[16] *i-Ready Connect, i-Ready Classroom, and Teacher Toolbox Digital Products Terms and Conditions of Use*, Curriculum Associates, https://cdn.i-ready.com/instruction/content/system-check/iReady_Terms_Of_Use.pdf (last updated Feb. 22, 2023).

described in its terms of service and privacy policies. Neither Plaintiffs nor their parents consented to Curriculum Associates using their personal information in this manner.

149.    Although Curriculum Associates markets its products, including the Products used by Plaintiffs, as conferring administrative and pedagogical benefits to schools and school districts, these products are undeniably commercial, for-profit products that have enabled Curriculum Associates to build a multibillion-dollar data-analytics company at the expense of student privacy.

> **2.    Curriculum Associates collects, generates, and uses student data to build intimate data profiles.**

150.    Curriculum Associates collects data from students' use of its i-Ready Products, generates further data based on students' performance on assessments and in lessons, and uses all of the student data collected and generated to build intimate data profiles on students.

> **a.    Curriculum Associates uses an adaptive algorithm to collect extensive student data while students' take i-Ready assessments, and uses the student data it collects to further develop the algorithm.**

151.    The i-Ready assessments within the Diagnostic and Standards Mastery Products use an adaptive algorithm to adjust each question dynamically in real time as a student works her way through assessments.[17]  The foundation of this algorithm is a statistical framework known as Item Response Theory ("IRT"), which links probable student success with a student's ability as evaluated by extensive data collected about the student and her performance.

152.    While IRT relies largely on the student's response data to questions, it also analyzes other data, such as the domain, difficulty, and format of the question; information about the student, such

---

[17] *The Science Behind i-Ready's Adaptive Diagnostic*, Curriculum Associates, https://www.setda.org/ls2013/wp-content/uploads/sites/8/2014/12/Adaptive-Diagnostic-Science-SETDA.pdf (last visited November 25, 2025).

as her age and grade level; and second-by-second granular behavioral data, such as her response time, her click sequence and speed, erratic mouse movements or interaction patterns, interruptions, tab or task switching, and other student behavioral data extracted from and about her continuously as she performs her work.

### b. Curriculum Associates generates further student data based on students' performance on assessments and in personalized lessons.

153.    Curriculum Associates creates reports based on student assessments that purport to reveal the student's skill levels, strengths, and weaknesses in several domains within reading and mathematics. The reports further purport to reveal the grade level at which the student is performing. For example, a student may perform "1 grade level below" on a certain domain within the assessment and "mid or above grade level" on another. The reports also purport to reveal how a student's performance compares to their peers. In addition, the reports purport to predict growth potential and make recommendations for further personalized instruction and for grouping the student with other students who share similar strengths and weaknesses.

154.    Curriculum Associates also creates reports based on students' performance on lessons completed in its i-Ready Personalized Instruction Product. The reports include data such as each student's lesson time-on-task, lessons in progress, lessons completed, the percentage of lessons passed in the previous week and year-to-date, and alerts indicating when students need additional support.

**c. Curriculum Associates uses the student data it collects and generates to build intimate data profiles on each student that are used to draw conclusions, make determinations, and make predictions about each student.**

155.    Curriculum Associates uses the data it collects and generates to build a highly detailed profile on each individual student that purports to reflect the student's cognitive ability, behavior, and problem-solving process.

156.    Each i-Ready assessment a student undertakes adds substantial data to a student's data profile. For example, Curriculum Associates collects data regarding how long a student takes to answer each question on an assessment, the difficulty of the question, and whether the student answers the question correctly or incorrectly. By collecting and combining this data, Curriculum Associates adds data to each child's profile that is and can be used to draw a number of conclusions about the child's skills, abilities and behavior.

157.    For example, data showing that a student rushed through questions and answered them incorrectly regardless of the difficulty of the questions could lead Curriculum Associates, educators, and others with whom Curriculum Associates shares student data to conclude, among other possibilities, that a student might be guessing, experiencing attention-deficit issues, becoming easily frustrated, or experiencing a low persistence level. In fact, because i-Ready persistently surveils students while they participate in a diagnostic assessment, the program will alert administrators to perceived abnormal behaviors in real time:



158.    Data showing that a student spent a significant amount of time on questions and still got them wrong despite the difficulty level might lead to conclusions that she has a knowledge gap, a conceptual misunderstanding of the subject matter, or cognitive deficits.

159.    Data showing a decline in performance or sudden change in the time spent per question over the course of the assessment could lead to conclusions that the student became fatigued or lost focus or that the student struggles with her attention span, endurance, or persistence.

160.    Further, data showing that a student spent a short amount of time on each question but answered a significant number of the questions correctly, even difficult questions, could lead to a conclusion that the student is academically gifted, or conversely, that the student cheated.

161.    Data showing students' scores in each subject-matter domain (i.e., number and operations, algebra and algebraic thinking, measurement and data, and geometry) also adds further specific detail to a child's profile. The data allows for a comparison and analysis of the student's strengths and weaknesses in some domains over others. For example, data may reveal that a child excels in algebra and algebraic thinking but struggles in geometry.

162.    Curriculum Associates further adds to student profiles with data about how targeted interventions—the personalized instruction offered by Curriculum Associates—succeed or fail with respect to each child. For example, if a child undertakes lessons designed to help them with a purported weakness shown on an assessment but still struggles in that subject matter on the next assessment, conclusions can be drawn about the student's comprehension or other abilities.

163.    Over time, each child's profile becomes more robust. Curriculum Associates continues to add to each profile by collecting and generating data over the span of several years through repeated measures of the same students, using consistent or psychometrically equivalent assessments, and tracking students' performance on personalized lessons. The student profiles can then reveal trends and patterns, such as consistent strengths, persistent struggles, knowledge retention, or knowledge gaps, and can be used to identify learning disabilities, comprehension challenges, placement in advanced curricula, and grade-level retention. Indeed, CA intends that school personnel rely on its algorithmically derived predictions and insights in making these determinations.[18]

164.    Thus, using a student's dynamic, deeply sensitive digital profile, Curriculum Associates purports to make—and encourages educators to make—powerful inferences and predictions about the student's knowledge, understanding, and engagement with the subject matter. Beyond a simple right-or-wrong analysis, this academic and behavioral data is used to generate insights into the student's thought process, behavior, and learning habits and make predictions of the student's skill levels and growth potential.

---

[18] *Common Uses for i-Ready Assessments, Curriculum Associates*, https://www.curriculumassociates.com/reviews/assessment/assessment-uses (last visited Nov. 26, 2025); *Using i-Ready Diagnostic for Retention Decisions*, Curriculum Associates, https://cdn.bfldr.com/LS6J0F7/at/vhw3fmf6sjw3gwtk8qznm4g/ireadyretentionguidance.pdf (Aug. 2024).

165.    Such highly invasive logs of a students' thought processes and struggles—made possible only by continuous and granular surveillance—far exceed the scope of traditional "education records."

### 3. Curriculum Associates shares student data with third parties for commercial purposes.

166.    Curriculum Associates discloses students' personal information to a host of third parties, including schools and educators, but also private companies for commercial purposes, such as "affiliates" and investors.

167.    Curriculum Associates also discloses personal information with other third parties, including so-called vendors, subprocessors, or service providers for various purposes, including:

    a.  hosting;

    b.  information technology;

    c.  customer support;

    d.  data security;

    e.  consumer research services;

    f.  educational research services; and

    g.  to obtain analytics and other information regarding traffic on its products.

168.    Curriculum Associates does not disclose to Parents the identities of the vendors, subprocessors, or service providers who have received their children's data, what student data it shares with those third parties, or how those third parties use student data, in violation of COPPA.

169.    One of Curriculum Associates' so-called subprocessors includes Munetrix, which analyzes student data to create "actionable insights." Curriculum Associates "automatically" shares student

assessment data with Munetrix via an SFTP data file connection.[19]

170.    Curriculum Associates also partners with 6sense for marketing and advertising purposes, but it does not disclose any information about its partnership with 6sense in its terms or privacy policies. 6sense is a data broker, a company that collects, aggregates, and sells personal information about individuals to other businesses or organizations.[20]

171.    Neither Plaintiffs nor their parents consented to Curriculum Associates disclosing their personal information to any third-party subprocessor, vendor, or service provider.

172.    In addition to sharing personal information with subprocessors, vendors, and service providers, Curriculum Associates discloses personal information through expansive data-sharing agreements with numerous third-party companies.

173.    Whether through a data-sharing agreement or through another arrangement, Curriculum Associates also shares extensive student-assessment and student-instruction data and usage metrics with Google, as revealed by forensic analysis of the use of its i-Ready Products and explained in detail in the next section of this Complaint. Curriculum Associates does not disclose that it shares student data with Google in any of its terms or privacy policies.

174.    This sharing of student data commercially benefits both Curriculum Associates and its third-party partners.

175.    Its primary value to third-party partners depends on maximizing access to student data.

176.    Data exchanged through these partnerships—which includes Plaintiffs' personal

---

[19] *Clever + i-Ready: Setup guide & rollover process*, Clever, https://support.clever.com/s/articles/000001641?language=en_US (last visited Oct. 24, 2025).

[20] *Data Broker Registration for 6Sense Insights, Inc.*, State of California Department of Justice, Office of the Attorney General, https://oag.ca.gov/data-broker/registration/563658#:~:text=Data%20Broker%20Name:,submit%20requests%20under%20the%20CCPA: (last visited Dec. 3, 2025).

information—enables Curriculum Associates and its partners to develop, improve, expand, deliver, support, market, and sell their products and services.

177.    Curriculum Associates shares data directly with its partners through an Application Programming Interfaces "API" technology."[21] An API is how third parties interact programmatically with Curriculum Associates products.

178.    Specifically, Curriculum Associates integrates with the Aeries Support platform, enabling Aeries to access student data through REST API technology, which facilitates automatic syncing of student data and third-party applications, eliminating the need for periodic, manual data transfers.[22]

179.    One such partner is Clever, a single-sign-on platform that facilitates integration of school information systems with platforms such as i-Ready.[23] At all times relevant to this Complaint, Plaintiffs' schools used Clever. Thus, Curriculum Associates granted Clever access to their data, which, on information and belief, included at least their first and last name, school district, school, student-identification-system ID, student number, State ID, date of birth, grade level, and class

---

[21] *iReady (Curriculum Associates) Integration*, Aeries Support, https://support.aeries.com/support/solutions/articles/14000151591-i-Ready-curriculum-associates-integration (last modified Jan. 8, 2025); *Aeries API Full Documentation*, Aeries Support, https://support.aeries.com/support/solutions/articles/14000077926 (last modified Sept. 22, 2025); *List of Third Party Vendors who Integrate with Aeries*, Aeries Support, https://support.aeries.com/support/solutions/articles/14000089971-list-of-third-party-vendors-who-integrate-with-aeries (last modified Oct. 21, 2025).

[22] *iReady (Curriculum Associates) Integration*, Aeries Support, https://support.aeries.com/support/solutions/articles/14000151591-i-Ready-curriculum-associates-integration (last modified Jan. 8, 2025).

[23] *Curriculum Associates Partners with Clever to Add 5-Minute SIS Integration to i-Ready*, Curriculum Associates, https://www.curriculumassociates.com/about/press-releases/2013/03/ca-partners-with-clever-to-add-5-minute-sis-integration-to-i-ready (March 17, 2013).

enrollments.[24] This data was transmitted in real time through Curriculum Associates' API.

180.    Curriculum Associates integrates with several other third-party products, including Blackboard by Finalsite and Schoology by PowerSchool[25]—other products used by Plaintiffs' schools.

181.    This data sharing commercially benefits both Curriculum Associates and the third parties with which Curriculum Associates shares data. The companies all monetize the data in numerous ways, such as by using it to develop and enhance their own products, facilitate greater data analytics and "user insights," improve internal operations, or more effectively target their marketing efforts and attract new customers. These types of indirect data monetization can be at least as valuable to a company as directly monetizing it through the sale of raw or aggregated data.

182.    Neither Plaintiffs nor their parents consented to Curriculum Associates disclosing their personal information to any third party. Curriculum Associates was not permitted to rely on the consent of schools alone or flout the law of consent altogether before making Plaintiffs' personal information available to wide-ranging third parties. Plaintiffs and their parents were denied the choice as to whether to permit Curriculum Associates or any other company to use their personal information to fuel this highly profitable, industry-wide, data-sharing ecosystem.

### 4.    Forensic analysis revealed that Curriculum Associates shares Plaintiffs' data with third parties in real time.

183.    Forensic analysis of i-Ready Products used by M.C. 3 and M.C. 4, and monitoring the hypertext transfer protocol ("HTTP") traffic generated by Curriculum Associates' Products reveal

---

[24] *Clever + i-Ready: Setup guide & rollover process*, Clever, https://support.clever.com/s/articles/000001641?language=en_US (last visited Oct. 24, 2025).

[25] *i-Ready Connect, i-Ready Classroom, and Teacher Toolbox Digital Products Terms and Conditions of Use*, Curriculum Associates, https://cdn.i-ready.com/instruction/content/system-check/iReady_Terms_Of_Use.pdf (last updated Feb. 22, 2023).

that Curriculum Associates generates, records, and transmits information about Plaintiffs to third parties in real time as they use its Products.

184. The third-party recipients of information belonging to Plaintiffs include advertising companies, marketing companies, and identity-resolution companies.

185. The categories of student information being generated, recorded, duplicated, and transmitted to third party companies, and the identity of the third parties with which that information is shared, are determined by each Curriculum Associates product and are typical of all student accounts.

186. Because they vary by product, the categories of information being generated, recorded, duplicated, and transmitted to third party companies do not vary by user, their school, or their school district. In other words, every user of a given Curriculum Associates product is subject to the same data practices regardless of their identity, school, or location.

187. Forensic testing was conducted within the i-Ready Personalized Instruction Product on M.C. 3's Chromebook and within the i-Ready Diagnostic Assessment Product on M.C. 4's iPad.

188. Curriculum Associates' Diagnostic and Personalized Instruction Products generate, record, and transmit personal information about students in real time to third parties, without the knowledge or consent of the students or their Parents.

189. When a student interacts with the i-Ready platform for a diagnostic assessment or a personalized-instruction lesson, those interactions cause information about the student and the student's activity to be generated, recorded, and instantaneously transmitted to third parties outside of Curriculum Associates.

190. Google is one of those third parties.

### a. Google's mass advertising surveillance operation

191.    Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives. This information is then used as fuel for a massive, targeted advertising enterprise.

192.    Thus, any information about a person captured by these online behemoths can be used to stream ads to that person, among other uses. If Google receives information that a person is struggling with a school subject, it will collect that information and allow its clients to use that information to stream ads related to tutoring services and related products to that person's computers and smartphones.

193.    Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools").

194.    Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

195.    But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including tracking pixels ("Pixels") and third-party cookies that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user called a Client ID ("CID"), regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, information entered into an online

form by a website user, and the device characteristics of a website user's phone or computer.

196.    In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.

197.    Curriculum Associates is one of the companies that has chosen to prioritize its marketing efforts and profits over the privacy of the minor students using its Products by installing Google's Tracking Tools on its Products, including i-Ready.

198.    Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[26]

199.    In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[27]

200.    Google advertises Google Analytics and other Business Tools to website operators, like Curriculum Associates, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[28]

201.    But, in order for website operators to get information from Google Analytics about their

---

[26] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively.

[27] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Sept. 7, 2025).

[28] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Sept. 7, 2025).

website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[29]

202.    Moreover, as Curriculum Associates does not disclose its use of Google's Tracking Tools, Plaintiffs and Class members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Products.

203.    Google aggregates the user information that it collects from third-party websites into "advertising profiles" consisting of all of the data that it has collected about a given user.[30]

204.    With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, education level, use of specific apps or websites, and more.[31]

205.    This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmit, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[32]

206.    In fact, Google values user information so highly that it provides its Business Tools to many

---

[29] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Sept. 7, 2025).

[30] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[31] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Sept. 7, 2025).

[32] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Sept. 7, 2025).

website operators for free, all to expand its surveillance apparatus.[33]

207.    When website operators, like Curriculum Associates, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy.

208.    For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[34]

209.    Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[35]

210.    And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[36]

211.    Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours—or 30.5

---

[33] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Mar. 7, 2025) ("Google Analytics gives you the tools, free of charge"),

[34] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Mar. 7, 2025).

[35] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[36] *Id.*

working days—to read the privacy policy of every new website that they visited in a single year.[37]

### b. Pixels Can Record Almost Every Interaction Between a User and a Website.

212.    In order to use Google's Business Tools, Curriculum Associates installed Google's Tracking Tools, including tracking Pixels, onto the Website.

213.    Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[38]

214.    Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the text entered by the user into a website search bar, and even the information provided by the user on an

---

[37] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[38] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Sept. 7, 2025).

online form—all transmitted in real-time as the user navigates a website.[39]

215.    But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third-party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[40]

### c.  The Pixels installed on the Products transmit confidential and personally identifiable information to Google.

216.    Every website is hosted by a computer "server" that holds the website's contents.

217.    To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.

218.    Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

219.    Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual

---

[39] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Sept. 7, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Sept. 7, 2025).

[40] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Sept. 7, 2025).

Requests and Responses.

220.    A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information—the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

221.    Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as "cookies" on the user's device.[41] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[42] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[43]

222.    When a Google user logs onto their account, their web browser records a Google tracking cookie.[44] This cookie includes a specific line of code that links the web browser to the user's Google account.[45]

223.    Google's Pixels use cookies but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user. The information can include details about the user, his or her interactions with

---

[41] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Sept. 7, 2025).

[42] *Id.*

[43] *Id.*

[44] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[45] *Id.*

the website, and information about the user's environment (e.g., type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

224.    Simultaneously, the Google Pixels, like those installed on the Products, request identifying information from any Google cookies previously installed on the user's web browser.

225.    The Pixels then combine the data received from the browser with the data acquired from the cookie and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels to the user's identity, via the user's Google profile. Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

226.    A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[46] When these users visit a website, like those on which the Website has been installed, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

227.    M.C. 1, M.C. 2, M.C. 3, and M.C. 4 all have Google profiles because their schools require that they use Google Classroom. Every user of Google Classroom has a Google profile.

228.    However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods

---

[46] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Mar. 7, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Sept. 7, 2025).

to identify even those few users who do not have a Google account.[47]

229.    Google's Pixels, like those on the Curriculum Associates Products, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

230.    An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[48] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[49] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

### d. Curriculum Associates disclosed Plaintiffs' and Class members' confidential and personally identifiable information to Google.

231.    When a student loads the i-Ready home page on a web browser, the page-load user action automatically triggers Google Analytics and Google Tag Manager, which are marketing and tracking tools operated by Google. These tools collect, create, and transmit information about the student to Google's servers in real time, without any intervening action by the student.

232.    i-Ready causes student information to be sent to Google every time a student loads an i-Ready page, including the student dashboard and lesson pages.

233.    For students who use Chromebooks, such as M.C. 3, i-Ready causes student information to be sent to Google every time the student interacts with i-Ready. This includes both (a) content

---

[47] *See Client ID vs User ID in Google Analytics*, GLIDE AD AGENCY, https://glideagency.com/client-id-vs-user-id-in-google-analytics/ (last visited Sept. 23, 2025).

[48] Cyphers, *supra*, n.44.

[49] *Id.*

of student communications and interactions with the instructional software—such as lesson content, grade level, subject matter, activity status, and assessment results—and (b) addressing and routing information, such as persistent unique identifiers that Google uses to create longitudinal profiles about individual students, including M.C. 3.

234.    Forensic analysis of M.C. 3's i-Ready account and Chromebook network traffic shows that when M.C. 3 accessed i-Ready, Google Analytics transmitted two categories of data packets to Google: (a) a first category containing multiple unique user identifiers, including the "cid" (Client ID), the "_gid" (Google Analytics identifier), the "jid" (Join ID), and the "a" parameter; and (b) a second category containing the Google Tag Manager Tag ID associated with the i-Ready implementation.

235.    As to the first category of packets, the cid (Client ID) and _gid parameters function as persistent identifiers that allow information associated with a student's interactions with i-Ready to be linked together over time. The cid is the primary identifier used by Google Analytics to associate multiple page views, lesson interactions, and instructional events with the same browser instance across a session and across multiple sessions. The _gid parameter further enables Google to associate and aggregate real-time interaction data originating in i-Ready with other data associated with the same identifier that originated in other applications, websites, or services used by the student. In this way, Google can assemble a unique, longitudinal profile of the student.

236.    The i-Ready Products automatically generate, collect, and transmit information about how a student interacts with i-Ready in real time while the student is using the Products. Using Google Analytics and Google Tag Manager, i-Ready associates that information with persistent identifiers such as the cid and _gid parameters and simultaneously transmits that information to Google while it is in transit, enabling Google to link discrete instructional events to the same student browser

over time.

237.    The student information associated with the cid and _gid parameters and transmitted to Google in real time includes, among other things: which pages within Curriculum Associates' Products the student visits; how long the student remains on those pages; the origin of the visit, including whether the student arrived from Clever or another website; the number of sessions and engagement time; and device and browser information, including the type of device used and the operating system.

238.    The cid and _gid parameters are vital to Google's ability to collect real-time interaction data and to generate student-specific insights regarding a student's performance, aptitudes, engagement, and behavioral patterns over time. By transmitting these identifiers with each analytics event, Google is able to stitch together lesson loads, activity starts, resumptions, completions, and outcomes into a coherent record associated with the same student browser, including M.C. 3.

239.    The jid parameter, or Join ID, is a unique user identifier that joins user information originating in the i-Ready Products and collected through Google Analytics with the DoubleClick cookie, a proprietary Google advertising cookie.

240.    Joining Google Analytics data with the DoubleClick cookie in this manner makes the uniquely identified student's information available to Google's DoubleClick advertising infrastructure and, on information and belief, allows the student to be targeted, categorized, or profiled for advertising-related purposes.

241.    The "a" parameter is a unique user identifier that joins user information originating in the i-Ready Products and collected through Google Analytics with the AdSense cookie, another proprietary Google advertising cookie.

242.    Joining Google Analytics data with the AdSense cookie in this manner makes the uniquely identified student's information available to Google's AdSense systems and, on information and belief, allows Google to monetize advertisements directed to, or informed by, the student's activity, characteristics, and inferred interests.

243.    As to the second category of packets, the Google Tag Manager Tag ID transmitted by i-Ready functions as an additional tracking identifier and, when used in conjunction with other identifiers such as the cid and _gid, can be used to recognize and distinguish a specific student browser instance across multiple interactions with the i-Ready platform.

244.    On information and belief, Google combines user information originating in the i-Ready Products—including data linked by the cid, _gid, jid, and related identifiers—with other information it has received from Google-owned properties and services into a unique, longitudinal profile of student users, which Google uses for its own independent purposes, separate from and unrelated to the educational services provided to Curriculum Associates.

245.    Forensic analysis of M.C. 3's i-Ready account further shows that, during a single instructional session, i-Ready caused M.C. 3's browser to transmit multiple Google Analytics event-level payloads to Google endpoints at www.google-analytics.com, including both Google Analytics 4 collection endpoints (/g/collect) and legacy Universal Analytics endpoints (/j/collect).

246.    Representative examples of the Google Analytics transmissions described above—including transmissions disclosing a student's grade level, lesson name, and persistent Google identifiers—are reproduced below:

```
https://www.google-analytics.com/g/collect?v=2

&tid=G-0VS5702RCS

&cid=[REDACTED]

&dl=https://login.i-ready.com/student/dashboard/home
```

```
&dr=https://clever.com/

&en=page_view

&ep.dimension7=Determine Word Meanings Using Context
Clues 4

&ep.dimension9=Grade 5

&ep.page=/student/lesson?channel=MAIN&lesson=Determine
Word Meanings Using Context Clues 4&level=Grade
5&subject=ela&track=Vocabulary&type=HTML_LESSON


https://www.google-analytics.com/j/collect?v=1

&a=[REDACTED]

&t=pageview

&dl=https://login.i-ready.com/student/dashboard/home

&dr=https://clever.com/

&cid=[REDACTED]

&tid=UA-24034912-4

&_gid=[REDACTED]

&jid=[REDACTED]
```

247.   These transmissions identified specific Google Analytics properties receiving the data, including GA4 measurement identifiers associated with i-Ready and Clever. Each transmission included a persistent Client ID (cid) and, in many instances, a session identifier (sid), allowing Google to associate all events, page views, and instructional interactions occurring during the session with the same uniquely identifiable student browser.

248.   The transmitted analytics payloads included full page URLs and referrer URLs, revealing

that M.C. 3 accessed i-Ready through Clever single sign-on and subsequently navigated within the i-Ready student dashboard and lesson interfaces. The transmitted URLs disclosed the precise i-Ready paths accessed by M.C. 3, including student dashboard pages, lesson pages, and progress summary pages.

249.    Forensic analysis of M.C. 3's i-Ready account confirms that i-Ready transmitted to Google detailed instructional metadata through custom Google Analytics event parameters and dimensions, including the specific lesson title, lesson type, subject area, instructional track, and grade level associated with M.C. 3's activity. For example, transmissions included structured fields identifying the lesson "Determine Word Meanings Using Context Clues 4," the subject "ELA," the instructional track "Vocabulary," the lesson type "HTML lesson," and the grade level "Grade 5"—the latter of which directly communicates to Google that M.C. 3 is a minor.

250.    i-Ready further transmitted to Google a sequence of instructional lifecycle events reflecting M.C. 3's progression through the lesson, including events indicating that the lesson was loaded, that the instructional activity was started, that the activity was resumed after interruption, and that the activity was completed. These events were transmitted in real time and associated with the same persistent identifiers used throughout the session.

251.    Forensic analysis of M.C. 3's i-Ready account also shows that i-Ready transmitted performance-related outcome data to Google. Specifically, Google Analytics event payloads included completion outcome indicators reflecting that M.C. 3 completed the lesson activity and achieved a recorded result, such as a passing score. This outcome data was transmitted alongside lesson identifiers, grade-level information, and persistent user identifiers.

252.    In addition to instructional content and outcomes, i-Ready transmitted behavioral and engagement metrics to Google, including scroll depth, engagement duration, and time-on-task

measurements. These metrics allow Google to infer how M.C. 3 interacted with instructional content, how long M.C. 3 remained engaged, and how M.C. 3 progressed through educational material.

253.    All of the foregoing data—including persistent identifiers, device and browser characteristics, URLs, lesson metadata, instructional events, engagement metrics, and performance outcomes—was transmitted to Google in real time, linked together by persistent identifiers, and capable of being aggregated by Google into a detailed, longitudinal profile of M.C. 3's educational activity, behavior, and performance that it combines with other data about that child—all for Google's own benefit, including the monetization of that data for myriad purposes, such as targeted advertising.

### E. Curriculum Associates fails to obtain effective consent for its sweeping generation, extraction, use, and disclosure of students' personal information.

254.    A party seeking to raise consent as a defense to alleged tortious conduct has the burden of proving that it obtained effective consent.

255.    Effective consent may be express or implied, but it must be actual.

256.    Before generating, collecting, using, and sharing student data, including Plaintiffs' data, Curriculum Associates fails to obtain informed, voluntary consent from a person with authority.

257.    Specifically, any purported consent obtained by Curriculum Associates is ineffective because (1) Curriculum Associates both fails to provide its terms and policies to Parents and fails to disclose sufficient information about its data practices to support informed consent; (2) student use of Curriculum Associates' Products is not voluntary; and (3) such consent is not obtained from a person with authority to provide consent to Curriculum Associates' collection, use and disclosure of student information.

### 1.    Any purported consent was not informed.

258.    For consent to be effective, it must be informed, meaning the aggrieved person must have sufficient knowledge of the nature of the act or transaction to make an educated decision.

259.    Further, before collecting personal information from children under 13, COPPA requires a company to provide parental notice of its data practices that is "clearly and understandably written, complete" and contains "no unrelated, confusing, or contradictory materials."

260.    Curriculum Associates does not provide students or their Parents any notice of its data practices before collecting student data.

261.    Students do not create their Curriculum Associates accounts; school personnel do. Accordingly, personnel at Plaintiffs' schools created their iReady accounts.

262.    Curriculum Associates also does not provide the terms and policies that govern its data practices to students or Parents. Accordingly, neither Plaintiffs nor their parents received notice of Curriculum Associates' data practices before Plaintiffs began using its Products.

263.    Thus, neither Plaintiffs nor their parents received *any* information necessary to support informed consent.

264.    Even if Curriculum Associates had provided Plaintiffs' parents its terms and policies, Plaintiffs' parents would not have been able to understand them because they offer only general, vague statements with few specific information or details.[50] For example, Curriculum Associates makes the general statements that "certain assessment results and usage metrics" are created from

---

[50] *i-Ready Connect, i-Ready Classroom, and Teacher Toolbox Digital Products Terms and Conditions of Use*, Curriculum Associates, https://cdn.i-ready.com/instruction/content/system-check/iReady_Terms_Of_Use.pdf (last updated Feb. 22, 2023); *Privacy and Policies*, Curriculum Associates, https://www.curriculumassociates.com/support/privacy-and-policies (last visited Oct. 24, 2025); *Privacy Statement*, Curriculum Associates, https://www.curriculumassociates.com/support/privacy-and-policies/policy (last modified Jan. 1, 2023).

students' use of i-Ready Products and that it uses the results and metrics in various ways, such as "for services" and "to make i-Ready available to its customers," but it does not define or provide any details or specific information about what results and usage metrics are collected or the ways in which they are used and shared.[51] Curriculum Associates also states that it "provides reporting capabilities to its educator customers" and generates the reports "based on i-Ready usage information" but does not identify or provide details as to what usage data is gathered, what types of reports are generated, or what is included in the reports.[52] It also fails to explain, in terms a reasonable Parent could understand, what data profiling is, how those profiles are used, and the risks those profiles pose to students.

265.    Therefore, even if a Parent was notified that their child would be using Curriculum Associates' Products at school, it would be impossible for that Parent to understand its data practices as necessary to support informed consent to those practices on behalf of their child.

### 2. Any purported consent was not freely given.

266.    For consent to be effective, it must be freely given.

267.    Every state has compulsory education laws.

268.    Schools use i-Ready Products to support a host of pedagogical and administrative functions.

269.    Students whose schools use those Products, including Plaintiffs, are required to use them. Parents are not asked for permission for their children to use its Products, nor are they given an opportunity to refuse to consent to Curriculum Associates' data practices.

---

[51] *i-Ready Platform Data Handling and Privacy Statement*, Curriculum Associates, https://www.curriculumassociates.com/support/privacy-and-policies/i-ready-data-handling-privacy (last updated March 7, 2025).

[52] *Id.*

270.    Further, Curriculum Associates may not place students and their Parents in the position of having to choose between their right to privacy and their right to an education. Nor may Curriculum Associates place students and their Parents at risk of compromising their relationship with their teachers and school administrators or the quality of the education their children receive. Such inherently coercive circumstances do not support freely given consent: to be effective, consent must be as easy to withhold or revoke as it is to provide.

271.    Use of i-Ready Products under these circumstances would not lead a reasonable person to believe that a student or their Parent had freely consented to Curriculum Associates' data practices.

### 3.  Any purported consent was not obtained by a person with authority.

272.    A party seeking to raise consent as a defense to alleged tortious conduct has the burden of proving that it obtained effective consent.

273.    For consent to be effective, it must be obtained from the aggrieved person or a person authorized to consent on their behalf. For minors, that is a Parent.

274.    In addition to general consent requirements, COPPA contains heightened parental-consent requirements that Curriculum Associates must meet before it may collect, use, or share personal information from children under 13. Specifically, COPPA requires that Curriculum Associates provide Parents notice that is clearly and understandably written, complete, and contains no unrelated, confusing, or contradictory materials, including a list of specific notice requirements with which Curriculum Associates does not comply. It further requires the company to "obtain verifiable parental consent before any collection, use, or disclosure of personal information from children, including consent to any material change in the collection, use, or disclosure practices to which the Parent has previously consented."

275.    Curriculum Associates has never obtained, and does not purport to obtain, consent from

students or their Parents before it takes, uses, and shares students' personal information, including that of Plaintiffs. Nor does it comply with heightened notice-and-consent requirements of COPPA.

276.    Instead, Curriculum Associates relies on the consent of schools alone.

277.    No personnel at Plaintiffs' respective schools had authority to consent to Curriculum Associates' data practices on students' behalf in lieu of their Parents.

278.    School personnel are not Plaintiffs' legal guardians.

279.    Plaintiffs' schools do not own Plaintiffs' personal information.

280.    Plaintiffs have significant privacy and property rights in their own personal information.

281.    Plaintiffs' schools could not and cannot legally consent—in lieu of Plaintiffs or over their objections—to the disclosure of their personal information by Curriculum Associates, even if such disclosure may confer a benefit upon schools that is administrative, pedagogical, or otherwise, or even upon students themselves.

282.    Plaintiffs' schools do not control the generation, collection, storage, use, or disclosure of Plaintiffs' personal information by Curriculum Associates or any third party to which Curriculum Associates grants access to Plaintiffs' personal information.

283.    Curriculum Associates does not require or obtain proof that students or Parents have authorized their respective schools to act as their agent or intermediary to provide consent on their behalf.

284.    Curriculum Associates did not require or obtain proof that Plaintiffs authorized their respective schools to consent on their behalf as their agent or intermediary, and Plaintiffs did not provide any such authorization.

285.    Curriculum Associates has thus generated, collected, used, and disclosed Plaintiffs' personal information to third parties without effective consent, and it continues to do so.

**F. Curriculum Associates makes false and misleading statements about its data practices.**

286.    Curriculum Associates makes false and misleading statements about its data practices and the law on which it intends school personnel to rely in order to avoid seeking parental consent and to keep Parents in the dark.

1.    **Curriculum Associates falsely states that COPPA does not require schools to obtain parental consent before providing data to Curriculum Associates.**

287.    In its privacy policies, Curriculum Associates falsely states that "[b]ecause i-Ready is only used in the context of school-directed learning, schools are not required to obtain parental consent under COPPA to provide us with this data[.]"

288.    In fact, COPPA in no way governs schools. COPPA is silent as to schools. Rather, COPPA expressly governs private companies like Curriculum Associates. Further, COPPA requires companies like Curriculum Associates to obtain parental consent before taking, using, or sharing the personal information of children under 13.

289.    In its privacy policies, Curriculum Associates falsely states that it complies with COPPA.[53]

290.    In fact, Curriculum Associates violates numerous provisions of COPPA. With respect to children under 13, Curriculum Associates:

a.    fails to provide Parents with complete, understandable notice of its data practices, including when its terms and policies materially change;

b.    fails to obtain verifiable parental consent before taking, using, and disclosing children's

---

[53] *i-Ready Platform Data Handling and Privacy Statement*, Curriculum Associates, https://www.curriculumassociates.com/support/privacy-and-policies/i-ready-data-handling-privacy (last updated March 7, 2025); *Privacy Statement*, Curriculum Associates, https://www.curriculumassociates.com/support/privacy-and-policies/policy (last modified Jan. 1, 2023).

personal information;

c.  fails to provide Parents access to and control over their children's personal information or explain how that information has been used and shared;

d.  collects far more information than is necessary for student participation in school activities; and

e.  retains student information for longer than permitted.

291.  Curriculum Associates intends that schools rely on its false statements to avoid seeking parental consent and parental scrutiny.

## 2. Curriculum Associates falsely states that schools may use its Products in compliance with FERPA.

292.  Curriculum Associates falsely states that it obtains and collects student data "pursuant to the school official exception under FERPA."[54]

293.  In fact, Curriculum Associates' data practices do not comport with FERPA, which requires that schools obtain parental consent before disclosing certain student information to any third party. The "school official" exception to this requirement permits a *school* to release "education records" to "other school officials" under limited circumstances: the "school official" must (1) perform an institutional service or function for which the school would otherwise use employees; (2) be under the direct control of the school as to the use and maintenance of education records; and (3) not redisclose any personally identifiable information from education records without prior parental consent.

294.  The school-official exception does not absolve Curriculum Associates of its duty to obtain

---

[54] *i-Ready Platform Data Handling and Privacy Statement*, Curriculum Associates, https://www.curriculumassociates.com/support/privacy-and-policies/i-ready-data-handling-privacy (last updated March 7, 2025).

parental consent before generating, collecting, using, or disclosing student data for numerous reasons:

   a.  FERPA regulates schools, not private companies;

   b.  Curriculum Associates generates and takes student data directly from students;

   c.  Curriculum Associates' student data practices are not directly controlled by schools;

   d.  Curriculum Associates obtains information far beyond "education records;"

   e.  Curriculum Associates uses data for commercial purposes; and

   f.  Curriculum Associates rediscloses student information to numerous third parties without first obtaining parental consent.

295.   Further, students retain significant, legally protected privacy interests in their personal information contained within education records, including those disclosed by schools to third parties under the school-official exception.

### 3. Curriculum Associates makes misleading statements about its disclosure of student-assessment results and usage metrics.

296.   Curriculum Associates states that "certain assessment results and usage metrics" are created when students use i-Ready Products and that "[w]hile teachers and school administrators are able to access student information and related i-Ready usage data, this information is not made available to other students or the public."[55]

297.   However, forensic analysis of i-Ready Products used by M.C. 3 and M.C. 4 and monitoring of the hypertext transfer protocol ("HTTP") traffic generated by Curriculum Associates' Products reveals that Curriculum Associates in fact shares the student-assessment results and usage metrics

---

[55] *i-Ready Platform Data Handling and Privacy Statement*, Curriculum Associates, https://www.curriculumassociates.com/support/privacy-and-policies/i-ready-data-handling-privacy (last updated March 7, 2025).

with Google, as explained in detail earlier in this Complaint.

298.    While it may be accurate to state that the student data and usage metrics are not shared with "other students" or "the public," Curriculum Associates intentionally misleads Parents, educators, and others by omitting the companies, including Google, with which it does indeed share the information.

299.    Curriculum Associates intends that schools rely on its false statements to avoid seeking parental consent and parental scrutiny.

300.    All the foregoing false and misleading statements are made by Curriculum Associates on a company-wide and nationwide basis: they are included in its publicly available privacy policies, as well as its agreements with schools and school districts, which are developed in and emanate from its principal place of business in Massachusetts.

### G. Curriculum Associates' nonconsensual data practices harm students, including Plaintiffs.

301.    Curriculum Associates' surreptitious data practices are not benign. Rather, they harm children, including Plaintiffs, in myriad ways that are immediate, long-lasting, and substantial.

### 1. Curriculum Associates harms children, including Plaintiffs, by invading their privacy.

302.    A person's right to privacy begins with protection from having information created about them in the first instance.

303.    The right to privacy encompasses the person's right to control information concerning his or her person. Loss of such control harms a person's ability to, for example, manage and minimize risk.

304.    Curriculum Associates' data practices violate children's fundamental right to privacy. They

forever wrest from children and their Parents control over children's personal information, including the right to determine whether such information is created in the first place.

305.    Curriculum Associates collects, uses and discloses personal information about school-aged children—for the commercial benefit of itself and numerous third parties—from data it takes from students while they use Curriculum Associates' Products as part of their legally required education.

306.    Curriculum Associates also uses student data to build highly detailed and dynamic psychographic profiles of students to predict and influence their behavior. Such intimate surveillance and profiling are inherently antithetical to a child's right to privacy.

307.    That Curriculum Associates targets minors in a compulsory environment and without parental notice or consent is conduct that is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

### 2. Curriculum Associates harms children, including Plaintiffs, by compromising the security of their personal information.

308.    By collecting and storing children's personal information, including Plaintiffs' personal information—and by creating information about them that did not previously exist, such as digital profiles that purport to predict their future performance and behavior—Curriculum Associates forever jeopardizes that information by making it vulnerable to a host of data security risks.

309.    Rates of cybercrime are steadily rising, including numerous data breaches that affect a host of consumers and their personal information.

310.    Schools and school districts have been particularly and increasingly targeted by cybercriminals in recent years, which has resulted in leaks of highly personal information about children, which in some cases have been made publicly available by the perpetrators.

311.    In fact, another widely used education-technology company was hacked in

December 2024, compromising the personal information of tens of millions of students dating back four decades.[56]

312.    Such exposure can have immediate and long-term consequences for children. As explained by one cybersecurity professional, whose son's school was hacked, "It's your future. It's getting into college, getting a job. It's everything."[57]

313.    Curriculum Associates' sweeping, invasive, and indiscriminate data practices unduly compromise the security of children's personal and private information.

314.    Children's data is further compromised by Curriculum Associates' practice of sharing that information with a multitude of third parties. And the resulting harms and risks of harms are exacerbated by the sheer volume of data collected and the number of entities that receive access to it. Once such data is unlawfully obtained, the harms are irreversible.

315.    In sum, Curriculum Associates' data practices harm children from the moment their personal information is generated or otherwise obtained by Curriculum Associates.

316.    That harm is exacerbated by Curriculum Associates' persistent storage, use, and disclosure of that information to its vast network of partners.

### 3. Curriculum Associates harms children by affecting their access to information, opportunities, and other basic rights through algorithmic profiling.

317.    As described herein, Curriculum Associates uses student data to digitally profile students

---

[56] TechCrunch, Malware stole internal PowerSchool passwords from engineer's hacked computer, https://techcrunch.com/2025/01/17/malware-stole-internal-powerschool-passwords-from-engineers-hacked-computer/.

[57] Natasha Singer, *A Cyberattack Illuminates the Shaky State of Student Privacy*, The New York Times (July 31, 2022), https://www.nytimes.com/2022/07/31/business/student-privacy-illuminate-hack.html.

and create products that purport to analyze, predict, and influence student performance and behavior.

318.    Curriculum Associates markets these analytics to its customers for use in wide-ranging decision-making about children, a practice known as algorithmic profiling. Such analytics purport to help teachers and administrators "personalize" a child's curriculum and learning plan, understand a child's strengths and weaknesses, identify a student's individual education goals, formulate plans for reaching those goals, and a host of other predictions and recommendations for purportedly better management of the child.

319.    Curriculum Associates' algorithms attempt to gather children's knowledge, understanding, development, and potential to reduce them to quantifiable analytics. In doing so, attributes that benefit children, such as accuracy, nuance, and privacy, are sacrificed in favor of those that benefit Curriculum Associates, such as efficiency, measurability, and scalability.

320.    Curriculum Associates' algorithmic models define their own metrics, which Curriculum Associates uses to justify their results, creating and perpetuating a pernicious and untested feedback loop.

321.    By generating purported insights and predictions about children on which myriad third parties rely in making consequential decisions about those children, Curriculum Associates produces and sells the equivalent of credit reports on children in every domain over which Curriculum Associates claims algorithmic expertise.

322.    This harm is compounded by Curriculum Associates' policy of denying students and Parents access to, control of, or the ability to delete their own data, as well as an understanding of how their data is used to generate analyses of and predictions about them.

### 4.  Curriculum Associates harms children by forcing them to choose between their right to an education and other fundamental rights.

323.    Curriculum Associates forces families into the untenable position of having to choose between their right to an education and other fundamental rights, such as their rights to privacy and property.

324.    Research shows that nearly 80 percent of adults reported being very or somewhat concerned about how companies use data collected about adults,[58] and the number of those concerned about their online privacy is growing quickly.

325.    Protective behaviors are on the rise, with 87 percent of U.S. adults using at least one privacy- or security-protecting tool online.[59]

326.    An even greater percentage of parents value protecting their children's personal data, including their identity (90%), location (88%), health data (87%), age (85%), school records (85%), and browsing history (84%).[60]

327.    Curriculum Associates has driven a wedge between school personnel and Parents, including Plaintiffs' Parents, leaving them reluctant to press their schools for information regarding Curriculum Associates' data practices or request that their children be alternatively accommodated.

328.    Parents fear becoming adversarial with their children's schools and the possible

---

[58] Brooke Auxier, et al., Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their personal information, Pew Research Center (November 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[59] Olivia Sideot and Emily Vogels, What Americans Know About AI, Cybersecurity and Big Tech, Pew Research Center (August 17, 2023), https://www.pewresearch.org/internet/2023/08/17/what-americans-know-about-ai-cybersecurity-and-big-tech/.

[60] Polling Memo: Parents' Views on Children's Digital Privacy and Safety, Trusted Future (2022), https://trustedfuture.org/childrens-digital-privacy-and-safety/.

repercussions they or their children might suffer if they are perceived as difficult or meddlesome, including stigmatization or retaliation. Curriculum Associates has thus chilled parental efforts to inquire about and object to its practices.

329. This chilling effect has left children particularly vulnerable and disempowered to protect themselves against Curriculum Associates' exploitative conduct.

### H. Curriculum Associates' nonconsensual data practices are unfair and unlawful.

330. Curriculum Associates has generated massive profits through its generation, collection, and analysis of children's personal information—without their Parents' knowledge or consent, and without compensating them for actively and passively providing Curriculum Associates with valuable information.

331. This one-sided arrangement—whereby Curriculum Associates earns vast revenues each year using the personal information of children gathered through children's compelled use of Curriculum Associates' Products, and all that children receive in return are education services to which they are already legally entitled—is particularly unjust given the core philanthropic purpose and compulsory nature of a public education.

332. Through its surreptitious, exploitative data practices, Curriculum Associates has unjustly enriched itself at the cost of children's privacy, security, and autonomy, when children would otherwise have the ability to choose how they would monetize their data—or decide not to. School-aged children should not be made to bear these risks and harms for the commercial benefit of private, for-profit corporations like Curriculum Associates and its partners.

## V.    CLASS ACTION ALLEGATIONS

333. Plaintiffs bring this class action pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

334.    Plaintiffs seek to represent a nationwide class of students ("Nationwide Class") defined as:

> *All persons in the United States who attend or attended a K–12*
>
> *school who used one or more Curriculum Associates Products.*

335.    Plaintiffs seek to represent a state-only subclass of students ("California Subclass") under the law of the State of California defined as:

> *All persons in California who attend or attended a K–12 school*
>
> *who used one or more Curriculum Associates Products.*

336.    In addition, and in the alternative to the Nationwide Class, Plaintiffs reserve the right to seek leave to amend the complaint to represent state subclasses under the laws of 50 states.

337.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

338.    The Nationwide Class and California Subclass are collectively referred to herein as the "Classes." Members of both Classes are collectively referred to herein as "Class members."

339.    Excluded from the Classes are: (1) the Court (including any Judge or Magistrate presiding over this action and any members of their chambers and families); (2) Curriculum Associates, its subsidiaries, parents, predecessors, successors and assigns, including any entity in which any of them have a controlling interest and its officers, directors, employees, affiliates, or legal representatives; (3) persons who properly and timely request exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel, Classes' counsel, and Curriculum Associates' counsel; and (6) the legal representatives, successors, and assigns of any such excluded person.

340.    **Ascertainability:** Membership of the Classes is defined based on objective criteria and individual members will be identifiable from Curriculum Associates' records, including from

Curriculum Associates' massive data storage. Based on information readily accessible to it, Curriculum Associates can identify members of the Classes who have used Curriculum Associates' Products.

341.    **Numerosity:** Members of the Classes are so numerous that joinder of all members is impracticable. The exact size of the Classes and the identities of the members of the Classes are readily ascertainable in or through Curriculum Associates' records.

342.    **Typicality:** Plaintiffs' claims are typical of the claims of other members of the Classes, as all members of the Classes were uniformly affected by Curriculum Associates' wrongful conduct in violation of federal and state law as described herein.

343.    **Adequacy:** Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel that is competent and experienced in class action litigation, including nationwide class actions and privacy violations. Plaintiffs and their counsel have no interest that is in conflict with or otherwise antagonistic to the interests of the other members of the Classes. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so.

344.    **Commonality:** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

    a.  Whether Curriculum Associates obtained effective consent to generate, obtain, use, and disclose the personal and private information of the members of the Classes;

    b.  Whether Curriculum Associates led the members of the Classes to believe, either directly or through school personnel, that their data and their privacy would be protected;

c.  Whether Curriculum Associates represented that members of the Classes could control what data were intercepted, received, or collected by Curriculum Associates;

d.  Whether Curriculum Associates actually protected the data and privacy of members of the Classes;

e.  Whether Curriculum Associates' practice of intercepting, receiving, collecting, or sharing users' data violated state or federal privacy laws;

f.  Whether Curriculum Associates' practice of intercepting, receiving, collecting, or sharing users' data violated anti-wiretapping laws;

g.  Whether Curriculum Associates' practice of intercepting, receiving, collecting, or sharing users' data violated any other state or federal laws;

h.  Whether Plaintiffs and members of the Classes are entitled to declaratory or injunctive relief to enjoin the unlawful conduct alleged herein; and

i.  Whether Plaintiffs and members of the Classes have sustained damages as a result of Curriculum Associates' conduct and, if so, what is the appropriate measure of damages or restitution.

345.  **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of a single adjudication, economies of scale and comprehensive supervision by a single, able court. Furthermore, as the damages individual members of the Classes have suffered may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in management of this action as a class action.

346.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## VI.    TOLLING OF THE STATUTE OF LIMITATIONS

347.    Any applicable statute(s) of limitations have been tolled by Curriculum Associates' and its affiliates' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Classes could not have reasonably discovered the true nature of Curriculum Associates' data-harvesting scheme because Curriculum Associates purposely concealed it. Plaintiffs' claims were thus tolled under the discovery rule.

348.    The causes of action alleged herein did not accrue until Plaintiffs and members of the Classes discovered or could have discovered Curriculum Associates' data-harvesting scheme.

349.    As alleged above, Plaintiffs and members of the Classes had no way of knowing about Curriculum Associates' data-harvesting scheme. Curriculum Associates concealed the scheme while simultaneously claiming that it protects student data and privacy.

350.    To this day, Curriculum Associates fails to disclose the full extent of, and risks associated with, its data-harvesting scheme.

351.    Within any applicable statutes of limitation, Plaintiffs and members of the Classes could not have discovered, through the exercise of reasonable diligence, that Curriculum Associates was concealing the conduct complained of herein and misrepresenting the nature of its business.

352.    Plaintiffs and members of the Classes did not know facts that would have caused a reasonable person to suspect that there was a data-harvesting scheme that would result in a private corporation collecting, manipulating, and monetizing every aspect of their children's lives and their own interactions with their children's schools and school districts. Curriculum Associates

also withheld any and all information that would give a reasonable person knowledge of the data-harvesting scheme and disclaimed that it unlawfully monetized data about and belonging to Plaintiffs and members of the Classes.

353.    For ordinary students and Parents, the existence of the data-harvesting scheme is still unknown. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

## VII.    CAUSES OF ACTION

### COUNT I: Violation of the Federal Wiretap Act, U.S.C. § 2510 *et seq.*

### (*On behalf of Plaintiffs and the Nationwide Class*)

354.    Plaintiffs incorporate by reference paragraphs 1 through 353 as though fully set forth herein.

355.    The Federal Wiretap Act, as amended by the Electronic Communications Privacy Act of 1986, prohibits the intentional interception of the contents of any wire, oral, or electronic communication through the use of a device. 18 U.S.C. § 2511.

356.    The Wiretap Act protects both the sending and receipt of communications.

357.    18 United States Code section 2520(a) provides a private right of action to any person whose wire, oral, or electronic communication is intercepted.

358.    Curriculum Associates' actions in intercepting and tracking student communications were intentional. Upon information and belief, Curriculum Associates is aware that it is intercepting communications and has taken no remedial actions.

359.    Curriculum Associates' interception of internet communications that Plaintiffs and Nationwide Class members were sending and receiving was done contemporaneously with Plaintiffs' and Nationwide Class members' sending and receipt of those communications.

360.    The communications intercepted by Curriculum Associates included "contents" of electronic communications made in the form of detailed URL requests, webpage browsing histories, search queries, and other information that Plaintiffs and Nationwide Class members sent to Curriculum Associates and for which Plaintiffs and Nationwide Class members received communications in return from Curriculum Associates.

361.    These transmissions were tracked and intercepted without authorization and are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce[,]" and were therefore "electronic communications" within the meaning of 18 United States Code section 2510(12).

362.    The following constitute "devices" within the meaning of 18 United States Code section 2510(5):

    a.    The computer codes and programs that Curriculum Associates used to track and disclose Plaintiffs' and Nationwide Class members' communications to third parties, including the Pixels and cookies described in this Complaint;

    b.    Plaintiffs' and Nationwide Class members' browsers and mobile applications;

    c.    Plaintiffs' and Nationwide Class members' computing and mobile devices;

    d.    Curriculum Associates' servers; and

    e.    The plan that Curriculum Associates carried out to effectuate its tracking and interception of Plaintiffs' and Nationwide Class members' communications.

363.    Curriculum Associates, in its conduct alleged here, was not providing an "electronic communication service" as that term is defined in 18 United States Code section 2510(12) and used elsewhere in the Wiretap Act. Curriculum Associates was not acting as an Internet Service

Provider.

364.    Curriculum Associates was not an authorized party to the communications because Plaintiffs and Nationwide Class members were unaware of Curriculum Associates' interceptions and did not knowingly send any communications to Curriculum Associates with the knowledge that Curriculum Associates would disclose those communications to third parties without consent.

365.    Plaintiffs and Nationwide Class members did not consent to Curriculum Associates' continued gathering or disclosure of their communications.

366.    After intercepting the communications, Curriculum Associates, through Pixels and other tracking code that it installed in its source code, simultaneously disclosed the contents of the communications to unauthorized third parties, including but not limited to Google, Clever, and Munetrix, knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 United States Code section 2511(1)(a).

367.    Curriculum Associates disclosed the contents of those communications with third parties for the purpose of committing a crime or tort, including but not limited to, the tort of invasion of privacy, including but not limited to, intrusion upon seclusion and public disclosure of private facts.

368.    After intercepting the communications, Curriculum Associates then used the contents of the communications knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 United States Code section 2511(1)(a).

369.    As a result of this conduct, the Court may assess statutory damages to Plaintiffs and Nationwide Class members; injunctive and declaratory relief; punitive damages in an amount to

be determined by a jury, but sufficient to prevent the same or similar conduct by Curriculum Associates in the future, and reasonable attorneys' fees and other litigations costs reasonably incurred.

**COUNT II: Violation of the California Invasion of Privacy Act ("CIPA")**

**Cal. Penal Code § 631**

***(On behalf of Plaintiffs and the California Subclass)***

370.    Plaintiffs incorporate by reference paragraphs 1 through 369 as though fully set forth herein.

371.    CIPA is codified at California Penal Code sections 630–638. The Act begins with its statement of purpose in California Penal Code section 630:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

372.    California Penal Code section 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to lawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars[.]

373.    Under section 631 of CIPA, a defendant must show it had the consent of all parties to a

communication.

374.    Curriculum Associates designed, contrived, and effectuated its scheme to track California students.

375.    Curriculum Associates' non-consensual tracking of Plaintiffs' and California Subclass members' internet communications was without authorization and consent from the Plaintiffs and California Subclass members. The interception by Curriculum Associates in the aforementioned circumstances was unlawful and tortious.

376.    The interceptions by Curriculum Associates in the aforementioned circumstances occurred while the same was in transit or passing over a wire, line, or cable in California or was being sent from California, where Plaintiffs were located at the time of the interceptions.

377.    The following items constitute machines, instruments, or contrivances under CIPA, and even if they do not, Curriculum Associates' deliberate and purposeful scheme that facilitated its interceptions falls under the broad statutory catch-all category of "any other manner":

      a.    The computer code and programs Curriculum Associates used to track and disclose to third parties Plaintiffs' and California Subclass members' communications, including the Pixels and cookies described in this Complaint;

      b.    The Plaintiffs' and California Subclass members' browsers and mobile applications;

      c.    The Plaintiffs' and California Subclass members' computing and mobile devices;

      d.    Curriculum Associates' servers;

      e.    The computer codes and programs used by Curriculum Associates to effectuate its tracking and interception of the Plaintiffs' and California Subclass members' communications; and

      f.   The plan Curriculum Associates carried out to effectuate its tracking and interception of the Plaintiffs' and California Subclass members' communications.

378.    Curriculum Associates aided and abetted third parties, including but not limited to, Google, to unlawfully intercept protected communications belonging to Plaintiffs and California Subclass members and use the contents of those communications for their own commercial benefit, including the development and improvement of proprietary technologies, independent of the services those third parties provide Curriculum Associates.

379.    Plaintiffs and California Subclass members have suffered loss by reason of these violations, including, but not limited to, violation of their rights to privacy and loss of value in their personal information.

380.    Pursuant to California Penal Code section 637.2, Plaintiffs and California Subclass members have been injured by the violations of California Penal Code section 631, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT III: Violation of the California Invasion of Privacy Act ("CIPA")

## Cal. Penal Code § 632

### *(On behalf of Plaintiffs and the California Subclass)*

381.    Plaintiffs incorporate by reference paragraphs 1 through 380 as though fully set forth herein.

382.    California Penal Code § 632(a) provides, in pertinent part:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a

fine not exceeding two thousand five hundred dollars ($2,500) per violation[.]

383.    California Penal Code § 632(c) defines a "confidential communication" as:

> "Any communication carried on in circumstances as may reasonably indicate that any party to the communications desires to be confined to the parties thereto, but excludes a communication made … in any other circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

384.    Courts routinely hold that internet communications can have sufficient confidential character to support a claim under section 632 of CIPA.

385.    At all relevant times, Curriculum Associates aided, employed, agreed with, and conspired with Google, Clever, Munetrix, and other third parties to record and eavesdrop upon Plaintiff's and California Subclass members' confidential communications while using the Products, specifically by installing and configuring tracking software to permit Google, Clever, Munetrix, and other third parties to eavesdrop upon and record the content of Plaintiffs' and California Subclass members' confidential communications with Curriculum Associates.

386.    The content of those conversations included highly sensitive and confidential communications of minor students, including Plaintiffs and California Subclass members. Through Curriculum Associates' installation and configuration of the tracking software on its Products, these communications were recorded and/or eavesdropped upon by Google, Clever, and Munetrix during the communications and without the knowledge, authorization, or consent of Plaintiffs and California Subclass members.

387.    Curriculum Associates intentionally inserted an electronic device into its Products that, without the knowledge and consent of Plaintiff and California Subclass members, recorded and transmitted the substance of their confidential communications with Curriculum Associates to a

third party.

388.    Curriculum Associates willingly facilitated Google's, Clever's, Munetrix's, and other third parties' interception and collection of Plaintiff's and California Subclass members' confidential information by embedding the tracking software into the Products, thereby assisting Google's, Clever's, Munetrix's, and other third parties' eavesdropping.

389.    Plaintiff and California Subclass members did not know of, and did not consent to, any recording or eavesdropping of these confidential communications.

390.    The following items constitute "electronic amplifying or recording device to eavesdrop upon or record the confidential communication" under the CIPA:

   a.    The computer code and programs Curriculum Associates used to track and disclose to third parties Plaintiffs' and California Subclass members' communications, including the Pixels and cookies described in this Complaint;

   b.    The Plaintiffs' and California Subclass members' browsers and mobile applications;

   c.    The Plaintiffs' and California Subclass members' computing and mobile devices;

   d.    Curriculum Associates' servers;

   e.    The computer codes and programs used by Curriculum Associates to effectuate its tracking and interception of the Plaintiffs' and California Subclass members' communications; and

   f.    The plan Curriculum Associates carried out to effectuate its tracking and interception of the Plaintiffs' and California Subclass members' communications.

391.    Curriculum Associates failed to disclose to Plaintiffs, California Subclass members, or their Parents, that it uses tracking software to track and automatically and simultaneously transmit

highly sensitive personal communications to any third party.

392.    As demonstrated hereinabove, Curriculum Associates violates CIPA by aiding and permitting third parties, including Google, Clever, Mnetrix, and their agents, employees, and contractors to receive students' online communications through its Products without their consent. Google specifically receives the content of these communications and understands it, as the CID is assigned by Google and Google must understand the content in order to process it and link it to individual users so that Google may target advertising to those persons based on their communications.

393.    By disclosing Plaintiff's and the California Subclass members' confidential information, Curriculum Associates violated Plaintiff's and California Subclass members' statutorily protected right to privacy.

394.    The data collected by Curriculum Associates constituted "confidential communications" as that term is used in section 632, because Plaintiffs and California Subclass members had objectively reasonable expectations of privacy in their devices and activity when communicating with Curriculum Associates, particularly as they were minors communicating sensitive education-related and other information protected from disclosure by federal and state law.

395.    As a result of the above violations and pursuant to CIPA Section 637.2, Curriculum Associates is liable to Plaintiffs and California Subclass members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

396.    Under the statute, Curriculum Associates is also liable for reasonable attorney's fees,

litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Curriculum Associates in the future.

**COUNT IV: Violation of the California Invasion of Privacy Act ("CIPA")**

**Cal. Penal Code § 638.51(a)**

*(On behalf of Plaintiffs and the California Subclass)*

397.    Plaintiffs incorporate by reference paragraphs 1 through 396 as though fully set forth herein.

398.    Plaintiff brings this claim *in the alternative to, or in addition to*, violations of Cal. Penal Code sections 631(a) and 632, which prohibit the interception of the *contents* of communications in transit. The section 638.51(a) claim is based solely on Curriculum Associates' capture of non-content signaling data, such as IP addresses and routing metadata, regardless of whether content was also intercepted.

399.    CIPA section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

400.    A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

401.    The Products are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—the IP address and other device identifier information such as device type, browser type, unique cookie identifiers (such as the Google CID), session identifiers, referrer URLs, user-agent strings, clickstream paths, and

timestamped navigation or submission data ("Device Metadata")—from the electronic communications transmitted by Plaintiffs' and the California Subclass members' computers, tablets or smartphones. Cal. Penal Code § 638.50(b).

402.    Likewise, the Products are "pen registers" because they are "device[s] or process[es]" that "capture[d]" the unique user identifiers associated with each Product from the electronic communications transmitted by Plaintiffs' and the California Subclass members' computers, tablets or smartphones. Cal. Penal Code § 638.50(b). The unique IDs are "addressing" information because they are used to tie a Product's user to third parties' databases and repositories of information about the user and ascertain the user's identity.

403.    At all relevant times, Curriculum Associates installed the Products—which include pen registers—on Plaintiffs' and California Subclass members' browsers, and used the Products to collect Plaintiffs' and California Subclass members' IP addresses and Device Metadata.

404.    The Products collect Plaintiffs' and California Subclass members' IP addresses and Device Metadata independent of the contents it also collects of Plaintiffs' and the California Subclass members' electronic communications with Curriculum Associates. *See In re Zynga Privacy Litig*., 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

405.    Plaintiffs and California Subclass members did not provide their prior consent to Curriculum Associates' use of the Products to collect their IP addresses and Device Metadata.

406.    Curriculum Associates did not obtain a court order to install or use the Products.

407.    Curriculum Associates, in its conduct alleged here, was not providing an "electronic communication service" as that term is defined in 18 United States Code section 2510(12) and used in the Wiretap Act. Curriculum Associates was not acting as an Internet Service Provider.

408.    Even if Curriculum Associates did qualify as an "electronic communication service" provider, (i) it did not install or use pen registers solely for the purpose of operating or protecting its own service, but instead used them for analytics, marketing, behavioral profiling, or unauthorized surveillance; and (ii) its deployment of pen registers in this context exceeds the narrow technical exception set forth in § 638.51(b), as it permitted third parties (e.g., data analytics or tracking vendors) to receive, process, or store these intercepted signals without user consent or judicial oversight.

409.    Pursuant to Cal. Penal Code section 637.2, Plaintiffs and California Subclass members have been injured by Curriculum Associates' violations of CIPA section 638.51(a), and each seeks statutory damages of $5,000 for each of Curriculum Associates' violations of CIPA section 638.51(a).

**COUNT V: Violation of the Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502 *et seq*.**

**(*On behalf of Plaintiffs and the California Subclass*)**

410.    Plaintiffs incorporate by reference paragraphs 1 through 409 as though fully set forth herein.

411.    Cal. Penal Code section 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction."

412.    Plaintiffs and California Subclass members' devices on which they accessed Curriculum Associates' services, including computers, smart phones, and tablets, constitute computers or "computer systems" within the meaning of CDAFA. *Id.* § 502(b)(5).

413.    Curriculum Associates violated Cal. Penal Code section 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiffs' and California Subclass members' data as described herein.

414.    Curriculum Associates was unjustly enriched by acquiring the valuable personal information of Plaintiffs and California Subclass members without permission and using it for Curriculum Associates' own financial benefit to advance its business interests.

415.    Plaintiffs and California Subclass members retain a stake in the profits that Curriculum Associates earned from the misuse of their activity and personally identifiable information because, under the circumstances, it is unjust for Curriculum Associates to retain those profits.

416.    Curriculum Associates accessed, copied, took, analyzed, and used data from Plaintiffs' and California Subclass members' computers in and from the State of California, where Curriculum Associates marketed and sold its products. Accordingly, Curriculum Associates caused the access of their computers in California and is therefore deemed to have accessed their computers in California.

417.    As a direct and proximate result of Curriculum Associates' unlawful conduct within the meaning of Cal. Penal Code section 502, Curriculum Associates has caused loss to Plaintiffs and California Subclass members and has been unjustly enriched in an amount to be proven at trial.

418.    Plaintiffs and California Subclass members seek compensatory damages and/or disgorgement in an amount to be proven at trial, and declarative, injunctive, or other equitable relief.

419.    Plaintiffs and California Subclass members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code section 502(e)(4) because Curriculum Associates' violations were willful and, upon information and belief, Curriculum Associates is guilty of oppression or malice

as defined by Cal. Civil Code section 3294.

420.    Plaintiffs and California Subclass members are also entitled to recover their reasonable attorneys' fees pursuant to Cal. Penal Code section 502(e).

### COUNT VI: Violation of the Massachusetts Right to Privacy Act ("MRPA")

### Mass. Gen. Laws Ann. ch. 214, §1B

### (*On behalf of Plaintiffs and the Nationwide Class*)

421.    Plaintiffs incorporate by reference paragraphs 1 through 420 as though fully set forth herein.

422.    Under Massachusetts law, Plaintiffs asserting claims for invasion of privacy must plead (1) a gathering and dissemination of facts of a private nature; (2) resulting in an unreasonable, substantial, or serious interference with Plaintiffs' privacy.

423.    Plaintiffs and Nationwide Class members had a legitimate expectation of privacy regarding their highly sensitive and intimate personal information and were entitled to the protection of this information against disclosure to third parties without their or their Parents' consent.

424.    Curriculum Associates intentionally intruded into Plaintiffs' and Nationwide Class members' private affairs in a highly offensive manner through its systematic and pervasive collection, accessing, downloading, transferring, selling, storing and use of Plaintiffs' and Nationwide Class members' highly sensitive personal information, including but not limited to, Plaintiffs' and Nationwide Class members performance, progress, and proficiency in various subject-matter domains; how their performance, progress, and proficiency compares with their peers; conclusions about their learning difficulties or weaknesses in subject-matter domains; predictions about their growth potential; and data about online searches they perform, files they upload or download, and online content they consume.

425.    Plaintiffs and Nationwide Class members maintained a reasonable expectation of privacy interest in their personal information absent consent to tracking and collection practices. Plaintiffs and Nationwide Class members never consented—and in the case of Curriculum Associates school-licensed Products, never even had the opportunity to consent—to Curriculum Associates' data practices. The reasonableness of this expectation of privacy is reflected in longstanding custom and practice; security measures intended to prevent unauthorized access to personal information, especially concerning young children; state, federal, and international laws protecting a right to financial privacy; and the privacy policies and other assurances of protection by applications that use Curriculum Associates discussed herein, among other indicia.

426.    Plaintiffs and Nationwide Class members could not reasonably expect that, by simply participating in their education and completing required activities, Curriculum Associates would collect, store, manipulate, disclose, and monetize such voluminous and far-reaching categories of personal information; prevent Plaintiffs and Nationwide Class members from reviewing, correcting, or controlling that information; and use that information in ways that were harmful to Plaintiffs and Nationwide Class members.

427.    Individuals also maintain a reasonable expectation of privacy when they are using products in a compulsory environment such as public schools. Curriculum Associates' collection of Plaintiffs' and Nationwide Class members' information while logged into Curriculum Associates' Products was unreasonable.

428.    Curriculum Associates' collection and use of children's personal information without the knowledge or consent of those children or their Parents is highly offensive to an ordinary reasonable person.

429.    Curriculum Associates' intrusions upon Plaintiffs' and Nationwide Class members' private

affairs and concerns are highly offensive to an ordinary reasonable person, especially considering (a) the highly sensitive and personal nature of Plaintiffs' and Nationwide Class members' personal information and data; (b) the extensive scope of data obtained by Curriculum Associates, including years of historical data; (c) Curriculum Associates' intent to profit from Plaintiffs' and Nationwide Class members' data by selling it outright (e.g., back to schools, its "customers," and myriad other third parties) and using it to develop and market its products and services; (d) Curriculum Associates' use of subterfuge to intrude into Plaintiffs' and Nationwide Class members' electronic devices for the purpose of collecting their data; (e) the surreptitious and unseen nature of Curriculum Associates' data collection with respect to students, and (f) Curriculum Associates' failure to obtain valid consent.

430.   Curriculum Associates' conduct would be highly offensive to a reasonable person, particularly given Curriculum Associates' extensive and false public statements regarding its commitment to user privacy and given that Curriculum Associates designs products to be used by children, including young children. The manner of the invasion—collection through students' use of education tools in a compulsory setting—is also highly offensive.

431.   Curriculum Associates' intrusion was into a place and thing that was private and entitled to remain private. Plaintiffs and Nationwide Class members merely engaged in their required educational curriculum at their schools with the reasonable expectation and intention that their highly sensitive and confidential personal information would be kept private and confidential.

432.   Curriculum Associates acted with a knowing and intentional state of mind when it engaged in its systematic and pervasive collection, accessing, downloading, transferring, selling, storing and use of Plaintiffs' and Nationwide Class members' highly sensitive personal information and knew that its data practices would harm Plaintiffs and Nationwide Class members.

433.    As a proximate result of Curriculum Associates' acts and omissions, the private and sensitive personal information of Plaintiffs and Nationwide Class members has been disclosed and redisclosed, and is available for disclosure and redisclosure, without Plaintiffs and Nationwide Class members' or their Parents' knowledge or consent, causing Plaintiffs and Nationwide Class members' to suffer damages.

434.    Curriculum Associates' invasions of privacy caused Plaintiffs and Nationwide Class members the following damages:

      a.    Nominal damages;

      b.    The diminution in value of Plaintiffs' and Nationwide Class members' private information;

      c.    The loss of privacy due to Curriculum Associates rendering no longer private the confidential and personal information that Plaintiffs and Nationwide Class members intended to remain private; and

      d.    The fair value of Plaintiffs' and Nationwide Class members' personal information and data. Curriculum Associates took something of value from Plaintiffs and Nationwide Class members—their personal information and data—and derived benefits therefrom without Plaintiffs' and Nationwide Class members' knowledge or consent and without Curriculum Associates sharing the fair benefit of such value with them.

435.    Curriculum Associates invaded Plaintiffs' and Nationwide Class members' privacy with oppression, fraud, or malice.

436.    As a result of Curriculum Associates' invasions of privacy, Plaintiffs and Nationwide Class members seek actual damages, compensatory damages, restitution, disgorgement, general damages, nominal damages, unjust enrichment, punitive damages, and any other relief the Court

deems just.

## COUNT VII: Unjust Enrichment

### (*On Behalf of Plaintiffs and the Nationwide Class Pursuant to Massachusetts Law*)

437.    Plaintiffs incorporate by reference paragraphs 1 through 436 as though fully set forth herein.

438.    Plaintiffs lack an adequate remedy at law.

439.    In addition or as an alternative to legal remedies sought herein, Plaintiffs seek equitable relief to the extent that legal remedies are inadequate.

440.    The gross and protracted invasion of privacy that Plaintiffs and the Nationwide Class members have suffered cannot be rectified through legal remedies.

441.    Plaintiffs and Nationwide Class members conferred a benefit upon Curriculum Associates, namely, provision of their personal information to Curriculum Associates through their compelled use of Curriculum Associates' Products at school.

442.    Curriculum Associates appreciated the fact that it obtained this benefit from Plaintiffs and Nationwide Class members, namely, it understands that student data is the raw material that fuels its business, without which Curriculum Associates would have no product and no business.

443.    It would be inequitable for Curriculum Associates to retain that benefit without payment to Plaintiffs and Nationwide Class members of the value that benefit has conferred to Curriculum Associates.

444.    More specifically, Curriculum Associates acquired and compromised troves of personal information that rightfully belong to Plaintiffs and Nationwide Class members without effective consent through intentionally deceptive practices conducted in connection with students' use of Curriculum Associates' Products.

445.    Curriculum Associates obtained access to this information only by marketing and selling its Products for use by children in the compulsory environment of K–12 education.

446.    Curriculum Associates has built, developed, improved, marketed, and delivered an ever-growing suite of products using the personal information of Plaintiffs and Nationwide Class members. It has further derived profits and other tangible and intangible benefits from its improper collection, use, and disclosure of Plaintiffs' and Nationwide Class members' data.

447.    But for collecting children's personal information without effective consent, Curriculum Associates could not have grown its business, acquired numerous other tangible and intangible assets, developed other applications, and received millions of dollars in investment capital to exceed a billion-dollar valuation.

448.    Curriculum Associates has also directly and substantially profited from its use, storage, aggregation, and sale of Plaintiffs' and Nationwide Class members' data. Indeed, Plaintiffs' and Nationwide Class members' data powers Curriculum Associates' ever-growing ecosystem of products and services. Without Plaintiffs' and Nationwide Class members' personal information unlawfully taken by Curriculum Associates, Curriculum Associates would cease to operate in its current form.

449.    In exchange for these benefits to Curriculum Associates, Plaintiffs and Nationwide Class members received nothing but educational services to which they were already legally entitled and required to receive.

450.    To benefit its bottom line, Curriculum Associates deprived Plaintiffs and Nationwide Class members of their property, security, privacy, and autonomy.

451.    Curriculum Associates harmed Plaintiffs and Nationwide Class members by, among other harms, subjecting them to commercial manipulation and continuous surveillance; invading their

privacy; denying their due process rights by subjecting them to opaque, unreviewable data practices; forcing them to choose between their right to an education and other fundamental rights; and failing to compensate them for their property and labor.

452.    Plaintiffs and Nationwide Class members did not consent to Curriculum Associates' taking of their personal information and using it for Curriculum Associates' or other third parties' commercial gain.

453.    There is no justification for Curriculum Associates' enrichment. It would be inequitable, unconscionable, and unjust for Curriculum Associates to be permitted to retain these benefits when they were procured because of and by means of Curriculum Associates' wrongful conduct and at the expense of children's property and wellbeing.

454.    Plaintiffs and Nationwide Class members seek an order compelling Curriculum Associates to disgorge the profits and other benefits it has unjustly obtained.

455.    Plaintiffs and Nationwide Class members may not have an adequate remedy at law against Curriculum Associates, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT VIII: Negligence

### (*On Behalf of Plaintiffs and the Nationwide Class*)

456.    Plaintiffs incorporate by reference paragraphs 1 through 455 as though fully set forth herein.

457.    Under Massachusetts law, Curriculum Associates owed a duty to children who use its Products, including Plaintiffs and Nationwide Class members, including a duty to exercise reasonable care in the collection, handling, retention, security, and use of their personal and behavioral data.

458.    Under Massachusetts law, every person also owes a duty to exercise reasonable care to prevent foreseeable harm to others. Plaintiffs and Nationwide Class members were the probable victims of Curriculum Associates' failure to properly collect, handle, secure, and use children's personal and behavioral data. Curriculum Associates was obligated to act with reasonable care to protect against the foreseeable risks of harm caused by its failures, including privacy harms arising from the unauthorized or exploitative use of children's data.

459.    Curriculum Associates also owed a duty of care because it enters into contracts with schools and school districts in which it agrees to collect, handle, secure and use children's personal and behavioral data, including the data of Plaintiffs and Nationwide Class members, only in compliance with applicable law and only for the purposes of educational services provided to children. Because Curriculum Associates undertook these obligations, it had a duty to exercise reasonable care in the performance of its obligations under the contracts.

460.    Curriculum Associates further owed a heightened duty of care due to its contracts with schools and school districts. Curriculum Associates enters into the contracts for the express purpose of providing educational services to children, including Plaintiffs and Nationwide Class members. It solicits and collects student data under the guise of an educational context, thereby establishing a relationship of trust and dependency. Having assumed this role, Curriculum Associates had a duty to protect student data and not to exploit the relationship by using student data, including that of Plaintiffs and Nationwide Class members, for its own independent commercial advantage, or for the benefit of third parties with whom those students and Parents have no direct relationship.

461.    Curriculum Associates breached these duties by, among other things, (a) sharing Plaintiffs' and Nationwide Class members' personal and behavioral information—including real-time

behavioral metadata—with third-parties; and (b) allowing or enabling those third parties to use such information to enhance their own commercial products, models, and services, independent of Curriculum Associates' provision of educational services.

462.    Curriculum Associates also breached its duties by using Plaintiffs' and Nationwide Class members' personal data—collected without informed consent—to improve or train its own proprietary systems, including artificial intelligence, adaptive learning, behavioral analytics, engagement scoring, and product development features unrelated to the specific students or educational services at issue. This misuse of student data for Curriculum Associates' own product development purposes was not reasonably foreseeable or disclosed to Parents, and it constituted an unreasonable intrusion upon children's data privacy interests.

463.    It was reasonably foreseeable to Curriculum Associates that collecting and sharing such granular behavioral and interactional data—particularly from minors—without express informed consent, and using that data to power commercial product improvements, posed a substantial risk of privacy harm. This risk is especially acute in the context of educational software, where users are children. Curriculum Associates' failure to implement adequate controls to prevent such misuse, and its active facilitation of third-party data access, was a breach of its duty of ordinary care under Massachusetts law.

464.    Curriculum Associates' duty of care owed to children who use its Products includes complying with applicable federal laws that protect children, privacy, and property.

465.    COPPA imposes legal requirements on operators of websites and online services directed to children under 13 years of age. Among other provisions, COPPA prohibits the collection, use, or disclosure of a child's personal information — including persistent identifiers and behavioral data — without verifiable parental consent. *See* 15 U.S.C. § 6502(b); 16 C.F.R. § 312.5.

466.    Although COPPA does not contain an express private right of action, courts in Massachusetts and elsewhere have recognized that violations of a federal statute may supply evidence of negligence as to the consequences the statute was designed to prevent, even if the statute itself does not authorize private enforcement.

467.    COPPA's statutory protections were enacted specifically to prevent the kind of unauthorized and exploitative data collection alleged here—namely, the use of children's behavioral, interactional, and identifying data for commercial benefit without adequate notice or consent. Curriculum Associates' failure to obtain verifiable parental consent before collecting such data—and its subsequent disclosure of that data to third parties for analytics, product development, and cross-platform tracking—constitutes a violation of COPPA that may properly serve as evidence of negligence under Massachusetts law.

468.    Plaintiffs and Nationwide Class members are among the class of persons COPPA was designed to protect, and the harm they suffered—loss of privacy, unauthorized profiling, exploitation of behavioral data, and exposure to cross-platform tracking and commercial targeting—is of the type the statute was designed to prevent.

469.    Curriculum Associates was required to comply with COPPA and did not: it failed to notify Parents of its data practices and obtain verifiable parental consent before collecting and using children's data; it failed to limit its collection of data to only that necessary for children to participate in the activity; and it failed to permit Parents to access, review, and delete all personal information that was collected from their children when they were under 13.

470.    Curriculum Associates' routine violations of COPPA constitute evidence of negligence where, as here, an independent duty of care exists between the parties.

471.    Curriculum Associates owed a higher duty of care to children than to an ordinary consumer

because of minors' lack of capacity to appreciate and avoid risks.

472.     Curriculum Associates, which markets its Products for use by K–12 students, knew or should have known that minors would be the primary users of its Products, that parental consent would therefore be required for the collection and use of students' personal data, and that the failure to obtain parental consent would result in the unlawful collection of students' personal information, including persistent identifiers such as cookies and IP addresses.

473.     Curriculum Associates negligently failed to obtain parental consent before collecting, using, and sharing children's information.

474.     Curriculum Associates failed to implement or maintain policies, procedures, or oversight mechanisms necessary to comply with COPPA.

475.     Curriculum Associates' failure to obtain parental consent or act with reasonable care directly enabled the unlawful collection of children's personal information, exposing millions of children to commercial exploitation and violating their right to privacy.

476.     Curriculum Associates also had independent duties under state and federal laws that required it to ensure that personal information of children was not collected without parental consent.

477.     As a direct and proximate result of Curriculum Associates' negligent actions and Curriculum Associates' violations of COPPA, Plaintiffs and Nationwide Class members suffered injury, including the improper collection, exposure, exploitation, and diminution in value of their intimate personal information.

478.     Because legal remedies are inadequate to fully redress the harm, Plaintiffs seek equitable relief, including restitution and disgorgement of all profits, benefits, and other compensation obtained by Curriculum Associates as a result of its unlawful conduct.

**Count IX: Violation of the Massachusetts Consumer Protection Act ("MCPA"),**

**Mass. Gen. Laws Ann. ch. 93A**

*(On behalf of Plaintiffs and the Nationwide Class)*

479.    Plaintiffs incorporate by reference paragraphs 1 through 478 as though fully set forth herein.

480.    Plaintiffs and Nationwide Class members and Curriculum Associates are each a "person" as defined under Mass. Gen. Laws Ann. ch. 93A ("MCPA"), § 1(a).

481.    At all times herein, Curriculum Associates was engaged in "trade" and "commerce" as defined under MCPA § 1(b).

482.    Pursuant to MCPA §9(3), Plaintiffs sent a written demand for relief to Curriculum Associates by certified mail on March 7, 2025, describing the unfair or deceptive acts and the injury suffered. Curriculum Associates did not make a reasonable written tender of settlement within thirty days.

483.    The MCPA prohibits and declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." MCPA § 2(a).

484.    By conduct complained of in the preceding paragraphs, Curriculum Associates willfully and knowingly committed unfair and deceptive acts in violation of the MCPA § 2, including but not limited to its use of false and misleading statements to violate Plaintiffs' and Nationwide Class members' property, economic, and privacy interests protected by federal and state laws.

485.    Massachusetts has a strong public policy of protecting consumers' privacy interests. Curriculum Associates' conduct is unfair because it violated this public policy by, among other things, surreptitiously collecting Plaintiffs' and Nationwide Class members' personal information, accessing, and copying Plaintiffs' and Nationwide Class members' private data, disclosing and

transferring that data to third-party affiliates, and storing and using that data for its own commercial purposes, all without informed or effective consent.

486.    Curriculum Associates also violated the interests protected by COPPA, ECPA, Massachusetts Right to Privacy Law (Mass. Gen. Laws, ch. 214 § 1B), and Massachusetts' common-law protections against conversion and trespass to chattels.

487.    Curriculum Associates' business acts and practices are unconscionable because they cause harm and injury in fact to Plaintiffs and Nationwide Class members, and for which Curriculum Associates has no justification other than to increase, beyond what Curriculum Associates would have otherwise realized, the value of its information assets through the acquisition of users' personal information through its development and sale of data-derivative products, and through its granting access to personal information by its third-party affiliates for commercial purposes.

488.    Curriculum Associates collected, used, and disclosed Plaintiffs' and Nationwide Class members' personal information without their knowledge and consent. Plaintiffs and Nationwide Class members could not have anticipated this degree of intrusion into their privacy. Curriculum Associates' conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs and Nationwide Class members.

489.    Curriculum Associates' conduct lacks reasonable and legitimate justification in that Curriculum Associates has benefited from such conduct and practice while Plaintiffs and Nationwide Class members have been misled as to the nature and integrity of Curriculum Associates' services. They have suffered material disadvantage regarding their interests in the privacy and confidentiality of their personal information.

490.    Curriculum Associates' conduct offends public policy in Massachusetts as embodied in the state constitutional right of privacy and Massachusetts's statutes, including the Massachusetts

Right to Privacy Law (Mass. Gen. Laws, ch. 214 § 1B).

491.    Curriculum Associates' acts and practices are deceptive within the meaning of the MCPA, because they mislead Plaintiffs and Nationwide Class members concerning the collection and use of their data and personally identifiable information, as described in detail herein.

492.    The foregoing allegations are tethered to underlying constitutional, statutory or regulatory provisions; describe practices that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers; and show that negative impact of Curriculum Associates' practices on school-aged children and their Parents far outweighs the reasons, justifications, and motives of Curriculum Associates.

493.    Curriculum Associates' false and misleading representations and omissions described in this Complaint and incorporated into this count were material, and they were likely to and did mislead some members of the public and/or caused harm to the public interest. They also misled Parents, whether directly or indirectly through school personnel.

494.    Plaintiffs and Nationwide Class members have suffered injury-in-fact, including the loss of money and/or property as a result of Curriculum Associates' unfair and/or unlawful practices, to wit, the unauthorized disclosure and taking of their personal information which has value as demonstrated by its use and sale by Curriculum Associates. Plaintiffs and Nationwide Class members have suffered harm in the form of diminution of the value of their private and personally identifiable data and content.

495.    As a direct and proximate result of Curriculum Associates' violations of the MCPA § 2, Plaintiffs and Nationwide Class members have suffered injury and damages as set forth in the preceding paragraphs.

496.    Plaintiffs, on behalf of themselves and Nationwide Class members, are entitled to bring

this action under MCPA § 9(1) as a person injured by Curriculum Associates' unfair or deceptive acts or practices in violation of MCPA § 2.

497.    Plaintiffs, on behalf of themselves and Nationwide Class members, seek all monetary and non-monetary relief allowed by law, including actual damages; treble damages for the willful or knowingly unfair and deceptive conduct alleged herein; disgorgement and restitution of all profits and benefits stemming from Curriculum Associates' unconscionable and deceptive business practices; declaratory relief; reasonable attorneys' fees and costs under Mass. Gen. Laws Ann. ch. 93A; injunctive relief; and other appropriate equitable relief.

498.    On or about March 7, 2025, Plaintiffs sent Curriculum Associates a written demand for relief pursuant to M.G.L. c. 93A, § 9(3) ("Notice Letter"). More than thirty days have elapsed since Curriculum Associates' receipt of the demand, and Curriculum Associates has failed to make a reasonable offer of settlement. The parties met and conferred but did not resolve the matter. A copy of the Notice Letter is attached as Exhibit A.

## VIII.    RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request the Court enter judgment in their favor and against Curriculum Associates as follows:

a.    An award of damages, including actual, compensatory, general, special, incidental, consequential, and punitive damages, in an amount to be determined at trial;

b.    Injunctive, declaratory, and other equitable relief as appropriate;

c.    Pre- and post-judgment interest to the extent provided by law;

d.    Attorneys' fees to the extent provided by law;

e.    Costs to the extent provided by law; and

f.    Such other relief the Court deems just and proper.

## IX.    JURY TRIAL DEMAND

Plaintiffs demand a jury trial for all claims so triable.

Dated:  December 22, 2025

/s/ Karen Dahlberg O'Connell
Karen Dahlberg O'Connell
Mass. BBO No. 659969
**ALMEIDA LAW GROUP LLC**
157 Columbus Avenue, 4th Floor
New York, NY 10023
Phone: (347) 395-5666
Karen@almeidalawgroup.com

Julie U. Liddell*
W. Andrew Lidell*
**EdTech Law Center PLLC**
P.O. Box 300488
Austin, Texas 78705
Phone: (737) 351-5855
julie.liddell@edtech.law
andrew.liddell@edtech.law

Andrew R. Tate*
**PEIFFER WOLF CARR
KANE CONWAY & WISE LLP**
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Phone: (314) 669-3600
atate@peifferwolf.com

Lori G. Feldman*
**GEORGE FELDMAN MCDONALD,
PLLC**
102 Half Moon Bay Drive
Croton-on-Hudson, NY 10520
Phone: (917) 983-9321
LFeldman@4-Justice.com

*Attorneys for Plaintiffs*
*\*Pro Have Vice applications forthcoming*