**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| M.C. 1 and M.C. 2, by and through their legal guardian NICOLE REISBERG, and M.C. 3 and M.C. 4, by and through their legal guardian LILA BYOCK, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>CURRICULUM ASSOCIATES, LLC,<br><br>        Defendant. | Civ. No. 1:25-cv-13942-FDS |

**AFFIDAVIT OF DEMETRIOS LAZARIKOS IN SUPPORT OF DEFENDANT
CURRICULUM ASSOCIATES, LLC'S MOTION FOR PROTECTIVE ORDER**

I, Demetrios Lazarikos, declare as follows:

1.    I am over the age of 18 years and am the Chief Information Security Officer at Curriculum Associates, LLC ("Curriculum Associates"). I submit this affidavit in support of Curriculum Associates' Motion for a Protective Order. This affidavit is based on my personal knowledge or my review of Curriculum Associates' records as kept in the ordinary course of business, and if called as a witness to testify to its contents, I could and would completely testify thereto.

2.    I began working at Curriculum Associates in my current role in August 2025. Through my work, I am familiar with and have access to records relating to customer contracts and customer deletion requests. Such records were and are kept and maintained in the ordinary course of business.

1

3.     In the ordinary course of business, Curriculum Associates receives data deletion requests from its customers (i.e., schools and/or school districts). Those requests include parental requests to delete student-specific data; and school or school district requests to delete all student data from a particular school or district, including upon completion of a contract between the school or school district and Curriculum Associates.

4.     In May 2026, Curriculum Associates received a deletion request from its customer, Wilson Elementary School. A true and correct copy of the Standard Student Data Privacy Agreement between Ellsworth School Department and Curriculum Associates—one of the agreements governing Curriculum Associates' relationship with Wilson Elementary School—is attached hereto as **Exhibit A**. A true and correct copy of the duly executed Exhibit E to that agreement is attached hereto as **Exhibit B**.

5.     In May 2026, Curriculum Associates received a deletion request from its customer, Wayne County School District. A true and correct copy of the State of Utah Cooperative Contract between the Utah Division of Purchasing and Curriculum Associates—one of the agreements governing Curriculum Associates' relationship with Wayne County School District—is attached hereto as **Exhibit C**.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 7, 2026 in San Francisco, California.

_____
Demetrios Lazarikos

2

# Exhibit A

**STANDARD STUDENT DATA PRIVACY AGREEMENT**

**MASSACHUSETTS, MAINE, MISSOURI, NEW HAMPSHIRE, NEW YORK, OHIO, RHODE ISLAND, TENNESSEE, VIRGINIA AND VERMONT**

**MA-ME-MO-NH-NY-OH-RI-TN-VA-VT-DPA, Modified Version 1.0**

**ELLSWORTH SCHOOL DEPARTMENT**

**and**

**CURRICULUM ASSOCIATES, LLC**

**(for i-Ready Platform)**

1

This Student Data Privacy Agreement ("**DPA**") is entered into on the date of full execution (the "**Effective Date**") and is entered into by and between: Ellsworth School Department, located at 66 Main St., #201, Ellsworth, ME 04605 (the "**Local Education Agency**" or "**LEA**") and Curriculum Associates, LLC, located at 153 Rangeway Rd, North Billerica, MA 01862 (the "**Provider**").

**WHEREAS**, the Provider is providing educational or digital services to LEA.

**WHEREAS**, the Provider and LEA recognize the need to protect personally identifiable student information and other regulated data exchanged between them as required by applicable laws and regulations, such as the Family Educational Rights and Privacy Act ("**FERPA**") at 20 U.S.C. § 1232g (34 CFR Part 99); the Children's Online Privacy Protection Act ("COPPA") at 15 U.S.C. § 6501-6506 (16 CFR Part 312), applicable state privacy laws and regulations and

**WHEREAS**, the Provider and LEA desire to enter into this DPA for the purpose of establishing their respective obligations and duties in order to comply with applicable laws and regulations.

**NOW THEREFORE**, for good and valuable consideration, LEA and Provider agree as follows:

1. A description of the Services to be provided, the categories of Student Data that may be provided by LEA to Provider, and other information specific to this DPA are contained in the Standard Clauses hereto.

2. **Special Provisions.** *Check if Required*

    √ If checked, the Supplemental State Terms and attached hereto as **Exhibit "G"** are hereby incorporated by reference into this DPA in their entirety,.

    √ If Checked, the Provider, has signed **Exhibit "E"** to the Standard Clauses, otherwise known as General Offer of Privacy Terms

3. In the event of a conflict between the SDPC Standard Clauses, the State or Special Provisions will control. In the event there is conflict between the terms of the DPA and any other writing, including, but not limited to the Service Agreement and Provider Terms of Service or Privacy Policy the terms of this DPA shall control.

4. This DPA shall stay in effect for three years. Exhibit E will expire 3 years from the date the original DPA was signed.

5. The services to be provided by Provider to LEA pursuant to this DPA are detailed in **Exhibit "A"** (the "**Services**").

6. **Notices**. All notices or other communication required or permitted to be given hereunder may be given via e-mail transmission, or first-class mail, sent to the designated representatives below.

docs\EDU002\00023\1389238.v1-12/5/24

**The designated representative for the Provider for this DPA is:**

Name: Sarah Salerno      Title: General Counsel

Address: 153 Rangeway Road, North Billerica, MA 01862

Phone: 636-751-6335

Email: customercontracts@cainc.com

**The designated representative for the LEA for this DPA is:**

KATIE HOLLENBACK, Technology Director
Ellsworth School Department
66 Main St., #201, Ellsworth, ME 04605
khollenback@ellsworthschools.org
(207) 669-9999

**IN WITNESS WHEREOF**, LEA and Provider execute this DPA as of the Effective Date.

**ELLSWORTH SCHOOL DEPARTMENT**

*Katherine Hollenback*
By: _____

Date: 01/14/25 _____

Printed Name: Katie Hollenback _____

Title/Position: IT Director _____

**CURRICULUM ASSOCIATES, LLC**

By: *J. L Sipe, Jr.* _____

Date: 1/13/25 _____

Printed Name: John Sipe, Jr.

Title/Position: Executive Vice President

3

**STANDARD CLAUSES**
Version 1.0

## ARTICLE I: PURPOSE AND SCOPE

1. **Purpose of DPA**. The purpose of this DPA is to describe the duties and responsibilities to protect Student Data including compliance with all applicable federal, state, and local privacy laws, rules, and regulations, all as may be amended from time to time. In performing these services, the Provider shall be considered a School Official with a legitimate educational interest, and performing services otherwise provided by the LEA. Provider shall be under the direct control and supervision of the LEA, with respect to its use of Student Data

2. **Student Data to Be Provided**. In order to perform the Services described above, LEA shall provide Student Data as identified in the Schedule of Data, attached hereto as **Exhibit "B"**.

3. **DPA Definitions**. The definition of terms used in this DPA is found in **Exhibit "C".** In the event of a conflict, definitions used in this DPA shall prevail over terms used in any other writing, including, but not limited to the Service Agreement, Terms of Service, Privacy Policies etc.

## ARTICLE II: DATA OWNERSHIP AND AUTHORIZED ACCESS

1. **Student  Data Property of LEA**. All Student Data transmitted to the Provider pursuant to the Service Agreement is and will continue to be the property of and under the control of the LEA. The Provider further acknowledges and agrees that all copies of such Student Data transmitted to the Provider, including any modifications or additions or any portion thereof from any source, are subject to the provisions of this DPA in the same manner as the original Student Data. The Parties agree that as between them, all rights, including all intellectual property rights in and to Student Data contemplated per the Service Agreement, shall remain the exclusive property of the LEA. For the purposes of FERPA, the Provider shall be considered a School Official, under the control and direction of the LEA as it pertains to the use of Student Data, notwithstanding the above.

2. **Parent Access**. To the extent required by law the LEA shall establish reasonable procedures by which a parent, legal guardian, or eligible student may review Education Records and/or Student Data correct erroneous information, and procedures for the transfer of student-generated content to a personal account, consistent with the functionality of services. Provider shall respond in a reasonably timely manner (and no later than forty five (45) days from the date of the request or pursuant to the time frame required under state law for an LEA to respond to a parent or student, whichever is sooner (provided, however, the LEA must submit each request to Provider within fifteen (15) days of a parent or student's request to the LEA) to the LEA's request for Student Data in a student's records held by the Provider to view or correct as necessary. In the event that a parent of a student or other individual contacts the Provider to review any of the Student Data accessed pursuant to the Services, the Provider shall refer the parent or individual to the LEA, who will follow the necessary and proper procedures regarding the requested information.

3. **Separate Account**.Intentionally Omitted.

4

4. **Law Enforcement Requests**. Should law enforcement or other government entities ("Requesting Party(ies)") contact Provider with a request for Student Data held by the Provider pursuant to the Services, the Provider shall notify the LEA in advance of a compelled disclosure to the Requesting Party, unless lawfully directed by the Requesting Party not to inform the LEA of the request.

5. **Subprocessors**. Provider shall enter into written agreements with all Subprocessors performing functions for the Provider in order for the Provider to provide the Services pursuant to the Service Agreement, whereby the Subprocessors agree to protect Student Data in a manner no less stringent than the terms of this DPA.

## ARTICLE III: DUTIES OF LEA

1. **Provide Data in Compliance with Applicable Laws**. LEA shall provide Student Data for the purposes of obtaining the Services in compliance with all applicable federal, state, and local privacy laws, rules, and regulations, all as may be amended from time to time.

2. **Annual Notification of Rights**. If the LEA has a policy of disclosing Education Records and/or Student Data under FERPA (34 CFR § 99.31(a)(1)), LEA shall include a specification of criteria for determining who constitutes a school official and what constitutes a legitimate educational interest in its annual notification of rights.

3. **Reasonable Precautions**. LEA shall take reasonable precautions to secure usernames, passwords, and any other means of gaining access to the services and hosted Student Data.

4. **Unauthorized Access Notification**. LEA shall notify Provider promptly of any known unauthorized access. LEA will assist Provider in any efforts by Provider to investigate and respond to any unauthorized access.

## ARTICLE IV: DUTIES OF PROVIDER

1. **Privacy Compliance**. The Provider shall comply with all applicable federal, state, and local laws, rules, and regulations pertaining to Student Data privacy and security, all as may be amended from time to time.

2. **Authorized Use**. The Student Data shared pursuant to the Service Agreement, including persistent unique identifiers, shall be used for no purpose other than the Services outlined in Exhibit A or stated in the Service Agreement and/or otherwise authorized under the statutes referred to herein this DPA.

3. **Provider Employee Obligation**. Provider shall require all of Provider's employees and agents who have access to Student Data to comply with all applicable provisions of this DPA with respect to the Student Data shared under the Service Agreement. Provider agrees to require and maintain an appropriate confidentiality agreement from each employee or agent with access to Student Data pursuant to the Service Agreement.

4. **No Disclosure**. Provider acknowledges and agrees that it shall not make any re-disclosure of any Student Data or any portion thereof, including without limitation, user content or other non-public information

5

docs\EDU002\00023\1389238.v1-12/5/24

and/or personally identifiable information contained in the Student Data other than as directed or permitted by the LEA or this DPA. This prohibition against disclosure shall not apply to aggregate summaries of De-Identified information, Student Data disclosed pursuant to a lawfully issued subpoena or other legal process, or to subprocessors performing services on behalf of the Provider pursuant to this DPA. Provider will not Sell Student Data to any third party.

5.  **De-Identified Data**: Provider agrees not to attempt to re-identify de-identified Student Data. De-Identified Data may be used by the Provider for those purposes allowed under FERPA and the following purposes: (1) assisting the LEA or other governmental agencies in conducting research and other studies; and (2) research and development of the Provider's educational sites, services, or applications, and to demonstrate the effectiveness of the Services; and (3) for adaptive learning purpose and for customized student learning. Provider's use of De-Identified Data shall survive termination of this DPA or any request by LEA to return or destroy Student Data. Except for Subprocessors, Provider agrees not to transfer de-identified Student Data to any party unless (a) that party agrees in writing not to attempt re-identification,and (b) prior written notice has been given to the LEA who has provided prior written consent for such transfer. The prior sentence about prior written consent does not apply to subprocessors or third parties that the Provider shares De-Identified Data with for research and development of the Provider's educational sites, services, or applications, and to demonstrate the effectiveness of the Services. Prior to publishing any document that names the LEA explicitly or indirectly, the Provider shall obtain the LEA's written approval of the manner in which De-identified Data is presented.

6.  **Disposition of Data**. Upon written request from the LEA, Provider shall dispose of or provide a mechanism for the LEA to transfer Student Data obtained under the Service Agreement, within forty-five (45)days of the date of said request and according to a schedule and procedure as the Parties may reasonably agree, with the exception of backups, which are automatically deleted over time in accordance with Provider's data retention and destruction policies. If a backup restores Student Data after a request for deletion, the Provider will provide the LEA written notice so that it may request that the Student Data be deleted. Upon termination of this DPA, if no written request from the LEA is received, Provider shall dispose of all Student Data after providing the LEA with reasonable prior notice. The duty to dispose of Student Data shall not extend to Student Data that had been De-Identified. The LEA may employ a "Directive for Disposition of Data" form, a copy of which is attached hereto as **Exhibit "D"**. If the LEA and Provider employ Exhibit "D," no further written request or notice is required on the part of either party prior to the disposition of Student Data described in Exhibit "D".

7.  **Advertising Limitations.** Provider is prohibited from using, disclosing, or selling Student Data to (a) inform, influence, or enable Targeted Advertising; or (b) develop a profile of a student, family member/guardian or group, for any purpose other than providing the Service to LEA. This section does not prohibit Provider from using Student Data (i) for adaptive learning or customized student learning (including generating personalized learning recommendations); or (ii) to make product recommendations to teachers or LEA employees; or (iii) to notify account holders about new education product updates, features, or services or from otherwise using Student Data as permitted in this DPA and its accompanying exhibits

## ARTICLE V: DATA PROVISIONS

1.  **Data Storage**. Where required by applicable law, Student Data shall be stored within the United States. Upon request of the LEA, Provider will provide a list of the locations where Student Data is stored.

6

2. **Audits.** No more than once a year, or following unauthorized access, upon receipt of a written request from the LEA with at least ten (10) business days' notice and upon the execution of an appropriate confidentiality agreement, the Provider will allow the LEA to audit the security and privacy measures that are in place to ensure protection of Student Data or any portion thereof as it pertains to the delivery of services to the LEA. Such audits will be subject to Provider's confidentiality obligations to its other customers. The Provider will cooperate reasonably with the LEA and any local, state, or federal agency with oversight authority or jurisdiction in connection with any audit or investigation of the Provider and/or delivery of Services to students and/or LEA, and shall provide reasonable access to the Provider's staff, agents and LEA's Student Data and all records pertaining to the Provider, LEA and delivery of Services to the LEA. Failure to reasonably cooperate shall be deemed a material breach of the DPA.

3. **Data Security**. The Provider agrees to utilize administrative, physical, and technical safeguards designed to protect Student Data from unauthorized access, disclosure, acquisition, destruction, use, or modification. The Provider shall adhere to any applicable law relating to data security. The Provider shall implement an adequate Cybersecurity Framework based on one of the nationally recognized standards set forth in **Exhibit "F"**. Exclusions, variations, or exemptions to the identified Cybersecurity Framework must be detailed in an attachment. Additionally, Provider may choose to further detail its security programs and measures that augment or are in addition to the Cybersecurity Framework in **Exhibit "F"**. Provider shall provide, in the Standard Schedule to the DPA, contact information of an employee who LEA may contact if there are any data security concerns or questions.

4. **Data Breach**. In the event of an unauthorized release, disclosure or acquisition of Student Data that compromises the security, confidentiality or integrity of the Student Data maintained by the Provider the Provider shall provide notification to LEA within seventy-two (72) hours of confirmation of the incident, unless notification within this time limit would disrupt investigation of the incident by law enforcement. In such an event, notification shall be made within a reasonable time after the incident. Provider shall follow the following process:

    (1) The security breach notification described above shall include, at a minimum, the following information to the extent known by the Provider and as it becomes available:

        i.   The name and contact information of the reporting LEA subject to this section.
        ii.  A list of the types of personal information that were or are reasonably believed to have been the subject of a breach.
        iii. If the information is possible to determine at the time the notice is provided, then either (1) the date of the breach, (2) the estimated date of the breach, or (3) the date range within which the breach occurred. The notification shall also include the date of the notice.
        iv.  Whether the notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided; and
        v.   A general description of the breach incident, if that information is possible to determine at the time the notice is provided.

    (2) Provider agrees to adhere to all federal and state requirements with respect to a data breach related to the Student Data, including, when appropriate or required, the required responsibilities and procedures for notification and mitigation of any such data breach.

7

(3) Provider further acknowledges and agrees to have a written incident response plan that reflects industry standard practices and is consistent with industry standards and federal and state law for responding to a data breach, breach of security, privacy incident or unauthorized acquisition or use of Student Data or any portion thereof, including personally identifiable information and agrees to provide LEA, upon request, with a summary of said written incident response plan.

(4) LEA shall provide notice and facts surrounding the breach to the affected students, parents or guardians.

(5) In the event of a breach originating from LEA's use of the Service, Provider shall cooperate with LEA to the extent necessary to expeditiously secure Student Data.

## ARTICLE VI: GENERAL OFFER OF TERMS

Provider may, by signing the attached form of "General Offer of Privacy Terms" (General Offer, attached hereto as **Exhibit "E"**), be bound by the terms of **Exhibit "E"** to any other LEA who signs the acceptance on said Exhibit. The form is limited by the terms and conditions described therein.

## ARTICLE VII: MISCELLANEOUS

1. **Termination**. In the event that either Party seeks to terminate this DPA, they may do so by mutual written consent so long as the Service Agreement has lapsed or has been terminated. Either party may terminate this DPA and any service agreement or contract if the other party breaches any terms of this DPA.

2. **Effect of Termination Survival**. If the Service Agreement is terminated, the Provider shall destroy all of LEA's Student Data upon written request pursuant to Article IV, section 6.

3. **Priority of Agreements**. This DPA shall govern the treatment of Student Data in order to comply with the privacy protections, including those found in FERPA and all applicable privacy statutes identified in this DPA. In the event there is conflict between the terms of the DPA and the Service Agreement, Terms of Service, Privacy Policies, or with any other bid/RFP, license agreement, or writing, the terms of this DPA shall apply and take precedence. In the event of a conflict between the SDPC Standard Clauses and the Supplemental State Terms, the Supplemental State Terms will control. Except as described in this paragraph herein, all other provisions of the Service Agreement shall remain in effect.

4. **Entire Agreement**. This DPA and the Service Agreement constitute the entire agreement of the Parties relating to the subject matter hereof and supersedes all prior communications, representations, or agreements, oral or written, by the Parties relating thereto. This DPA may be amended and the observance of any provision of this DPA may be waived (either generally or in any particular instance and either retroactively or prospectively) only with the signed written consent of both Parties. Neither failure nor delay on the part of any Party in exercising any right, power, or privilege hereunder shall operate as a waiver of such right, nor shall any single or partial exercise of any such right, power, or privilege preclude any further exercise thereof or the exercise of any other right, power, or privilege.

8

5.  **Severability**. Any provision of this DPA that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this DPA, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be prohibited or unenforceable in such jurisdiction while, at the same time, maintaining the intent of the Parties, it shall, as to such jurisdiction, be so narrowly drawn without invalidating the remaining provisions of this DPA or affecting the validity or enforceability of such provision in any other jurisdiction.

6.  **Governing Law; Venue and Jurisdiction**. THIS DPA WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF THE LEA, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES. EACH PARTY CONSENTS AND SUBMITS TO THE SOLE AND EXCLUSIVE JURISDICTION TO THE STATE AND FEDERAL COURTS FOR THE COUNTY OF THE LEA FOR ANY DISPUTE ARISING OUT OF OR RELATING TO THIS DPA OR THE TRANSACTIONS CONTEMPLATED HEREBY.

7.  **Successors Bound**: This DPA is and shall be binding upon the respective successors in interest to Provider in the event of a merger, acquisition, consolidation or other business reorganization or sale of all or substantially all of the assets of such business. In the event that the Provider sells, merges, or otherwise disposes of its business to a successor during the term of this DPA, the Provider shall provide written notice to the LEA no later than sixty (60) days after the closing date of sale, merger, or disposal. Such notice shall include a written, signed assurance that the successor will assume the obligations of the DPA and any obligations with respect to Student Data within the Service Agreement. The LEA has the authority to terminate the DPA if it disapproves of the successor to whom the Provider is selling, merging, or otherwise disposing of its business.

8.  **Authority.**  Each party represents that it is authorized to bind to the terms of this DPA, including confidentiality and destruction of Student Data and any portion thereof contained therein, all related or associated institutions, individuals, employees or contractors who may have access to the Student Data and/or any portion thereof.

9.  **Waiver**. No delay or omission by either party to exercise any right hereunder shall be construed as a waiver of any such right and both parties reserve the right to exercise any such right from time to time, as often as may be deemed expedient.

docs\EDU002\00023\1389238.v1-12/5/24

## EXHIBIT "A"

### DESCRIPTION OF SERVICES

Limited, revocable, non-transferable licenses to access and use Provider's proprietary educational software, **i-Ready®,** an interactive online learning environment designed to assess students and provide individualized instruction based on each one's unique needs.

10

**EXHIBIT "B"**
**SCHEDULE OF DATA**

| Category of Data | Elements | Check if Used by Your System |
|---|---|---|
| Application Technology Meta Data | IP Addresses of users, Use of cookies, etc. | X |
| | Other application technology meta data-Please specify: | |
| Application Use Statistics | Meta data on user interaction with application | X |
| Assessment | Standardized test scores | |
| | Observation data | |
| | Other assessment data-Please specify: | |
| Attendance | Student school (daily) attendance data | |
| | Student class attendance data | |
| Communications | Online communications captured (emails, blog entries) | |
| Conduct | Conduct or behavioral data | |
| Demographics | Date of Birth | X |
| | Place of Birth | |
| | Gender | X (optional) |
| | Ethnicity or race | X (optional) |
| | Language information (native, or primary language spoken by student) | X |
| | Other demographic information-Please specify: Migrant status | X (optional) |
| Enrollment | Student school enrollment | X |
| | Student grade level | X |
| | Homeroom | |
| | Guidance counselor | |
| | Specific curriculum programs | |
| | Year of graduation | |
| | Other enrollment information-Please specify: | |
| Parent/Guardian Contact Information | Address | |
| | Email | |

11

docs\EDU002\00023\1389238.v1-12/5/24

| Category of Data | Elements | Check if Used by Your System |
|---|---|---|
|  | Phone |  |
| Parent/Guardian ID | Parent ID number (created to link parents to students) |  |
| Parent/Guardian Name | First and/or Last |  |
| Schedule | Student scheduled courses |  |
|  | Teacher names | X |
| Special Indicator | English language learner information | X (optional) |
|  | Low income status | X (optional) |
|  | Medical alerts/ health data |  |
|  | Student disability information |  |
|  | Specialized education services (IEP or 504) | X (optional) |
|  | Living situations (homeless/foster care) |  |
|  | Other indicator information-Please specify: Migrant status and gifted eligibility data | X (optional) |
| Student Contact Information | Address |  |
|  | Email |  |
|  | Phone |  |
| Student Identifiers | Local (School district) ID number | X |
|  | State ID number | X |
|  | Provider/App assigned student ID number | X |
|  | Student app username | X |
|  | Student app passwords | X |
| Student Name | First and/or Last | X |
| Student In App Performance | Program/application performance (typing program-student types 60 wpm, reading program-student reads below grade level) | X |
| Student Program Membership | Academic or extracurricular activities a student may belong to or participate in |  |
| Student Survey Responses | Student responses to surveys or questionnaires |  |
| Student work | Student generated content; writing, pictures, etc. |  |
|  | Other student work data -Please specify: |  |
| Transcript | Student course grades |  |

12

| Category of Data | Elements | Check if Used by Your System |
|---|---|---|
| | Student course data | |
| | Student course grades/ performance scores | |
| | Other transcript data - Please specify: | |
| Transportation | Student bus assignment | |
| | Student pick up and/or drop off location | |
| | Student bus card ID number | |
| | Other transportation data – Please specify: | |
| Other | Please list each additional data element used, stored, or collected by your application: | |

13

docs\EDU002\00023\1389238.v1-12/5/24

14

| Category of Data | Elements | Check if Used by Your System |
|---|---|---|
| None | No Student Data collected at this time. Provider will immediately notify LEA if this designation is no longer applicable. | |

**EXHIBIT "C"**
**DEFINITIONS**

**De-Identified Data and De-Identification**: Records and information are considered to be de-identified when all personally identifiable information has been removed or obscured, such that the remaining information does not reasonably identify a specific individual, including, but not limited to, any information that, alone or in combination is linkable to a specific student and provided that the educational agency, or other party, has made a reasonable determination that a student's identity is not personally identifiable, taking into account reasonable available information.

**Educational Records**: Educational Records are records, files, documents, and other materials directly related to a student and maintained by the school or local education agency, or by a person acting for such school or local education agency, including but not limited to, records encompassing all the material kept in the student's cumulative folder, such as general identifying data, records of attendance and of academic work completed, records of achievement, and results of evaluative tests, health data, disciplinary status, test protocols and individualized education programs.

**Metadata**: means information that provides meaning and context to other data being collected; including, but not limited to: date and time records and purpose of creation Metadata that have been stripped of all direct and indirect identifiers are not considered Personally Identifiable Information.

**Operator**: means the operator of an internet website, online service, online application, or mobile application with actual knowledge that the site, service, or application is used for K–12 school purposes. Any entity that operates an internet website, online service, online application, or mobile application that has entered into a signed, written agreement with an LEA to provide a service to that LEA shall be considered an "operator" for the purposes of this section.

**Originating** LEA: An LEA who originally executes the DPA in its entirety with the Provider.

**Provider**: For purposes of the DPA, the term "Provider" means provider of digital educational software or services, including cloud-based services, for the digital storage, management, and retrieval of Student Data. Within the DPA the term "Provider" includes the term "Third Party" and the term "Operator" as used in applicable state statutes.

**Student Generated Content**: The term "student-generated content" means materials or content created by a student in the services including, but not limited to, essays, research reports, portfolios, creative writing, music or other audio files, photographs, videos, and account information that enables ongoing ownership of student content.

**School Official**: For the purposes of this DPA and pursuant to 34 CFR § 99.31(b), a School Official is a contractor that: (1) Performs an institutional service or function for which the agency or institution would otherwise use employees; (2) Is under the direct control of the agency or institution with respect to the use and maintenance of Student Data including Education Records; and (3) Is subject to 34 CFR § 99.33(a) governing the use and re-disclosure of personally identifiable information from Education Records.

**Service Agreement**: Refers to the Contract, Purchase Order or Terms of Service or Terms of Use.

**Student Data**: Student Data includes any data, whether gathered by Provider or provided by LEA or its users, students, or students' parents/guardians, that is descriptive of the student including, but not limited to, information in the student's educational record or email, first and last name, birthdate, home or other physical address, telephone number, email address, or other information allowing physical or online contact, discipline records, videos, test results, special education data, juvenile dependency records, grades, evaluations, criminal

15

records, medical records, health records, social security numbers, biometric information, disabilities, socioeconomic information, individual purchasing behavior or preferences, food purchases, political affiliations, religious information, text messages, documents, student identifiers, search activity, photos, voice recordings, geolocation information, parents' names, or any other information or identification number that would provide information about a specific student. Student Data includes Meta Data. Student Data further includes "personally identifiable information (PII)," as defined in 34 C.F.R. § 99.3 and as defined under any applicable state law. Student Data shall constitute Education Records for the purposes of this DPA, and for the purposes of federal, state, and local laws and regulations. Student Data as specified in **Exhibit "B"** is confirmed to be collected or processed by the Provider pursuant to the Services. Student Data shall not constitute that information that has been anonymized or de-identified, or anonymous usage data regarding a student's use of Provider's services.

**Subprocessor:** For the purposes of this DPA, the term "Subprocessor" (sometimes referred to as the "Subcontractor") means a party other than LEA or Provider, who Provider uses for data collection, analytics, storage, or other service to operate and/or improve its service, and who has access to Student Data.

**Subscribing LEA**: An LEA that was not party to the original Service Agreement and who accepts the Provider's General Offer of Privacy Terms.

**Targeted Advertising:** means presenting an advertisement to a student where the selection of the advertisement is based on Student Data or inferred over time from the usage of the operator's Internet web site, online service or mobile application by such student or the retention of such student's online activities or requests over time for the purpose of targeting subsequent advertisements. "Targeted advertising" does not include any advertising to a student on an Internet web site based on the content of the web page or in response to a student's response or request for information or feedback.

**Third Party**: The term "Third Party" means a provider of digital educational software or services, including cloud-based services, for the digital storage, management, and retrieval of Education Records and/or Student Data, as that term is used in some state statutes. However, for the purpose of this DPA, the term "Third Party" when used to indicate the provider of digital educational software or services is replaced by the term "Provider."

16

**EXHIBIT "D"**
**DIRECTIVE FOR DISPOSITION OF DATA**

[**Insert Name of District or LEA**] Provider to dispose of data obtained by Provider pursuant to the terms of the Service Agreement between LEA and Provider. The terms of the Disposition are set forth below:

1. Extent of Disposition

_____ Disposition is partial. The categories of data to be disposed of are set forth below or are found in an attachment to this Directive:

[**Insert categories of data here**]

_____ Disposition is Complete. Disposition extends to all categories of data.

2. Nature of Disposition

_____ Disposition shall be by destruction or deletion of data.

_____ Disposition shall be by a transfer of data. The data shall be transferred to the following site as follows:

[**Insert or attach special instructions**]

3. Schedule of Disposition

Data shall be disposed of by the following date:

_____ As soon as commercially practicable.

_____ By [**Insert Date**]

4. Signature

_____          _____
Authorized Representative of LEA                                    Date

5. Verification of Disposition of Data

_____          _____
Authorized Representative of Company                         Date

17

docs\EDU002\00023\1389238.v1-12/5/24

**EXHIBIT "E"**
**GENERAL OFFER OF PRIVACY TERMS**

**1**. **Offer of Terms**

Provider offers the same privacy protections found in this DPA between it and **Ellsworth School Department** ("Originating LEA") which is dated _01/14/25_____, to any other LEA ("Subscribing LEA") who accepts this General Offer of Privacy Terms ("General Offer") through its signature below. This General Offer shall extend only to privacy protections, and Provider's signature shall not necessarily bind Provider to other terms, such as price, term, or schedule of services, or to any other provision not addressed in this DPA. The Provider and the Subscribing LEA may also agree to change the data provided by Subscribing LEA to the Provider to suit the unique needs of the Subscribing LEA. The Provider may withdraw the General Offer in the event of: (1) a material change in the applicable privacy statutes; (2) a material change in the services and products listed in the originating Service Agreement; or three (3) years after the date of Provider's signature to this Form.

Subscribing LEAs should send the signed **Exhibit "E"** to Provider at the following email address:
_customercontracts@cainc.com_____.

## CURRICULUM ASSOCIATES, LLC

BY: _J.L Sipe, Jr._____Date: _1/13/25_____

Printed Name: _John Sipe, Jr._____Title/Position: _Executive Vice President_____

**2**. **Subscribing LEA**

A Subscribing LEA, by signing a separate Service Agreement with Provider, and by its signature below, accepts the General Offer of Privacy Terms. The Subscribing LEA and the Provider shall therefore be bound by the same terms of this DPA for the term of the DPA between the **Ellsworth School Department** and the Provider. **PRIOR TO ITS EFFECTIVENESS, SUBSCRIBING LEA MUST DELIVER NOTICE OF ACCEPTANCE TO PROVIDER PURSUANT TO ARTICLE VII, SECTION 5. **

**Subscribing LEA: (School District Name):** _____

BY: _____Date:_____

Printed Name: _____ Title/Position: _____

DESIGNATED REPRESENTATIVE OF LEA:

Name:           _____

Title:            _____

Address:        _____

Telephone Number:    _____

Email:            _____

docs\EDU002\00023\1389238.v1-12/5/24

**EXHIBIT "F"**
**DATA SECURITY REQUIREMENTS**

**Adequate Cybersecurity Frameworks**
**2/24/2020**

The Education Security and Privacy Exchange ("Edspex") works in partnership with the Student Data Privacy Consortium and industry leaders to maintain a list of known and credible cybersecurity frameworks which can protect digital learning ecosystems chosen based on a set of guiding cybersecurity principles* ("Cybersecurity Frameworks") that may be utilized by Provider .

Cybersecurity Frameworks

|  | MAINTAINING ORGANIZATION/GROUP | FRAMEWORK(S) |
|---|---|---|
| X | National Institute of Standards and Technology | NIST Cybersecurity Framework Version 1.1 |
| X | National Institute of Standards and Technology | NIST SP 800-53, Cybersecurity Framework for Improving Critical Infrastructure Cybersecurity (CSF), Special Publication 800-171 |
| X | International Standards Organization | Information technology — Security techniques — Information security management systems (ISO 27000 series) |
|  | Secure Controls Framework Council, LLC | Security Controls Framework (SCF) |
|  | Center for Internet Security | CIS Critical Security Controls (CSC, CIS Top 20) |
|  | Office of the Under Secretary of Defense for Acquisition and Sustainment (OUSD(A&S)) | Cybersecurity Maturity Model Certification (CMMC, ~FAR/DFAR) |

*Please visit http://www.edspex.org for further details about the noted frameworks.*
*Cybersecurity Principles used to choose the Cybersecurity Frameworks are located here

19

## EXHIBIT "G"
## Massachusetts

**WHEREAS,** the documents and data transferred from LEAs and created by the Provider's Services are also subject to several state laws in Massachusetts.  Specifically, those laws are 603 C.M.R. 23.00, Massachusetts General Law, Chapter 71, Sections 34D to 34H and 603 CMR 28.00; and

**WHEREAS,** the Parties wish to enter into these supplemental terms to the DPA to ensure that the Services provided conform to the requirements of the privacy laws referred to above and to establish implementing procedures and duties;

**WHEREAS,** the Parties wish these terms to be hereby incorporated by reference into the DPA in their entirety for Massachusetts;

**NOW THEREFORE,** for good and valuable consideration, the parties agree as follows:


1. In Article IV, Section 2, replace "otherwise authorized," with "otherwise required" and delete "or stated in the Service Agreement."

2. All employees of the Provider who will have direct contact with students shall pass criminal background checks.
3. In Article V, Section 1 Data Storage: Massachusetts does not require data to be stored within the United States.

20

docs\EDU002\00023\1389238.v1-12/5/24

# EXHIBIT "G"
## Maine

**WHEREAS**, the documents and data transferred from LEAs and created by the Provider's Services are also subject to several state laws in Maine.  Specifically, those laws are 20-A M.R.S. §6001-6005.; 20-A M.R.S. §951 et. seq., Maine Unified Special Education Regulations, Maine Dep't of Edu. Rule Ch. 101; and

**WHEREAS**, the Parties wish to enter into these supplemental terms to the DPA to ensure that the Services provided conform to the requirements of the privacy laws referred to above and to establish implementing procedures and duties;

**WHEREAS**, the Parties wish these terms to be hereby incorporated by reference into the DPA in their entirety for Maine;

**NOW THEREFORE**, for good and valuable consideration, the parties agree as follows:

1.  In Article IV, Section 2, replace "otherwise authorized," with "otherwise required" and delete "or stated in the Service Agreement."

2.  All employees of the Provider who will have direct contact with students shall pass criminal background checks.

3.  In Article V, Section 1 Data Storage: Maine does not require data to be stored within the United States.

4.  The Provider may not publish on the Internet or provide for publication on the Internet any Student Data.

5.  If the Provider collects student social security numbers, the Provider shall notify the LEA of the purpose the social security number will be used and provide an opportunity not to provide a social security number if the parent and/or student elects.

6.  The parties agree that the definition of Student Data in Exhibit "C" includes the name of the student's family members, the student's place of birth, the student's mother's maiden name, results of assessments administered by the State, LEA or teacher, including participating information, course transcript information, including, but not limited to, courses taken and completed, course grades and grade point average, credits earned and degree, diploma, credential attainment or other school exit information, attendance and mobility information between and within LEAs within Maine, student's gender, race and ethnicity, educational program participation information required by state or federal law and email.

7.  The parties agree that the definition of Student Data in Exhibit "C" includes information that:

    a.  Is created by a student or the student's parent or provided to an employee or agent of the LEA or a Provider in the course of the student's or parent's use of the Provider's website, service or application for kindergarten to grade 12 school purposes;

    b.  Is created or provided by an employee or agent of the LEA, including information provided to the Provider in the course of the employee's or agent's use of the Provider's website, service or application for kindergarten to grade 12 school purposes; or

    c.  Is gathered by the Provider through the operation of the Provider's website, service or application for kindergarten to grade 12 school purposes.

docs\EDU002\00023\1389238.v1-12/5/24

# EXHIBIT "G"
## Missouri

**WHEREAS**, the documents and data transferred from LEAs and created by the Provider's Services are also subject to several state laws in Missouri. Specifically, those laws are Sections 162.1475 and 407.1500 RSMo; and

**WHEREAS**, the Parties wish to enter into these supplemental terms to the DPA to ensure that the Services provided conform to the requirements of the privacy laws referred to above and to establish implementing procedures and duties;

**WHEREAS**, the Parties wish these terms to be hereby incorporated by reference into the DPA in their entirety for Missouri;

**NOW THEREFORE**, for good and valuable consideration, the parties agree as follows:

1. In Article IV, Section 2, replace "otherwise authorized," with "otherwise required" and delete "or stated in the Service Agreement."
2. All employees of the Provider who will have direct contact with students shall pass criminal background checks.
3. In Article V, Section 1 Data Storage: Missouri does not require data to be stored within the United States.
4. Replace Article V, Section 4(1) with the following:
    a. In the event of a breach of data maintained in an electronic form that includes personal information of a student or a student's family member, Provider shall notify LEA within seventy-two (72) hours. The notice shall include:
        i. Details of the incident, including when it occurred and when it was discovered;
        ii. The type of personal information that was obtained as a result of the breach; and
        iii. The contact person for Provider who has more information about the incident.
    b. "*Breach*" shall mean the unauthorized access to or unauthorized acquisition of personal information that compromises the security, confidentiality, or integrity of the personal information. Good faith acquisition of personal information by a person employed by or contracted with, or an agent of, Provider is not a breach provided that the personal information is not used in violation of applicable Federal or Missouri law, or in a manner that harms or poses an actual threat to the security, confidentiality, or integrity of the personal information.
    c. "*Personal information*" is the first name or initial and last name of a student or a family member of a student in combination with any one or more of the following data items that relate to the student or a family member of the student if any of the data elements are not encrypted, redacted, or otherwise altered by any method or technology such that the name or data elements are unreadable or unusable:
        i. Social Security Number;
        ii. Driver's license number or other unique identification number created or collected by a government body;
        iii. Financial account information, credit card number, or debit card number in combination with any required security code, access code, or password that would permit access to an individual's financial account;
        iv. Unique electronic identifier or routing code in combination with any required security code, access code, or password that would permit access to an individual's financial account;
        v. Medical information; or
        vi. Health insurance information.

22

# EXHIBIT "G"
## Ohio

**WHEREAS**, the documents and data transferred from LEAs and created by the Provider's Services are also subject to several state laws in Ohio. Specifically, those laws are R.C. §§ 3319.32-3319.324, R.C. §§ 1349.17-19, Rule 3301-51-04; and

**WHEREAS**, the Parties wish to enter into these supplemental terms to the DPA to ensure that the Services provided conform to the requirements of the privacy laws referred to above and to establish implementing procedures and duties;

**WHEREAS**, the Parties wish these terms to be hereby incorporated by reference into the DPA in their entirety for Ohio;

**NOW THEREFORE**, for good and valuable consideration, the parties agree as follows:

5.  In Article IV, Section 2, replace "otherwise authorized," with "otherwise required" and delete "or stated in the Service Agreement."
6.  All employees of the Provider who will have direct contact with students shall pass criminal background checks.
7.  In Article V, Section 1 Data Storage: Ohio does not require data to be stored within the United States.

23

docs\EDU002\00023\1389238.v1-12/5/24

# EXHIBIT "G"
# Rhode Island

**WHEREAS,** the documents and data transferred from LEAs and created by the Provider's Services are also subject to several state laws in Rhode Island.  Specifically, those laws are R.I.G.L. 16-71-1, et. seq., R.I.G.L. 16-104-1, and R.I.G.L., 11-49.3 et. seq.; and

**WHEREAS,** the Parties wish to enter into these supplemental terms to the DPA to ensure that the Services provided conform to the requirements of the privacy laws referred to above and to establish implementing procedures and duties;

**WHEREAS,** the Parties wish these terms to be hereby incorporated by reference into the DPA in their entirety for Rhode Island;

**NOW THEREFORE,** for good and valuable consideration, the parties agree as follows:

1. In Article IV, Section 2, replace "otherwise authorized," with "otherwise required" and delete "or stated in the Service Agreement."
2. All employees of the Provider who will have direct contact with students shall pass criminal background checks.
3. In Article V, Section 1 Data Storage: Rhode Island does not require data to be stored within the United States.
4. The Provider agrees that this DPA serves as its written certification of its compliance with R.I.G.L. 16-104-1.
5. The Provider agrees to implement and maintain a risk-based information security program that contains reasonable security procedures.
6. In the case of a data breach, as a part of the security breach notification outlined in Article V, Section 4(1), the Provider agrees to provide the following additional information:

      i. Information about what the Provider has done to protect individuals whose information has been breached, including toll free numbers and websites to contact:

      1. The credit reporting agencies
      2. Remediation service providers
      3. The attorney general

      ii. Advice on steps that the person whose information has been breached may take to protect himself or herself.

      iii. A clear and concise description of the affected parent, legal guardian, staff member, or eligible student's ability to file or obtain a police report; how an affected parent, legal guardian, staff member, or eligible student's requests a security freeze and the necessary information to be provided when requesting the security freeze; and that fees may be required to be paid to the consumer reporting agencies.

      iv. For clarification, the LEA will provide direct notification to affected individuals. Provider will provide LEA contact information to its designated point of contact related to breach (not credit reporting agency or remediation services or an attorney general).

24

docs\EDU002\00023\1389238.v1-12/5/24

**EXHIBIT "G"**
**Tennessee**

**WHEREAS**, the documents and data transferred from LEAs and created by the Provider's Services are also subject to several state laws in Tennessee. Specifically, those laws are T.C.A. §§ 10-7-503 *et. seq.*, T.C.A. § 47-18-2107,  T.C.A. § 49-1-701 *et. seq.*, T.C.A. § 49-2-211, T.C.A. § 49-6-902, § 49-6-3001, T.C.A. §§ 49-50-1501 *et. seq.*; and

**WHEREAS**, the Parties wish to enter into these supplemental terms to the DPA to ensure that the Services provided conform to the requirements of the privacy laws referred to above and to establish implementing procedures and duties;

**WHEREAS**, the Parties wish these terms to be hereby incorporated by reference into the DPA in their entirety for Tennessee;

**NOW THEREFORE**, for good and valuable consideration, the parties agree as follows:

8.  In Article IV, Section 2, replace "otherwise authorized," with "otherwise required" and delete "or stated in the Service Agreement."
9.  All employees of the Provider who will have direct contact with students shall pass criminal background checks.
10. In Article V, Section 1 Data Storage: Tennessee does not require data to be stored within the United States.
11. The Provider agrees that it will not collect any individual student biometric data, student data relative to analysis of facial expressions, EEG brain wave patterns, skin conductance, galvanic skin response, heart-rate variability, pulse, blood volume, posture, and eye-tracking.
12. The Provider agrees that it will not collect individual student data on:
    a.  Political affiliation;
    b.  Religion;
    c.  Voting history; and
    d.  Firearms ownership

25

docs\EDU002\00023\1389238.v1-12/5/24

# EXHIBIT "G"
## Vermont

**WHEREAS,** the documents and data transferred from LEAs and created by the Provider's Services are also subject to several state laws in Vermont.  Specifically, those laws are 9 VSA 2443 to 2443f; 16 VSA 1321 to 1324; and

**WHEREAS,** the Parties wish to enter into these supplemental terms to the DPA to ensure that the Services provided conform to the requirements of the privacy laws referred to above and to establish implementing procedures and duties;

**WHEREAS,** the Parties wish these terms to be hereby incorporated by reference into the DPA in their entirety for Vermont;

**NOW THEREFORE,** for good and valuable consideration, the parties agree as follows:

1. In Article IV, Section 2, replace "otherwise authorized," with "otherwise required" and delete "or stated in the Service Agreement."
2. All employees of the Provider who will have direct contact with students shall pass criminal background checks.
3. In Article V, Section 1 Data Storage: Vermont does not require data to be stored within the United States.

26

# EXHIBIT "G"
## Virginia

**WHEREAS**, the documents and data transferred from LEAs and created by the Provider's Services are also subject to several state laws in Virginia. Specifically, those laws are Code of Virginia § 22.1-289.01 and Virginia Code § 2.2-5514(c); and

**WHEREAS**, the Parties wish to enter into these supplemental terms to the DPA to ensure that the Services provided conform to the requirements of the privacy laws referred to above and to establish implementing procedures and duties;

**WHEREAS**, the Parties wish these terms to be hereby incorporated by reference into the DPA in their entirety for Virginia;

**NOW THEREFORE**, for good and valuable consideration, the parties agree as follows:

13. In Article IV, Section 2, replace "otherwise authorized," with "otherwise required" and delete "or stated in the Service Agreement."
14. All employees of the Provider who will have direct contact with students shall pass criminal background checks.
15. In Article V, Section 1 Data Storage: Virginia does not require data to be stored within the United States.
16. In Article V, Section 4, add:  In order to ensure the LEA's ability to comply with its reporting requirements under Virginia Code § 2.2-5514(c), Provider shall provide initial notification to the LEA as soon as reasonably practical, and at a minimum within twenty-four (24) hours, where the Provider discovers Student Data has been disclosed in a data breach.

docs\EDU002\00023\1389238.v1-12/5/24

**EXHIBIT "G"**
**New Hampshire**

**WHEREAS,** the documents and data transferred from LEAs and created by the Provider's Services are also subject to several state laws in New Hampshire.  Specifically, those laws are RSA 189:1-e and 189:65-68-a; RSA 186; NH Admin. Code Ed. 300 and NH Admin. Code Ed. 1100; and

**WHEREAS,** the Parties wish to enter into these supplemental terms to the DPA to ensure that the Services provided conform to the requirements of the privacy laws referred to above and to establish implementing procedures and duties;

**WHEREAS,** the Parties wish these terms to be hereby incorporated by reference into the DPA in their entirety for New Hampshire;

**NOW THEREFORE,** for good and valuable consideration, the parties agree as follows:

1.  All references in the DPA to "Student Data" shall be amended to state "Student Data and Teacher Data." **"**Teacher Data" is defined as at least the following:

Social security number.
Date of birth.
Personal street address.
Personal email address.
Personal telephone number
Performance evaluations.

Other information that, alone or in combination, is linked or linkable to a specific teacher, paraprofessional, principal, or administrator that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify any with reasonable certainty.

Information requested by a person who the department reasonably believes or knows the identity of the teacher, paraprofessional, principal, or administrator to whom the education record relates.

"Teacher" means teachers, paraprofessionals, principals, school employees, contractors, and other administrators.

**2.**  In order to perform the Services described in the DPA, the LEA shall provide the categories of Teacher Data described in the Schedule of Data, attached hereto as **Exhibit "I".**

3.  In Article IV, Section 2, replace "otherwise authorized," with "otherwise required" and delete "or stated in the Service Agreement."

4.  In Article IV, Section 7 amend each reference to "students," to state: "students, teachers,…"

5.  All employees of the Provider who will have direct contact with students shall pass criminal background checks.

6.  Provider is prohibited from leasing, renting, or trading Student Data or Teacher Data to (a) market or advertise to students, teachers, or families/guardians; (b) inform, influence, or enable marketing, advertising or other commercial efforts by a Provider; (c) develop a profile of a student, teacher, family member/guardian or group, for any commercial purpose other than providing the Service to LEA; or (d) use the Student Data and Teacher Data for the development of commercial products or services, other than as

28

docs\EDU002\00023\1389238.v1-12/5/24

necessary to provide the Service to the LEA or through use of De-identified Data as permitted under FERPA. This section does not prohibit Provider from using Student Data and Teacher Data for adaptive learning or customized student learning purposes.

7.  The Provider agrees to the following privacy and security standards.  Specifically, the Provider agrees to:

    (1)  Limit system access to the types of transactions and functions that authorized users, such as students, parents, and LEA are permitted to execute;

    (2)  Limit unsuccessful logon attempts;

    (3)  Employ cryptographic mechanisms to protect the confidentiality of remote access sessions;

    (4)  Authorize wireless access prior to allowing such connections;

    (5)  Create and retain system audit logs and records to the extent needed to enable the monitoring, analysis, investigation, and reporting of unlawful or unauthorized system activity;

    (6)  Ensure that the actions of individual system users can be uniquely traced to those users so they can be held accountable for their actions;

    (7)  Establish and maintain baseline configurations and inventories of organizational systems (including hardware, software, firmware, and documentation) throughout the respective system development life cycles;

    (8)  Restrict, disable, or prevent the use of nonessential programs, functions, ports, protocols, and services;

    (9)  Enforce a minimum password complexity and change of characters when new passwords are created;

    (10) Perform maintenance on organizational systems;

    (11) Provide controls on the tools, techniques, mechanisms, and personnel used to conduct system maintenance;

    (12) Ensure equipment removed for off-site maintenance is sanitized of any Student Data or Teacher Data in accordance with NIST SP 800-88 Revision 1;

    (13) Protect (i.e., physically control and securely store) system media containing Student Data or Teacher Data, both paper and digital;

    (14) Sanitize or destroy system media containing Student Data or Teacher Data in accordance with NIST SP 800-88 Revision 1 before disposal or release for reuse;

    (15) Control access to media containing Student Data or Teacher Data and maintain accountability for media during transport outside of controlled areas;

    (16) Periodically assess the security controls in organizational systems to determine if the controls are effective in their application and develop and implement plans of action

29

designed to correct deficiencies and reduce or eliminate vulnerabilities in organizational systems;

(17) Monitor, control, and protect communications (i.e., information transmitted or received by organizational systems) at the external boundaries and key internal boundaries of organizational systems;

(18) Deny network communications traffic by default and allow network communications traffic by exception (i.e., deny all, permit by exception);

(19) Protect the confidentiality of Student Data and Teacher Data at rest;

(20) Identify, report, and correct system flaws in a timely manner;

(21) Provide protection from malicious code (i.e. Antivirus and Antimalware) at designated locations within organizational systems;

(22) Monitor system security alerts and advisories and take action in response; and

(23) Update malicious code protection mechanisms when new releases are available.

Alternatively, the Provider agrees to comply with one of the following standards:  (1) NIST SP 800-171 rev 2, Basic and Derived Requirements; (2) NIST SP 800-53 rev 4 or newer, Low Impact Baseline or higher; (3) FedRAMP (Federal Risk and Authorization Management Program); (4) ISO/IEC 27001:2013; (5) Center for Internet Security (CIS) Controls, v. 7.1, Implementation Group 1 or higher; (6) AICPA System and Organization Controls (SOC) 2, Type 2; and (7) Payment Card Industry Data Security Standard (PCI DSS), v3.2.1.  The Provider will provide to the LEA on an annual basis and upon written request demonstration of successful certification of these alternative standards in the form of a national or international Certification document; an Authorization to Operate (ATO) issued by a state or federal agency, or by a recognized security standards body; or a Preliminary Authorization to Operate (PATO) issued by the FedRAMP Joint Authorization Board (JAB).  For clarification, Provider's security program and documentation is based on ISO-27001/2, however, will be migrating to NIST 800/53 and CyberSecurity Framework.  SOC-2 audits are based on this security program.

8. In the case of a data breach, as a part of the security breach notification outlined in Article V, Section 4(1), the Provider agrees to provide the following additional information:

    i. The estimated number of students and teachers affected by the breach, if any.

9. The parties agree to add the following categories into the definition of Student Data: the name of the student's parents or other family members, place of birth, social media address, unique pupil identifier, and credit card account number, insurance account number, and financial services account number.

10. In Article V, Section 1 Data Storage: New Hampshire does not require data to be stored within the United States.

docs\EDU002\00023\1389238.v1-12/5/24

| EXHIBIT "I" – TEACHER DATA | | |
|---|---|---|
| **Category of Data** | **Elements** | **Check if used by your system** |
| Application Technology Meta Data | IP Addresses of users, Use of cookies etc. | X |
| | Other application technology meta data-Please specify: login dates and times, browser, OS | X |
| Application Use Statistics | Meta data on user interaction with application | X |
| Communications | Online communications that are captured (emails, blog entries) | |
| Demographics | Date of Birth | |
| | Place of Birth | |
| | Social Security Number | |
| | Ethnicity or race | |
| | Other demographic information-Please specify: | |
| Personal Contact Information | Personal Address | |
| | Personal Email | |
| | Personal Phone | |
| Performance evaluations | Performance Evaluation Information | |
| Schedule | Teacher scheduled courses | X |
| | Teacher calendar | |
| Special Information | Medical alerts | |
| | Teacher disability information | |
| | Other indicator information-Please specify: | |
| Teacher Identifiers | Local (School district) ID number | |
| | State ID number | |
| | Vendor/App assigned student ID number | |
| | Teacher app username | X |
| | Teacher app passwords | X |
| Teacher In App Performance | Program/application performance | |
| Teacher Survey Responses | Teacher responses to surveys or questionnaires | X |
| Teacher work | Teacher generated content; writing, pictures etc. | |
| | Other teacher work data -Please specify: | |
| Education | Course grades from schooling | |
| | Other transcript data -Please specify: | |
| Other | Please list each additional data element used, stored  or collected by your application | |

## Exhibit "G"

## New York

**WHEREAS,** the documents and data transferred from LEAs and created by the Provider's Services are also subject to several state laws in New York.  Specifically, those laws are New York Education Law § 2-d; and the Regulations of the Commissioner of Education at 8 NYCRR Part 121; and

**WHEREAS,** the Parties wish to enter into these additional terms to the DPA to ensure that the Services provided conform to the requirements of the privacy laws referred to above and to establish implementing procedures and duties;

**WHEREAS,** the Parties wish these terms to be hereby incorporated by reference into the DPA in their entirety for New York;

**NOW THEREFORE,** for good and valuable consideration, the parties agree as follows:

1. All employees of the Provider who will have direct contact with students shall pass criminal background checks.

2. Student Data will be used by Provider exclusively to provide the Services identified in Exhibit A to the DPA.

3. Provider agrees to maintain the confidentiality and security of Student Data in accordance with LEA's Data Security and Privacy Policy.  The LEA's Data Security Policy is attached hereto as Exhibit J.  Each Subscribing LEA will provide its Data Security Policy to the Provider upon execution of Exhibit "E".  Provider shall use industry standard security measures including encryption protocols that comply with New York law and regulations to preserve and protect Student Data and APPR Data. Provider must Encrypt Student Data and APPR Data at rest and in transit in accordance with applicable New York laws and regulations.

4. Provider represents that their Data Privacy and Security Plan is attached as Exhibit K and is incorporated into this DPA.  Provider warrants that its Data Security and Privacy Plan, at a minimum: (a)implements all applicable state, federal and local data privacy and security requirements; (b) has operational technical safeguards and controls in place to protect PII that it will receive under the service agreement; (c) complies with the LEA's parents bill of rights for data privacy and security;  (d) requires training of all providers' employees, assignees and subprocessors who have Access to student data or APPR data; (e) ensures subprocessors are required to protect PII received under this service agreement; (f) specifies how data security and privacy incidents that implicate PII will be managed and ensuring prompt notification to the LEA, and (g) addresses Student Data return, deletion and destruction.

5. In addition to the requirements described in Paragraph 3 above, the Provider's Data Security and Privacy Plan shall be deemed to incorporate the LEA's Parents Bill of Rights for Data Security and Privacy, as found at the URL link identified in Exhibit J.  The Subscribing LEA will provide its Parents Bill of Rights for Data Security and Privacy to the Provider upon execution of Exhibit "E".

docs\EDU002\00023\1389238.v1-12/5/24

6.  All references in the DPA to "Student Data" shall be amended to include and state, "Student Data and APPR Data."

7.  To amend Article II, Section 5 to add:  Provider shall ensure that its subprocessors agree that they do not have any property, licensing or ownership rights or claims to Student Data or APPR data and that they will comply with the LEA's   Data Privacy and Security Policy. Provider shall examine the data privacy and security measures of its Subprocessors. If at any point a Subprocessor fails to materially comply with the requirements of this DPA, Provider shall: (i) notify LEA, (ii) as applicable, remove such Subprocessor's Access to Student Data and APPR Data; and (iii) as applicable, retrieve all Student Data and APPR Data received or stored by such Subprocessor and/or ensure that Student Data and APPR Data has been securely deleted or securely destroyed in accordance with this DPA. In the event there is an incident in which Student Data and APPR Data held, possessed, or stored by the Subprocessor is compromised, or unlawfully Accessed or disclosed, Provider shall follow the Data Breach reporting requirements set forth in the DPA.

8.  In Article IV, Section 2, replace "otherwise authorized," with "otherwise required" and delete "or stated in the Service Agreement."

9.  To amend Article IV, Section 3 to add: Provider shall ensure that all its employees and subprocessors who have Access to or will receive Student Data and APPR Data will be trained on the federal and state laws governing confidentiality of such Student Data and APPR Data prior to receipt. Access to or Disclosure of Student Data and APPR Data shall only be provided to Provider's employees and subprocessors who need to know the Student Data and APPR Data to provide the services and such Access and/or Disclosure of Student Data and APPR Data shall be limited to the extent necessary to provide such services.

10.  To replace Article IV, Section 6 (Disposition of Data) with the following: Upon written request from the LEA, Provider shall dispose of or return Student Data obtained under the Service Agreement, within ninety (90) days of the date of said request and according to a schedule and procedure as the Parties may reasonably agree. Provider is prohibited from retaining disclosed Student Data or continuing to Access Student Data beyond the ninety (90) day period following written request to dispose of or return Student Data as noted above unless such retention is expressly authorized for a prescribed period by the Service Agreement, necessary for purposes of facilitating the transfer of disclosed Student Data to the LEA, or expressly required by law. The confidentiality and data security obligations of Provider under this DPA shall survive any termination of this contract to which this DPA is attached but shall terminate upon Provider's certifying, upon request, that it and its subprocessors, as applicable: (a) no longer have the ability to Access any Student Data provided to Provider pursuant to the Service Agreement and/or (b) have destroyed all Student Data and APPR Data provided to Provider pursuant to  this DPA.  The Provider agrees that the timelines for disposition of data will be modified by any Assurance of Discontinuation, which will control in the case of a conflict, as applicable.

Upon termination of this DPA, if no written request from the LEA is received, Provider shall provide LEA with written notice within 90 days of contract termination indicating that all LEA Student Data will be disposed of one year following such notice, unless the LEA elects for Provider to retain such Student Data.

The duty to dispose of Student Data shall not extend to Student Data that had been de-identified.  The LEA may employ a "**Directive for Disposition of Data"** form, a copy of which is attached hereto as **Exhibit "D",** or, with reasonable notice to the Provider, other form of its choosing.  No further written request or notice is required on the part of either party prior to the disposition of Student Data described in **"Exhibit D".**

11. To amend Article IV, Section 7 to add: 'Notwithstanding the foregoing, Provider is prohibited from using Student Data or APPR data for any Commercial or Marketing Purpose as defined herein.  And add after (iii) account holder, "which term shall not include students."

12. To replace Article V, Section 1 (Data Storage) to state: Student Data and APPR Data shall be stored within the United States and Canada only. Upon request of the LEA, Provider will provide a list of the locations where Student Data is stored.

13. To replace Article V, Section 2 (Audits) to state: No more than once a year or following an unauthorized Access, upon receipt of a written request from the LEA with at least ten (10) business days' notice and upon the execution of an appropriate confidentiality agreement, the Provider will allow the LEA or its designee(s) to audit the security and privacy measures that are in place to ensure protection of Student Data or any portion thereof as it pertains to the delivery of services to the LEA . The Provider will cooperate reasonably with the LEA or its designee(s) and any local, state, or federal agency with oversight authority or jurisdiction in connection with any audit or investigation of the Provider and/or delivery of Services to students and/or LEA, and shall provide reasonable Access to the Provider's facilities, staff, agents and LEA's Student Data and all records pertaining to the Provider, LEA and delivery of Services to the LEA.

To amend the third sentence of Article V. Section 3 (Data Security) to read: The Provider shall implement security practices that are in alignment with the NIST Cybersecurity Framework v1.1 or any update to this Framework that is adopted by the New York State Department of Education.

14. To replace Article V. Section 4 (Data Breach) to state: In the event of a Breach as defined in 8 NYCRR Part 121.1 Provider shall provide notification to LEA within seventy-two (72) hours of confirmation of the incident, unless notification within this time limit would disrupt investigation of the incident by law enforcement.  In such an event, notification shall be made within a reasonable time after the incident. Provider shall follow the following process:

(1) The security breach notification described above shall include, at a minimum, the following information to the extent known by the Provider and as it becomes available:

i. The name and contact information of the reporting LEA subject to this section.

ii. A list of the types of personal information that were or are reasonably believed to have been the subject of a breach.

iii. If the information is possible to determine at the time the notice is provided, then either (1) the date of the breach, (2) the estimated date of the breach, or (3) the date range within which the breach occurred. The notification shall also include the date of the notice.

iv. Whether the notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided; and

v. A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

vi. The number of records affected, if known; and

vii. A description of the investigation undertaken so far; and

viii. The name of a point of contact for Provider.

(2) Provider agrees to adhere to all applicable federal and state requirements with respect to a data breach related to the Student Data, including, when appropriate or required, the required responsibilities and procedures for notification and mitigation of any such data breach.

(3) Provider further acknowledges and agrees to have a written incident response plan that reflects industry standard practices and is consistent with industry standards and federal and state law for responding to a data breach, breach of security, privacy incident or unauthorized acquisition or use of Student Data or any portion thereof, including personally identifiable information and agrees to provide LEA, upon request, with a summary of said written incident response plan.

(4) LEA shall provide notice and facts surrounding the breach to the affected students, parents or guardians. Where a Breach of Student Data and/or APPR Data occurs that is attributable to Provider and/or its Subprocessors, Provider shall pay for or promptly reimburse LEA for the full cost of notification to Parents, Eligible Students, teachers, and/or principals.

(5) In the event of a breach originating from LEA's use of the Service, Provider shall cooperate with LEA to the extent necessary to expeditiously secure Student Data.

(6) Provider and its subprocessors will cooperate with the LEA, the NYSED Chief Privacy Officer and law enforcement where necessary, in any investigations into a Breach. Any costs incidental to the required cooperation or participation of the Provider will be the sole responsibility of the Provider if such Breach is attributable to Provider or its subprocessors.

15. To amend the definitions in Exhibit "C" as follows:

– "Subprocessor" is equivalent to subcontractor.  It is a third party who the provider uses for data collection, analytics, storage, or other service to allow Provider to operate and/or improve its service, and who has access to Student Data.

docs\EDU002\00023\1389238.v1-12/5/24

- "Provider" is also known as third party contractor.  It any person or entity, other than an educational agency, that receives Student Data or teacher or principal data from an educational agency pursuant to a contract or other written agreement for purposes of providing services to such educational agency, including but not limited to data management or storage services, conducting studies for or on behalf of such educational agency, or audit or evaluation of publicly funded programs. Such term shall include an educational partnership organization that receives student and/or teacher or principal data from a school district to carry out its responsibilities and is not an educational agency and a not-for-profit corporation or other non-profit organization, other than an educational agency.

16. To add to Exhibit "C" the following definitions:
   - **Access:**  The ability to view or otherwise obtain, but not copy or save, Student Data and/or APPR Data arising from the on-site use of an information system or from a personal meeting.
   - **APPR Data**: Personally Identifiable Information from the records of an Educational Agency relating to the annual professional performance reviews of classroom teachers or principals that is confidential and not subject to release under the provisions of Education Law §§ 3012-c and 3012-d
   - **Commercial or Marketing Purpose:**  In accordance with § 121.1(c) of the regulations of the New York Commissioner of Education, the Disclosure, sale, or use of Student or APPR Data for the purpose of directly or indirectly receiving remuneration, including the Disclosure, sale, or use of Student Data or APPR Data for advertising purposes, or the Disclosure, sale, or use of Student Data to develop, improve, or market products or services to Students.
   - **Disclose or Disclosure**: The intentional or unintentional communication, release, or transfer of Student Data and/or APPR Data by any means, including oral, written, or electronic.
   - **Encrypt or Encryption**: As defined in the Health Insurance Portability and Accountability Act of 1996 Security Rule at 45 CFR § 164.304, encrypt means the use of an algorithmic process to transform Personally Identifiable Information into an unusable, unreadable, or indecipherable form in which there is a low probability of assigning meaning without use of a confidential process or key.
   - **Release:** Shall have the same meaning as Disclose
   - **LEA:**  As used in this DPA and all Exhibits, the term LEA shall mean the educational agency, as defined in Education Law Section 2-d, that has executed the DPA; if the LEA is a board of cooperative educational services, then the term LEA shall also include Participating School Districts for purposes of the following provisions of the DPA: Article I, Section 2; Article II, Sections 1 and 3; and Sections 1, 2, and 3 of Article III.
   - **Participating School District**: As used in Exhibit G and other Exhibits to the DPA, the term Participating School District shall mean a New York State educational agency, as that term is defined in Education Law Section 2-d, that obtains access to the Services through a CoSer agreement with LEA, and shall include LEA if it uses the Services in its own educational or operational programs.

**Exhibit "J"**
**LEA Documents**


New York LEAs will provide links to their Data Security and Privacy Policy, Parents Bill of Rights for Data Security and Privacy, and supplemental information for this service agreement in their Exhibit Es.

## Exhibit "K"
## Provider Security Policy

_____Attached on following pages.

_____

New York

# Student Data Privacy and Security Plan

## Last Updated: March 4, 2024

### Purpose.

Curriculum Associates ("CA") takes the protection of our customers' data and information, particularly student data, very seriously. The purpose of this New York Student Data Privacy and Security Plan is to inform our New York customers about our current data security policies and practices, which are intended to safeguard this sensitive information. CA handles customer data in a manner consistent with applicable laws and regulations, including, without limitation, the Federal Family Educational Rights and Privacy Act (FERPA), New York Education Law §2-d, as well as other state student data privacy protection laws.

### Scope.

This plan covers the collection, use, and storage of data that is obtained through the use of the products and related services accessible through the use of CA's proprietary *i-Ready®* platform, *i-Ready Connect™*. These include *i-Ready® Assessment*, *i-Ready Learning*, *i-Ready Learning Games*, *i-Ready Standards Mastery*, *i-Ready* reports and reporting tools, and the e-book versions and digital components of *Ready® Classroom™ Mathematics*. All of these products and services are collectively referred to in this policy as "*i-Ready*." Note that there are separate terms applicable only to Teacher Toolbox, an educator-only facing product. These separate terms are described at the end of this plan.

### Student Bill of Rights.

The Parents Bill of Rights for Data Privacy and Security ("Parents Bill of Rights") is attached as Exhibit A.

### Student Data Obtained and Collected.

CA receives certain information, which we receive pursuant to the school official exception under FERPA, from its school district customers to enable students to use *i-Ready*. The following information is generally provided to CA for each student user of *i-Ready*:

- student first and last name;
- date of birth;
- gender;
- ethnicity or race;
- student identification number;
- student school or class enrollment;
- student grade level;

© 2024 Curriculum Associates, LLC. All rights reserved. | 03/04/24 SP OK

 | 1

- teacher name;
- English language learner (ELL) status, and;
- eligibility for free or reduced-price lunch.

Note that some of these data fields (such as ethnicity or race, ELL status, eligibility for free or reduced-price lunch) are not required for the use of *i-Ready*. However, where districts would like reporting capabilities based on these categories, they may choose to provide this information to CA.

## Data We Do Not Collect.

CA never obtains or collects the following categories of information through the use of *i-Ready*:

- user biometric or health data;
- student email addresses or social media profile information; or
- student mailing addresses or phone numbers, or other such "directory" information.

## Usage Data.

When students use *i-Ready*, certain assessment results and usage metrics are also created. These results and usage metrics are used by CA as described below. While teachers and school administrators are able to access student information and related *i-Ready* usage data, this information is not made available to other students or the public.

## How We Use Student Data.

CA only uses student data for education-related purposes and to improve teaching and learning, as described in more detail here. We receive this data under the "school official" exception under FERPA:

- **For Services.** CA only uses student-identifiable data provided by schools and/or school districts to make *i-Ready* available to that particular student and to provide related reports and services to that student's school and school district and its educators and administrators. CA uses student data collected from the use of *i-Ready* for the purpose of making *i-Ready* available to its customers and for improving its content and effectiveness.
- **For Reporting.** CA provides reporting capabilities to its educator customers, and these reports are generated based on *i-Ready* usage information.
- **For Account Support.** Customers' usage data may also be used on an aggregated basis to allow CA's account management, customer service, and tech support teams to provide services that meet the specific needs of our educator customers.
- **Treatment as PII.** CA treats all student-identifiable data, and any combination of that data, as personally identifiable information, and that data is stored securely as described more fully below.
- **No Solicitation of Students.** CA receives education records from our school district customers to enable students and teachers to use *i-Ready*. CA does not solicit personally identifiable information directly from students—all student information is provided by school district customers or created through the use of the *i-Ready* platform. Because *i-Ready* is only used in the context of school-directed learning, schools are not required to obtain parental consent under COPPA to provide us with this data, although many customers choose to do so to comply with state or local requirements.
- **No Ownership.** CA does not obtain any ownership interest in student-identifiable data.

© 2024 Curriculum Associates, LLC. All rights reserved. | 03/04/24 SP OK

## How We Use De-Identified Data.

- CA collects and uses "de-identified student data," which refers to data generated from usage of *i-Ready* from which all personally identifiable information has been removed or obscured so that it does not identify individual students and there is no reasonable basis to believe that the information can be used to identify individual students.

- CA uses this aggregated, de-identified student data for core product functionality to make *i-Ready* a more effective, adaptive product.

- CA uses de-identified data to provide services to our educator customers. We sometimes use third-party software tools (such as Salesforce or Domo) to enhance the level of service we provide. However, we only use de-identified data with these tools.

- CA also uses de-identified student data for research and development purposes. This might include research analyzing the efficacy of *i-Ready* or development efforts related to our product and service offerings. We also conduct research using de-identified data for studies focused on improving educational systems and student outcomes more generally.

- While some of this research work is done internally, CA does share de-identified student data with trusted third-party research partners as part of these research initiatives.

- CA does not attempt to re-identify de-identified student data and takes reasonable measures to protect against the re-identification of its de-identified student data.

- Our research partners are prohibited from attempting to re-identify de-identified student data.

- CA does not sell student identifiable data or aggregated de-identified student data to third parties.

## No Targeted Advertisements or Marketing.

- CA does not include advertisements or marketing messages within *i-Ready* nor does it use student data for targeted advertising or marketing.

- No student data collected in connection with *i-Ready* usage is shared with third parties for any advertising, marketing, or tracking purposes.

## No User Interactions.

- There are no social interactions between users in *i-Ready*, and a given user's account is not accessible to other student users or third parties. Thus there is no opportunity for cyberbullying within *i-Ready*.

- There is no ability for users to upload user content created outside of *i-Ready*. Other than responses to questions or instructional prompts, students cannot create content within *i-Ready*.

- *i-Ready* user information does not involve the creation of a profile and cannot be shared for social purposes.

## Student Privacy Pledge.

To further demonstrate its commitment to protecting the privacy of student information, CA has taken the Student Privacy Pledge at https://StudentPrivacyPledge.org. This means that, among other things, CA has pledged not to sell student information, not to engage in behaviorally targeted advertising, and to use collected data for authorized purposes only. CA only uses collected student data for the purposes described in the "How We Use Student Data" paragraph.

© 2021 © 2024 Curriculum Associates, LLC. All rights reserved. | 03/04/24 SP OK

**i-Ready** | 3

**How We Use Educator Data.**

CA also collects the following information about educators that use the *i-Ready* platform: name, school or district affiliation, grade-level teaching, and email address. CA uses this information for account registration and maintenance purposes. CA also records when educator account logins are created and when educators log in and out of the *i-Ready* platform. CA utilizes a third-party service provider to host professional-development content for educators in a learning-management system (LMS). For any educator who utilizes that content, CA and/or the educator will provide certain *i-Ready* account information to its third-party service provider, and this information will be used to communicate with educators and district-level administrators more effectively about their specific implementation and to better understand how educators use the *i-Ready* and LMS platforms.

**Data Storage Location.**

- *i-Ready* is a cloud-based application.
- Our servers are located in Tier 1 data centers located in the United States.
- We do not store any student data outside of the US.

**Network-Level Security Measures.**

- CA's *i-Ready* systems and servers are hosted in a cloud environment.
- Our hosting provider implements network-level security measures in accordance with industry standards.
- Curriculum Associates manages its own controls of the network environment.

**Server-Level Security Measures.**

- Access to production servers is limited to a small, identified group of operations engineers who are trained specifically for those responsibilities.
- The servers are configured to conduct daily updates for any security patches that are released and applicable.
- The servers have anti-virus protection, intrusion detection, configuration control, monitoring/alerting, and automated backups.
- Curriculum Associates conducts regular vulnerability testing.

**Computer/Laptop/Device Security Measures.**

Curriculum Associates employs a full IT staff that manages and secures its corporate and employee IT systems. Laptops are encrypted and centrally managed with respect to configuration updates and anti-virus protection. Access to all CA computers and laptops is password-controlled. CA sets up teacher and administrator accounts for *i-Ready* so that they are also password-controlled. We support customers that use single sign-on (SSO) technology for accessing *i-Ready*.

**Encryption.**

- *i-Ready* is only accessible via https and all public network traffic is encrypted with current encryption standards.
- Encryption of data at rest is implemented for all data stored in the *i-Ready* system.

**Employee and Contractor Policies and Procedures.**

CA limits access to student-identifiable data and customer data to those employees who need to have such access in order to allow CA to provide quality products and services to its customers. CA requires all employees who have access to CA servers and systems to sign confidentiality agreements. CA requires its employees and contractors who have access to student data to participate in annual training sessions on IT security policies and best practices.

© 2024 Curriculum Associates, LLC. All rights reserved. | 03/04/24 SP OK

Any employee who ceases working at CA is reminded of his or her confidentiality obligations at the time of departure, and network access is terminated at that time.

## Third-Party Audits and Monitoring.

In addition to internal monitoring and vulnerability assessments, Curriculum Associates contracts with a third party to conduct annual security audits, which includes penetration testing of the *i-Ready* application. Curriculum Associates reviews the third-party audit findings and implements recommended security program changes and enhancements where practical and appropriate.

## Data Retention and Destruction.

Student and teacher personal data is used only in the production systems and only for the explicitly identified functions of the *i-Ready* application. Student and teacher personal data is de-identified before any testing or research activities may be conducted. Upon the written request of a customer, Curriculum Associates will remove all personally identifiable student and educator data from its production systems when CA will no longer be providing access to *i-Ready* to that customer. In addition, CA reserves the right, in its sole discretion, to remove a particular customer's student data from its production servers a reasonable period of time after its relationship with the customer has ended, as demonstrated by the end of contract term or a significant period of inactivity in all customer accounts. Student data is removed from backups in accordance with CA's data retention practices.  If CA is required to restore any materials from its backups, it will purge all student-identifiable data not currently in use in the production systems from the restored backups.

## Correction and Removal of Student Data.

- Parents of students who use *i-Ready* may request correction or removal of their child's personally identifiable data from *i-Ready* by contacting their child's teacher or school administrator. The teacher or school administrator can then verify the identity of the requesting party and notify CA of the request.
- CA will promptly comply with valid requests for correction or removal of student data; however, removal of student personally identifiable data will limit that student's ability to use *i-Ready*.

## Breach Notification.

CA follows documented "Security Incident Management Procedures" when investigating any potential security incident. In the event of a data security breach, CA will notify impacted customers as promptly as possible that a breach has occurred, and will inform them (to the extent known) what data has been compromised. CA expects customers to notify individual teachers and parents of any such breach to the extent required, but will provide customers reasonably requested assistance with such notifications and will also reimburse customers for the reasonable costs associated with legally required breach notices.

## Data Collection and Handling Practices for All Teacher Toolboxes.

The Teacher Toolbox for *Ready Classroom Mathematics*, *Ready Mathematics*, *Ready Reading*, and *Ready Writing* provides a set of digital resources intended for use by educators. It is not a student-facing product, and therefore no student data is collected through the use of any Teacher Toolboxes. CA collects the following information about educators who use a Teacher Toolbox: name, school or district affiliation, grade-level teaching, and email address. CA uses this information for account registration and maintenance purposes. CA also records when educator account logins are created, and when educators log in and out of Teacher Toolbox. When a teacher uses a Teacher Toolbox, our systems record which resources have been accessed by whom and the frequency of access. We use this information for product development purposes, to ensure that we are providing educators with resources that are useful to them. Our account management, customer service, and tech support teams also use this information to provide more specifically tailored support to our educator customers. Upon request, we may also provide this information to school- or district-level administrators to

©2024 Curriculum Associates, LLC. All rights reserved. | 03/04/24 SP OK

help them better understand how our Toolbox resources are used by educators in their school or district. We also use this information to communicate with educators more effectively about their specific implementation. We do not sell this information or otherwise share it with any third parties, nor do we serve advertisements to educators based on this usage data. We do not use this data to create a profile about any of the educators who use our products to provide to anyone outside of CA. We simply use this collected data for internal purposes to make our product and service offerings better.

If you have any questions about our data handling practices or this privacy policy, you may contact us at privacy@cainc.com.

© 2021 © 2024 Curriculum Associates, LLC. All rights reserved. | 03/04/24 SP OK

# Exhibit A

## Parents Bill of Rights for Data Privacy and Security

Parents (includes legal guardians or persons in parental relationships) and Eligible Students (student 18 years and older) can expect the following:

1. A student's personally identifiable information (PII) cannot be sold or released for any commercial purpose. PII, as defined by Education Law § 2-d and FERPA, includes direct identifiers such as a student's name or identification number, parent's name, or address; and indirect identifiers such as a student's date of birth, which when linked to or combined with other information can be used to distinguish or trace a student's identity. Please see FERPA's regulations at 34 CFR 99.3 for a more complete definition.

2. The right to inspect and review the complete contents of the student's education record stored or maintained by an educational agency. This right may not apply to parents of an Eligible Student.

3. State and federal laws such as Education Law § 2-d; the Commissioner of Education's Regulations at 8 NYCRR Part 121, the Family Educational Rights and Privacy Act ("FERPA") at 12 U.S.C. 1232g (34 CFR Part 99); Children's Online Privacy Protection Act ("COPPA") at 15 U.S.C. 6501-6502 (16 CFR Part 312); Protection of Pupil Rights Amendment ("PPRA") at 20 U.S.C. 1232h (34 CFR Part 98); the Individuals with Disabilities Education Act ("IDEA") at 20 U.S.C. 1400 et seq. (34 CFR Part 300); protect the confidentiality of a student's identifiable information.

4. Safeguards associated with industry standards and best practices including but not limited to encryption, firewalls and password protection must be in place when student PII is stored or transferred.

5. A complete list of all student data elements collected by the school district is available from the school district.

6. The right to have complaints about possible breaches and unauthorized disclosures of PII addressed. Complaints should be submitted directly to the school district.

7. To be notified by the school district in accordance with applicable laws and regulations if a breach or unauthorized release of PII occurs.

8. Educational agency workers that handle PII will receive training on applicable state and federal laws, policies, and safeguards associated with industry standards and best practices that protect PII.

9. Educational agency contracts with vendors that receive PII will address statutory and regulatory data privacy and security requirements.

**Curriculum Associates, LLC**

By: *Stephen Pyne*

Name: Stephen Pyne

Title: Vice President and Chief Information Security Officer

© 2024 Curriculum Associates, LLC. All rights reserved. | 03/04/24 SP OK

# iready_Ellsworth_VendorSigned

Final Audit Report

2025-01-14

| | |
|---|---|
| Created: | 2025-01-14 |
| By: | Ramah Hawley (rhawley@tec-coop.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA0RJVT58ceusYUDTBKG-43WtbWL3dOwvW |

## "iready_Ellsworth_VendorSigned" History

📄 Document created by Ramah Hawley (rhawley@tec-coop.org)
2025-01-14 - 11:36:27 AM GMT

✉️ Document emailed to Katie Hollenback (khollenback@ellsworthschools.org) for signature
2025-01-14 - 11:36:38 AM GMT

📄 Email viewed by Katie Hollenback (khollenback@ellsworthschools.org)
2025-01-14 - 1:38:14 PM GMT

✍️ Document e-signed by Katie Hollenback (khollenback@ellsworthschools.org)
Signature Date: 2025-01-14 - 1:39:15 PM GMT - Time Source: server

✅ Agreement completed.
2025-01-14 - 1:39:15 PM GMT

**Adobe Acrobat Sign**

# Exhibit B

**EXHIBIT "E"**
**GENERAL OFFER OF PRIVACY TERMS**

**1**. **Offer of Terms**

Provider offers the same privacy protections found in this DPA between it and **Ellsworth School Department** ("Originating LEA") which is dated 01/14/25 _____, to any other LEA ("Subscribing LEA") who accepts this General Offer of Privacy Terms ("General Offer") through its signature below. This General Offer shall extend only to privacy protections, and Provider's signature shall not necessarily bind Provider to other terms, such as price, term, or schedule of services, or to any other provision not addressed in this DPA. The Provider and the Subscribing LEA may also agree to change the data provided by Subscribing LEA to the Provider to suit the unique needs of the Subscribing LEA. The Provider may withdraw the General Offer in the event of: (1) a material change in the applicable privacy statutes; (2) a material change in the services and products listed in the originating Service Agreement; or three (3) years after the date of Provider's signature to this Form.

Subscribing LEAs should send the signed **Exhibit "E"** to Provider at the following email address:
customercontracts@cainc.com _____.

**CURRICULUM ASSOCIATES, LLC**

BY: _J.L Sipe, Jr._____Date: 1/13/25 _____

Printed Name: John Sipe, Jr._____Title/Position: Executive Vice President_____

**2**. **Subscribing LEA**

A Subscribing LEA, by signing a separate Service Agreement with Provider, and by its signature below, accepts the General Offer of Privacy Terms. The Subscribing LEA and the Provider shall therefore be bound by the same terms of this DPA for the term of the DPA between the **Ellsworth School Department** and the Provider. **\*\*PRIOR TO ITS EFFECTIVENESS, SUBSCRIBING LEA MUST DELIVER NOTICE OF ACCEPTANCE TO PROVIDER PURSUANT TO ARTICLE VII, SECTION 5. \*\***

**Subscribing LEA: (School District Name):** _____

By: **Timothy Carter**                        Date: 2025-01-23
Printed Name: Timothy Carter                  Title: Superintendent

SCHOOL DISTRICT NAME: Wilson Central School District
DESIGNATED REPRESENTATIVE OF LEA:
Name: Amanda Townsend
Title:
Address: 374 Lake St
Phone:
Email: atownsend@wilsoncsd.org

District Policy URL: https://sdpc.a4l.org/ny_dp_bor_url.php?districtID=13110

Bill of Rights URL: https://sdpc.a4l.org/ny_dp_bor_url.php?districtID=13110

# Exhibit C



**Contract #:** MA4031

# STATE OF UTAH COOPERATIVE CONTRACT

1. CONTRACTING PARTIES: This contract is between the Utah Division of Purchasing and the following Contractor:

Curriculum Associates
*Name*

153 Rangeway Road
*Street Address*

| North Billerica | Massachusetts | 01862 |
|---|---|---|
| *City* | *State* | *Zip* |

<u>Vendor #</u> VC0000162089   <u>Commodity Code #:</u> 43230   <u>Legal Status of Contractor:</u> Partnership

<u>Contact *Name:*</u> Erin Rush   *Phone Number:* +61 47219573   *Email:* RFPs@cainc.com

2. CONTRACT PORTFOLIO NAME: K-12 Math Personalized Learning Software.

3. GENERAL PURPOSE OF CONTRACT: K-12 Math Personalized Learning Software.

4. PROCUREMENT: This contract is entered into as a result of the procurement process on 2023, Solicitation# JK23-17

5. CONTRACT PERIOD: Effective Date: <u>Saturday, July 01, 2023</u>. Termination Date: <u>Friday, June 30, 2028</u> unless terminated early or extended in accordance with the terms and conditions of this contract.

6. Administrative Fee (if any): Zero Percent (or 0.00%).

7. Prompt Payment Discount Details (if any): N/A.

8. ATTACHMENT A: Standard Terms and Conditions for Information Technology
   ATTACHMENT B: Scope of Work
   ATTACHMENT C: Cost Proposal
   ATTACHMENT D: N/A

   **Any conflicts between Attachment A and the other Attachments will be resolved in favor of Attachment A.**

9. DOCUMENTS INCORPORATED INTO THIS CONTRACT BY REFERENCE BUT NOT ATTACHED:
   a. All other governmental laws, regulations, or actions applicable to the goods and/or services authorized by this contract.
   b. Utah Procurement Code, Procurement Rules, and Contractor's response to solicitation #JK23-17.

10. Each person signing this Agreement represents and warrants that he/she is duly authorized and has legal capacity to execute and deliver this Agreement and bind the parties hereto. Each signatory represents and warrants to the other that the execution and delivery of the Agreement and the performance of each party's obligations hereunder have been duly authorized and that the Agreement is a valid and legal agreement binding on the parties and enforceable in accordance with its terms.

    IN WITNESS WHEREOF, the parties sign and cause this contract to be executed. Notwithstanding verbal or other representations by the parties, the "Effective Date" of this Contract shall be the date provided within Section 5 above.

**CONTRACTOR**

*Robert Waldron*
Robert Waldron (Jan 27, 2023 12:42 EST)

01/27/2023

| Contractor's signature | Date |
|---|---|

Chief Executive Officer

Type or Print Name and Title

**DIVISION OF PURCHASING**

01/27/2023

| Director, Division of Purchasing | Date |
|---|---|

Internal Contract Tracking #: 202366034        Solicitation #: JK23-17        Vendor #: VC0000162089

Changes to 1. h,i,u &w, 2.k, 7, 10. a&c, 14, 17, 20. j,k,&l, 22, 28, 35.a, 37, 39, 41, 45.e, 46. a&b, 50, 52

**ATTACHMENT A: STATE OF UTAH STANDARD INFORMATION TECHNOLOGY TERMS AND CONDITIONS**
STATE OF UTAH COOPERATIVE INFORMATION TECHNOLOGY CONTRACT

This is a State Cooperative Contract for information technology products and services. DTS policies referenced by number in this Attachment are only applicable to the Executive Branch and are available at https://dts.utah.gov/policies. All other policies and codes of conduct are available upon request.

1. **DEFINITIONS:**

    a.  "Access to Secure State Facilities, Data, or Technology" means Contractor will (a) enter upon secure premises controlled, held, leased, or occupied by State of Utah or Eligible User; (b) maintain, develop, or have access to any deployed hardware, software, firmware, or any other technology, that is in use by State of Utah or Eligible User; or (c) have access to or receive any State Data or Confidential Information.

    b.  "Authorized Persons" means the Contractor's employees, officers, partners, Subcontractors, or agents of Contractor who need Access to Secure State Facilities, Data, or Technology to enable the Contractor to perform its responsibilities under this Contract.

    c.  "Background IP" means intellectual property (IP) owned or controlled prior to the effective date of this Contract or that IP developed or acquired from activities independent of the services performed under this Contract, including but not limited to (a) methodologies, processes, technologies, algorithms, software, or development tools used in performing the Services, and (b) processes and reusable reports, designs, charts, plans, specifications, documentation, forms, templates, or output which are supplied or otherwise used by or on behalf of Contractor in the course of performing the Services or creating the Custom Deliverables, other than portions that specifically incorporate proprietary or Confidential Information or Custom Deliverables of Eligible User.

    d.  "Contract" means the Contract Signature Page(s), including all referenced attachments and documents incorporated by reference.

    e.  "Contract Period" means the term of this Contract, as set forth in the Contract Signature Page(s).

    f.  "Contract Signature Page(s)" means the cover page that the Division and Contractor sign.

    g.  "Contractor" means the individual or entity identified on the Contract Signature Page(s). "Contractor" includes Contractor's agents, officers, employees, partners, contractors, and Subcontractors at any level.

    h.  "Custom Deliverables" means the product that Contractor is required to design, develop, or customize for the sole benefit of the Eligible User and deliver to the Eligible User as specifically described under this Contract or an associated statement of work for which all interest and title shall be transferred to and owned by the Eligible User. This includes every invention, design, development, customization, improvement, process, software program, work of authorship, documentation, formula, datum, technique, know how, or intellectual property right whatsoever or any interest therein (whether patentable or not patentable or registerable under copyright or similar statutes or subject to analogous protection) that is specifically made, conceived, discovered, or reduced to practice by Contractor pursuant to this Contract. No Custom Deliverables are contemplated at this time.

    i.  "Data Breach" means the unauthorized access or acquisition of State Data that compromises the security, confidentiality, or integrity of State Data.

    j.  
    "De-identified Data" refers to data generated from student usage of Contractor's proprietary educational software *i-Ready®*, from which all personally identifiable information has been removed so that it does not identify individual students and there is no reasonable basis to believe that the information can be re-identified or otherwise used to identify individual students.

    k.  "Division" means the State of Utah Division of Purchasing.

    l.  "DTS" means the Utah Department of Technology Services.

    m.  "Eligible User(s)" means the State of Utah's government departments, institutions, agencies, political subdivisions (i.e., colleges, school districts, counties, cities, etc.), and, as applicable, nonprofit organizations, agencies of the federal government, or any other entity authorized by the laws of the State of Utah to participate in State Cooperative Contracts.

    n.  "Federal Criminal Background Check" means a fingerprint-based, nationwide background check conducted and processed by the FBI.

    o.  "Good" means any deliverable not classified as a Custom Deliverable or Service.

    p.  "Intellectual Property Rights" means all rights to patents, utility models, mask works, copyrights, trademarks, trade secrets, and other protection afforded by law to inventions, models, designs, technical information, and applications.

    q.  "Non-Public Data" means records or data that are not subject to distribution to the public. Access is restricted because it includes information that is protected by state or federal law. Non-Public Data includes, but is not limited to, a person's name; government-issued identification numbers (e.g., Social Security, driver's license, passport); financial account information; or Protected Health Information.

    r.  "Protected Health Information" (PHI) is as defined in the Health Insurance Portability and Accountability Act of 1996 (HIPAA), as amended, and its implementing regulations.

s.  "Response" means the Contractor's bid, proposals, quote, or any other document used by the Contractor to respond to the State Entity's Solicitation.

t.  "Security Incident" means the attempted unauthorized access to State Data that may result in the use, disclosure, or theft of State Data.

u.  "Services" means the furnishing of labor, time, or effort by Contractor, and may include installation, configuration, implementation, technical support, warranty maintenance, and other support services.

v.  "Solicitation" means an invitation for bids, request for proposals, notice of sole source procurement, request for statement of qualifications, request for information, or any document used to obtain bids, proposals, pricing, qualifications, or information for the purpose of entering into this Contract.

w.  "State Data" means all Confidential Information and Non-Public Data that is created, controlled, maintained, owned, or in any way originating with the State of Utah or Eligible User regardless of where such data or output is stored or maintained. State Data does not include De-identified Data.

x.  "State of Utah" means the State of Utah, in its entirety, including its institutions, agencies, departments, divisions, authorities and instrumentalities, boards, commissions, elected or appointed officers, employees, agents, and authorized volunteers.

y.  "Subcontractors" includes contractors, manufacturers, distributors, suppliers, or consultants, at any tier, that are under the direct or indirect control or responsibility of Contractor, including a person or entity that is, or will be, providing goods or performing services pursuant to this Contract. Subcontractors does not include Contractor's cloud hosting provider and vendors used in the ordinary course of business who perform technology and software development services on Contractor's system and under Contractor's supervision.

2.  **ESSENTIAL PROVISIONS:**

a.  **CONTRACT JURISDICTION, CHOICE OF LAW, AND VENUE:** This Contract shall be governed solely by the laws of the State of Utah. Any action or proceeding arising from this Contract shall be brought in a court of competent jurisdiction in the State of Utah. Exclusive venue shall be in Salt Lake City, in the Third Judicial District Court for Salt Lake County.

b.  **LAWS:** Contractor and all Goods and Services delivered under this Contract will comply with all applicable federal and state of Utah laws, including applicable licensure and certification requirements.

c.  **SOVEREIGN IMMUNITY:** The Division and the State of Utah do not waive any protection, right, defense or immunity under the Governmental Immunity Act of Utah, Utah Code §§ 63G-7-101 to 904, as amended, the Eleventh Amendment to the Constitution of the United States, or otherwise, from any claim or from the jurisdiction of any court.

d.  **PUBLIC INFORMATION:** This Contract and any purchase orders, invoices, pricing lists, and the Response are public records available for disclosure in accordance with the State of Utah's Government Records Access and Management Act (GRAMA, Utah Code 63G-2-101 et seq.), except to the extent classified as protected in accordance with UCA 63G-2-309. GRAMA takes precedence over any statements of confidentiality or similar notations. Neither the Division, the Eligible User nor the State of Utah will inform Contractor of any request for a copy of this Contract, including any purchase orders, invoices, pricing lists, or the Response.

e.  **CREDITING THE DIVISION IN PUBLICITY:** Any publicity given to this Contract shall identify the Division as the managing agency and shall not be released without prior written approval from the Division.

f.  **SALES TAX EXEMPTION:** Goods, Custom Deliverables, and Services purchased by some Eligible Users are being paid from that Eligible User's funds and used in the exercise of that Eligible User's essential functions as a State of Utah governmental entity. Any such Eligible Users will provide Contractor with a copy of its sales tax exemption number upon request.

g.  **SEVERABILITY:** A declaration or order by any court that any provision of this Contract is illegal and void shall not affect the legality and enforceability of any other provision of this Contract, unless the provisions are mutually dependent.

h.  **AMENDMENTS:** This Contract may only be amended by the mutual written agreement of the parties, provided that the amendment is within the Scope of Work of this Contract, is within the scope/purpose of the Solicitation, and is attached and made part of this Contract. Automatic renewals are prohibited and are deemed void even if listed elsewhere in this Contract.

i.  **DEBARMENT:** Contractor certifies that it is not presently nor has ever been debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation by any government department or agency, whether international, national, state, or local. Contractor must notify the Division within thirty (30) days if debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from participation in any contract by any governmental entity.

j.  **NONAPPROPRIATION OF FUNDS, REDUCTION OF FUNDS, OR CHANGES IN LAW:** This Contract may be terminated in whole or in part at the sole discretion of the Division or Eligible User upon thirty days written notice, if the Division or Eligible User determines that (a) a change in Federal or State legislation or applicable laws materially affects the ability of either party to perform under the terms of this Contract; or (b) that a change in available funds affects the Division or Eligible User's ability to pay under this Contract. A change of available funds includes, but is not limited to, a change in Federal or State funding, whether as a result of a legislative act or an order of the President, the Governor, or Executive Director.

The Division or Eligible User, as applicable, will reimburse Contractor for the Goods or Services properly ordered and delivered until the effective date of said notice. The Division and Eligible User are not liable for any performance, commitments, penalties, or liquidated damages that accrue after the effective date of the notice.

k.  **ENTIRE AGREEMENT:** An award of the RFP  is the entire agreement between the parties, and supersedes any prior and contemporaneous agreements and understandings between the parties, whether oral or written.

l. **WAIVER:** The waiver by either party of any provision, term, covenant, or condition of this Contract shall not be deemed to be a waiver of any other provision, term, covenant, or condition of this Contract nor any subsequent breach of the same or any other provision, term, covenant, or condition of this Contract. The Eligible User's approval, acceptance, or payment for any Goods or Services required under this Contract shall not be construed to operate as a waiver by the Eligible User of any right under this Contract or of any cause of action arising out of the performance or nonperformance of this Contract.

m. **CHANGES IN SCOPE:** Any changes in the scope of work to be performed under this Contract shall be in the form of a written amendment to this Contract, mutually agreed to and signed by both parties, specifying any such changes, fee adjustments, any adjustment in time of performance, or any other significant factors arising from the changes in the scope of work.

n. **TRAVEL COSTS:** Unless otherwise agreed to in the contract, all travel costs associated with the delivery of Services will be paid in accordance with the Utah Administrative Code R25-7. Invoices containing travel costs outside of these rates will be returned to the Contractor for correction.

3. **RECORDS ADMINISTRATION:** Contractor shall maintain or supervise the maintenance of all records necessary to properly account for Contractor's performance and the payments made by an Eligible User to Contractor. These records shall be retained by Contractor for at least six (6) years after final payment (per Utah Administrative Code R33-12-605 and Utah Code 78B-2-309), or until all audits initiated within the six (6) years have been completed, whichever is later. Contractor shall allow, at no additional cost, State of Utah auditors, federal auditors, Eligible Users or any firm identified by the Division, access to all such records. Contractor must refund to the Division any overcharges brought to Contractor's attention by the Division or the Division's auditor and Contractor is not permitted to offset identified overcharges by alleged undercharges to Eligible Users.

4. **CERTIFY REGISTRATION AND USE OF EMPLOYMENT "STATUS VERIFICATION SYSTEM":** This Status Verification System, also referred to as "E-verify", requirement only applies to contracts issued through a Request for Proposal process and to sole sources that are included within a Request for Proposal.

   1) Contractor certifies as to its own entity, under penalty of perjury, that Contractor has registered and is participating in the Status Verification System to verify the work eligibility status of Contractor's new employees that are employed in the State of Utah in accordance with applicable immigration laws including Section 63G-12-302, <u>Utah Code</u>, as amended.

   2) Contractor shall require that the following provision be placed in each subcontract at every tier: "The subcontractor shall certify to the main (prime or general) Contractor by affidavit that the subcontractor has verified through the Status Verification System the employment status of each new employee of the respective subcontractor, all in accordance with applicable immigration laws including Section 63G-12-302, <u>Utah Code</u>, as amended, and to comply with all applicable employee status verification laws. Such affidavit must be provided prior to the notice to proceed for the subcontractor to perform the work."

   3) Contractor's failure to comply with this section will be considered a material breach of this Contract.

   4) Contractor shall protect, indemnify, and hold harmless the Division, the Eligible Users, and the State of Utah, and anyone that the State of Utah may be liable for, against any claim, damages, or liability arising out of or resulting from violations of the above Status Verification System Section whether violated by employees, agents, or contractors of the following: (a) Contractor; (b) Subcontractor at any tier; and/or (c) any entity or person for whom the Contractor or Subcontractor may be liable.

5. **CONFLICT OF INTEREST:** Contractor represents that none of its officers or employees are officers or employees of the State of Utah, unless written disclosure has been made to the Division.

6. **INDEPENDENT CONTRACTOR:** Contractor is an independent contractor, and not an employee or agent of the Division, the Eligible Users, or the State of Utah, and therefore is not entitled to any of the benefits associated with such employment. Contractor has no authorization, express or implied, to bind the Division, the Eligible Users, or the State of Utah to any agreements, settlements, liabilities, or understandings, and shall not perform any acts as an agent for the Division, the Eligible users, or the State of Utah. Contractor is responsible for all applicable federal, state, and local taxes and FICA contributions.

7. **CRIMINAL BACKGROUND SCREENING:** Contractor performs background checks using a reputable member of the National Association of Professional Background Screeners (NAPBSA) upon the hire of every employee who will be present on school property, have access to student personally identifiable information, and/or will have access to school funds. Upon request by the State or Eligible User, Contractor shall provide pertinent contact information for those employees who will be entering school premises should additional background checks be requested, the cost of which will be borne by Contractor. Upon the Eligible User's request,. Contractor or the applicable employee shall provide Eligible Users with sufficient personal information (at Contractor's expense) so that a State and/or Federal Criminal Background Check may be completed by the Eligible User, at Eligible User's expense. The Eligible User will provide Contractor with forms which must be filled out by Contractor and returned to the Eligible User. Each employee of Contractor or a Subcontractor who will be entering Eligible Users' premises must be fingerprinted by the Eligible User or local law enforcement a minimum of one week prior to needing access. At the time of fingerprinting, said employee shall disclose all felony or misdemeanor convictions. Eligible Users may conduct a State and/or Federal Criminal Background Check based upon the fingerprints and personal information provided and use this same information to complete a Name Check in the Utah Criminal Justice Information System (UCJIS) at least every two years. Eligible Users may revoke Access to its premises in the event of any negative results. If Contractor becomes aware of the arrest of an employee or subcontractor who has access to an Eligible User's premises, then Contractor shall promptly inform the Eligible User.I Eligible Users will determine in its discretion if such person's Access to schools shall remain in effect. Felony and misdemeanor are defined by the laws of the State of Utah, regardless of where the conviction occurred. (DTS Policy 2000-0014 Background Investigations)

8. **DRUG-FREE WORKPLACE:** Contractor shall abide by the Eligible User's drug-free workplace policies while on the Eligible User's or the State of Utah's premises.

9. **CODE OF CONDUCT:** If Contractor is working at facilities controlled or owned by the State of Utah, Contractor shall follow and

enforce the agency applicable code of conduct. Contractor will ensure that each employee receives a copy of the policies and applicable codes of conduct. (DTS Policy 2000-0001 Code of Conduct, DTS Policy 1000-0003 Acceptable Use of Information Technology Resources)

10. **INDEMNITY AND LIABILITY**

   a. **Indemnity Clause:** Contractor shall fully indemnify, defend, and save harmless the Division, Eligible Users, and the State of Utah from all third-party claims, losses, suits, actions, damages, and costs of every name and description arising out of Contractor's performance of this Contract caused by any intentional act, omission or negligence of Contractor, its agents, employees, officers, partners, and Subcontractors, without limitation; provided, however, that the Contractor shall not indemnify for that portion of any claim, loss, or damage due to the fault of the Division, the Eligible User, or the State of Utah. Any limitations of the Contractor's liability will not apply to injuries to persons, including death, or to damages to property.

   b. **Governmental Immunity Act:** In accordance with the Constitution of the State of Utah and the Governmental Immunity Act of Utah ("the Act", Utah Code §§63G-7-101 to 904, as amended), the Division and the State of Utah have no liability for the operations, acts, or omissions of the Contractor or any third party. Any indemnity obligations of the Division, Eligible Users, or the State of Utah are subject to the Constitution of the State of Utah and the Act and limited to claims that arise from and to the extent caused by the negligent acts or omissions of the Division or the Eligible Users in the performance of the Division's or the Eligible User's obligations under this Contract.

   c. **Intellectual Property Indemnification:** Contractor warrants and represents it has full ownership to any Good delivered under this contract. Contractor also warrants that any Good, Custom Deliverable, or Service furnished by Contractor under this Contract, including its use by the Eligible Users in unaltered form, will not infringe any copyrights, patents, trade secrets, or other proprietary rights, and that no third parties may rightfully assert a demand upon Eligible Users to cease use.

   Contractor will release, indemnify, and hold the Division, the Eligible Users, and the State of Utah harmless from liability or damages of any kind or nature, including Contractor's use of any copyrighted or un-copyrighted composition, secret process, patented or un-patented invention, article, or appliance furnished or used in Contractor's performance of this Contract. Additionally, if such a claim or liability is based upon an allegation that a Good, Custom Deliverable, or Service furnished by Contractor infringes on any right protected by any patent, copyright, trademark, trade secret, and/or proprietary right, Contractor shall indemnify and hold harmless the Division, the Eligible Users, and the State of Utah for any judgments, settlements, costs, and reasonable attorneys' fees resulting from such a claim or liability. Contractor shall defend all actions brought upon such matters to be indemnified hereunder and pay all costs and expenses incidental thereto; however, the Eligible Users shall have the right, at its option, to participate in the defense of any such action at its own expense without relieving Contractor of any obligation hereunder. If there are any limitations of liability in this Contract, such limitations will not apply to this section.

11. **HARDWARE WARRANTY: THE STATE OF UTAH DOES NOT ACCEPT ANY PROCUREMENT ITEM "AS-IS".** CONTRACTOR WARRANTS ALL HARDWARE PORTIONS OF ANY GOOD OR CUSTOM DELIVERABLE THAT IT DIRECTLY OR INDIRECTLY PROVIDES FOR A PERIOD OF **ONE YEAR**. ALL WARRANTIES GRANTED TO THE DIVISION AND ELIGIBLE USERS BY THE UNIFORM COMMERCIAL CODE OF THE STATE OF UTAH APPLY TO THIS CONTRACT. PRODUCT LIABILITY DISCLAIMERS AND/OR WARRANTY DISCLAIMERS FROM CONTRACTOR OR ITS SUPPLIERS ARE REJECTED. CONTRACTOR WARRANTS THAT THE HARDWARE: (A) WILL PERFORM AS SPECIFIED IN THE RESPONSE; (B) WILL LIVE UP TO ALL SPECIFIC CLAIMS LISTED IN THE RESPONSE; (C) WILL BE SUITABLE FOR THE ORDINARY PURPOSES FOR WHICH THE HARDWARE IS USED; (D) WILL BE SUITABLE FOR ANY SPECIAL PURPOSES THAT THE DIVISION HAS RELIED ON CONTRACTOR'S SKILL OR JUDGMENT TO CONSIDER WHEN IT ADVISED THE DIVISION ABOUT THE HARDWARE IN THE RESPONSE; (E) THE HARDWARE HAS BEEN PROPERLY DESIGNED AND MANUFACTURED; AND (F) IS FREE OF SIGNIFICANT DEFECTS.

12. **SOFTWARE WARRANTY: THE STATE OF UTAH DOES NOT ACCEPT ANY PROCUREMENT ITEM "AS-IS".** CONTRACTOR WARRANTS FOR A PERIOD OF **NINETY DAYS** FROM THE DATE OF ACCEPTANCE THAT THE SOFTWARE PORTIONS OF THE GOODS AND CUSTOM DELIVERABLES THAT CONTRACTOR DIRECTLY OR INDIRECTLY PROVIDES WILL: (A) PERFORM IN ACCORDANCE WITH THE SPECIFIC CLAIMS PROVIDED IN THE RESPONSE; (B) BE SUITABLE FOR THE ORDINARY PURPOSES FOR WHICH SUCH GOODS AND CUSTOM DELIVERABLES ARE USED; (C) BE SUITABLE FOR ANY SPECIAL PURPOSES THAT THE ELIGIBLE USER HAS RELIED ON CONTRACTOR'S SKILL OR JUDGMENT TO CONSIDER WHEN IT ADVISED THE STATE ABOUT THE GOODS OR CUSTOM DELIVERABLES; (D) HAVE BEEN PROPERLY DESIGNED AND MANUFACTURED; AND (E) BE FREE OF SIGNIFICANT DEFECTS. CONTRACTOR SHALL PROVIDE THE ELIGIBLE USER WITH BUG FIXES, INCLUDING INFORMING THE ELIGIBLE USERS OF ANY KNOWN SOFTWARE BUGS OR SOFTWARE DEFECTS THAT MAY AFFECT THE STATE'S USE OF THE SOFTWARE.

13. **WARRANTY REMEDIES:** Upon breach of warranty, Contractor will repair or replace (at no charge to the Eligible User) the nonconforming Goods or Custom Deliverables. If the repaired and/or replaced products are inadequate, Contractor will refund the full amount of any payments that have been made for the failed products. These remedies are in addition to any other remedies provided by law or equity.

14. **UPDATES AND UPGRADES:** Contractor's products are a SaaS offering and updates are automatically provided when users access the online platform. Such upgrades are subject to these Terms and Conditions.

15. **BUG FIXING AND REMOTE DIAGNOSTICS:** Contractor shall use commercially reasonable efforts to provide work-around solutions or patches to reported software problems. With the Eligible User's prior written authorization, Contractor may perform remote diagnostics to work on reported problems. If the Eligible User declines remote diagnostics, Contractor and the Eligible User may agree to on-site technical support, subject to the terms of the Contract.

16. **TECHNICAL SUPPORT AND MAINTENANCE:** If technical support and maintenance is required by the Contract, Contractor will use commercially reasonable efforts to respond to the Eligible User in a reasonable time, and in all events, in accordance with the specific timeframes detailed in the Contract, when the Eligible User makes technical support or maintenance requests.

17. **PHYSICAL DELIVERY:** All non-electronic deliveries will be F.O.B. destination with all transportation and handling costs paid by the Eligible User. . Contractor is responsible for including any freight charges due by the Eligible User to Contractor when providing quotes to the Eligible User. Invoices listing freight charges that were not identified in the quote will be returned to the Contractor to remove such costs. Responsibility and liability for loss or damage will remain with Contractor until final inspection and acceptance, when responsibility will pass to the Eligible User except as to latent defects, fraud, and Contractor's warranty obligations.

18. **ELECTRONIC DELIVERY:** Contractor may electronically deliver any Good or Custom Deliverable to the Eligible User or provide any Good and Custom Deliverable for download from the Internet, if pre-approved in writing by the Eligible User. Contractor shall ensure the confidentiality of electronic deliveries in transit. Contractor warrants that all electronic deliveries will be free of known malware, bugs, Trojan horses, etc.

19. **ACCEPTANCE PERIOD:** A Good, Custom Deliverable, or Service furnished under this Contract shall function in accordance with the specifications identified in this Contract and Solicitation. If the Goods and Custom Deliverables delivered do not conform to the specifications identified in this Contract and Solicitation ("Defects"), the Eligible User shall within thirty (30) calendar days of the delivery date ("Acceptance Period") notify Contractor in writing of the Defects. Upon receiving notice, Contractor shall use reasonable efforts to correct the Defects within fourteen (14) calendar days ("Cure Period"). The Eligible User's acceptance of a Good, Custom Deliverable, or Services occurs at the end of the Acceptance Period or Cure Period, whichever is later.

    If after the Cure Period, a Good, Custom Deliverable, or Service still has Defects, then the Eligible User may, at its option: (a) declare Contractor to be in breach and terminate this Contract; (b) demand replacement conforming Goods, Custom Deliverables, or Services from Contractor at no additional cost to the Eligible User; or (c) continue the Cure Period for an additional time period agreed upon by the Eligible User and Contractor in writing. Contractor shall pay all costs related to the preparation and shipping of the replacement products. No products shall be deemed accepted and no invoices shall be paid until acceptance. The warranty period will begin upon the end of the Acceptance Period.

20. **SECURE PROTECTION AND HANDLING OF STATE DATA:** If Contractor is given access to State Data, the protection of State Data shall be an integral part of the business activities of Contractor, and Contractor shall ensure that there is no inappropriate or unauthorized use of State Data. Contractor shall safeguard the confidentiality, integrity, and availability of the State Data and comply with the conditions outlined below. The Eligible User reserves the right to verify Contractor's adherence to the following conditions to ensure they are met:

    a. **Network Security**: Contractor shall maintain network security that, at a minimum, includes: network firewall provisioning, intrusion detection, and regular third-party penetration testing. Contractor shall maintain network security and ensure that Contractor network security policies conform to one of the following:
       1) Those standards the State of Utah applies to its own network, found outlined in *DTS Policy 5000-0002 Enterprise Information Security Policy*;
       2) Current standards set forth and maintained by the National Institute of Standards and Technology, includes those at: http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r4.pdf; or
       3) Any generally recognized comparable standard that Contractor then applies to its own network and pre-approved by the Eligible User in writing.

    b. **State Data Security:** Contractor shall protect and maintain the security of State Data with protection that is at least as good as or better than that maintained by the State of Utah which will be provided by an Eligible User upon Contractor's request (*DTS Policy 5000-0002*). These security measures included but are not limited to maintaining secure environments that are patched and up to date with all appropriate security updates as designated (ex. Microsoft Notification). The Eligible User reserves the right to determine if Contractor's level of protection meets the Eligible User's security requirements.

    c. **State Data Transmission**: Contractor shall ensure all transmission or exchange of system application data with the Eligible User and State of Utah and/or any other parties expressly designated by the State of Utah, shall take place via secure means (ex. HTTPS or FTPS).

    d. **State Data Storage**: All State Data will be stored and maintained in data centers in the United States. No State Data will be processed on or transferred to any portable or laptop computing device or portable storage medium, except for devices that are used and kept only at Contractor's United States data centers, unless such medium is part of the Contractor's designated backup and recovery process.

    e. **Access**: Contractor shall permit its employees and Subcontractors to remotely access non-State Data only as required to provide technical support.

    f. **State Data Encryption**: Contractor shall store all data provided to Contractor, including State, as well as any backups made of that data, in encrypted form using no less than 128 bit key and include all data as part of a designated backup and recovery process.

    g. **Password Protection**: Any portable or laptop computer that has access to the Eligible User's or State of Utah networks, or stores any Eligible User data shall be equipped with strong and secure password protection.

    h. **Confidential Information Certification:** Contractor shall sign a Confidential Information Certification form prior to being given access to confidential computerized records.

    i. **State Data Re-Use:** All data exchanged shall be used expressly and solely for the purpose enumerated in this Contract. No State Data of any kind may be transmitted, exchanged, or provided to other contractors or third parties except on a case-by-case basis as specifically agreed to in writing by the Eligible User.

    j. **State Data Destruction**: Upon expiration or termination of this Contract and receipt of written request from Eligible User, Contractor shall erase, destroy, and render unreadable all State Data from all non-state computer systems, and upon written request certify in writing that these actions have been completed within thirty (30) days of the expiration or termination of this Contract and receipt of written request of the Eligible User, whichever shall come first, unless the Eligible User provides

Contractor with a written directive. Any data which may have been created and archived for disaster recovery purposes will be destroyed over time pursuant to Contractor's data retention and destruction policies, consistent with industry standards. The Eligible User's written directive may require that certain data be preserved in accordance with applicable law.

k. **Services Shall Be Performed Within United States**: ALL OF THE SERVICES RELATED TO STATE DATA SHALL BE PERFORMED WITHIN THE BORDERS AND JURISDICTION OF THE UNITED STATES.

l. **User Support**: Contractor may provide technical user support on Monday through Friday; 7:00 a.m. to 9:00 p.m. ET.

m. Contractor maintains the perpetual right to use De-identified Data for product development, product functionality and research purposes, as permitted under the Family Educational Rights and Privacy Act (FERPA).

21. **SECURITY INCIDENT OR DATA BREACH NOTIFICATION:** Contractor shall immediately inform the Eligible User of any Security Incident or Data Breach. It is within the Eligible User's discretion to determine whether any attempted unauthorized access is a Security Incident or a Data Breach.

a. **Incident Response**: Contractor may need to communicate with outside parties regarding a Security Incident, which may include contacting law enforcement and seeking external expertise as mutually agreed upon, defined by law or contained in this Contract. Discussing Security Incidents with the Eligible User should be handled on an urgent as-needed basis, as part of Contractor's communication and mitigation processes, defined by law or contained in this Contract.

b. **Security Incident Reporting Requirements**: Contractor shall promptly report a Security Incident to the Eligible User.

c. **Breach Reporting Requirements**: As required by Utah Code 13-44-202 or any other law, Contractor shall immediately notify the Eligible User of a Data Breach that affects the security of State Data.

22. **DATA BREACH RESPONSIBILITIES:** Contractor shall comply with all applicable laws that require the notification of individuals in the event of a Data Breach or other events requiring notification(*DTS Policy 5000-0002 Enterprise Information Security Policy)*. In the event of a Data Breach or other event requiring notification under applicable law (Utah Code § 13-44-101 thru 301 et al), Contractor shall notify Eligible User within twenty-four hours of a confirmed breach, and shall: (a) cooperate with the Eligible User by sharing information relevant to the Data Breach; (b) promptly implement necessary remedial measures, if necessary; and (c) document responsive actions taken related to the Data Breach, including any post-incident review of events and actions taken to make changes in business practices in relation to the Data Breach. If the Data Breach requires public notification, all communication shall be coordinated with the Eligible User. Contractor is responsible for all notification and remedial costs and damages.

23. **STATE INFORMATION TECHNOLOGY POLICIES:** If Contractor is providing an Executive Branch Agency of the State of Utah with Goods or Custom Deliverables, Contractor shall comply with policies and procedures that meet or exceed those DTS follows for internally developed goods and deliverables to minimize security risk, ensure applicable Utah and Federal laws are followed, address issues with accessibility and mobile device access, and prevent outages and data breaches within the State of Utah's environment. Contractor shall comply with the following DTS Policies:

a. **DTS Policy 4000-0001, Enterprise Application and Database Deployment Policy**: A Contractor developing software for the State to develop and establish proper controls that will ensure a clear separation of duties between developing and deploying applications and databases to minimize security risk; to meet due diligence requirements pursuant to applicable Utah and federal regulations; to enforce contractual obligations; and to protect the State's electronic information and information technology assets.

b. **DTS policy 4000-0002, Enterprise Password Standards Policy**: A Contractor developing software for the State must ensure it complies with the password requirements of the Enterprise Password Standards Policy.

c. **DTS Policy 4000-0003, Software Development Life Cycle Policy**: A Contractor developing software for the State shall work with DTS in implementing a Software Development Lifecycle (SDLC) that addresses key issues of security, accessibility, mobile device access, and standards compliance.

d. **DTS Policy 4000-0004, Change Management Policy**: Goods or Custom Deliverables furnished or Services performed by Contractor which have the potential to cause any form of outage or to modify DTS's or the State of Utah's infrastructure must be reviewed by the DTS Change Management Committee. Any outages or Data Breaches which are a result of Contractor's failure to comply with DTS instructions and policies will result in Contractor's liability for all damages resulting from or associated with the outage or Data Breach.

24. **CONFIDENTIALITY:** This section does not apply to records where disclosure is regulated under Federal or State laws.

GRAMA applies only to records, therefore if information (other than Non-Public Data, Public Health Information, or State Data) is disclosed orally by either party which either party wishes to remain confidential, then each party shall adhere to the following:

Each party will: (a) limit disclosure of any such information to Authorized Persons who have a need to know such information in connection with the current or contemplated business relationship between the parties to which this Contract relates, and only for that purpose; (b) advise its Authorized Persons of the proprietary nature of the information and of the obligations set forth in this Contract and require such Authorized Persons to keep the information confidential; (c) shall keep all information strictly confidential by using a reasonable degree of care, but not less than the degree of care used by it in safeguarding its own confidential information; and (d) not disclose any such information received by it to any third parties, except as otherwise agreed to in writing by the disclosing party. Each party will notify the other of any misuse or misappropriation of such information that comes to said party's attention.

This duty of confidentiality shall be ongoing and survive the Contract Period.

25. **Reserved**

26. **OWNERSHIP IN INTELLECTUAL PROPERTY:** The Parties recognize that each has no right, title, or interest, proprietary or otherwise, in or to the name, logo, or intellectual property owned or licensed by the other. The Parties shall not, without the prior written consent of the other or as authorized in this Contract, use the name, logo, or intellectual property owned or licensed by the other.

27. **OWNERSHIP IN CUSTOM DELIVERABLES:** Contractor warrants, represents and conveys full ownership, clear title free of all liens and encumbrances to any Custom Deliverable. Contractor conveys the ownership in Custom Deliverables as defined in this Attachment A to the Eligible User. All intellectual property rights, title and interest in the Custom Deliverables shall transfer to the Eligible User, subject to the following:

    a. Contractor has received payment for the Custom Deliverables,

    b. Each party will retain all rights to Background IP, even if embedded in the Custom Deliverables.

    c. Custom Deliverables, excluding Contractor's Background IP may not be marketed or distributed without written approval by the Eligible User.

    Contractor shall grant to the Eligible User a perpetual, irrevocable, royalty-free license to use Contractor's Background IP as defined above, solely for the Eligible User to use the Custom Deliverables.

28. **LICENSE FOR GOODS:** For the Goods delivered that include Contractor's scripts and code and are not considered Custom Deliverables, Contractor grants the Eligible User a limited, revocable,, non-transferable license to access and use its online educational software for the number of users listed on any accepted price quotes

29. **OWNERSHIP, PROTECTION, AND USE OF RECORDS:** The Eligible User shall own exclusive title to all information and data gathered, reports developed, and conclusions reached by the Eligible User in performance of this Contract. Contractor may not use, except in meeting its obligations under this Contract, information gathered, reports developed, or conclusions reached by the Eligible User in performance of this Contract without the express written consent of the Eligible User.

30. **OWNERSHIP, PROTECTION, AND USE OF DATA:** The Eligible User shall own and retain unlimited rights to use, disclose, or duplicate all information and data (copyrighted or otherwise) developed, derived, documented, stored, or furnished by Contractor under this Contract. Contractor, and any Subcontractors under its control, expressly agrees not to use Non-Public Data without prior written permission from the Eligible User.

31. **OWNERSHIP, PROTECTION, AND USE OF CONFIDENTIAL FEDERAL, UTAH, OR LOCAL GOVERNMENT INTERNAL BUSINESS PROCESSES AND PROCEDURES:** In the event that the Eligible User provides Contractor with confidential federal or state business processes, policies, procedures, or practices, pursuant to this Contract, Contractor shall hold such information in confidence, in accordance with applicable laws and industry standards of confidentiality, and not to copy, reproduce, sell, assign, license, market, transfer, or otherwise dispose of, give, or disclose such information to third parties or use such information for any purpose whatsoever other than the performance of this Contract. The improper use or disclosure by any party of protected internal federal or state business processes, policies, procedures, or practices is prohibited. Confidential federal or state business processes, policies, procedures, or practices shall not be divulged by Contractor or its Subcontractors, except for the performance of this Contract, unless prior written consent has been obtained in advance from the Eligible User.

32. **OWNERSHIP, PROTECTION, AND RETURN OF DOCUMENTS AND DATA UPON CONTRACT TERMINATION OR COMPLETION:** All documents and data pertaining to work required by this Contract will be the property of the Eligible User, and must be delivered to the Eligible User within thirty (30) working days after termination or expiration of this Contract, and without restriction or limitation to their future use. Any State Data returned under this section must either be in the format as originally provided, in a format that is readily usable by the Eligible User, or formatted in a way that it can be used. The costs for returning documents and data to the Eligible User are included in this Contract.

33. **ORDERING AND INVOICING:** For State of Utah Executive Branch Agencies, a purchase order must be sent to the Contractor by DTS prior to any work being initiated, product shipped, or invoices cut under this contract. All orders will be shipped promptly in accordance with the delivery schedule. Contractor will promptly submit invoices (within 30 days after shipment or delivery of goods or services, with the exclusion of end of fiscal year invoicing for Executive Branch Agencies) to the appropriate Eligible User. The contract number shall be listed on all invoices, freight tickets, and correspondence relating to an order under this Contract. The prices paid by the Eligible User shall not exceed prices listed in this Contract. The Eligible User shall adjust or return any invoice reflecting incorrect pricing. For Executive Branch Agencies, Contractor must send all invoices no later than July 10, or the last working day prior, to the State for all work completed or items received during the State's fiscal year of July 1-June 30.

34. **PAYMENT AND NOTICE:**

    a. Payments will be made within thirty (30) days from the date a correct invoice is received. For Executive Branch Agencies, a correct invoice will contain the contract and purchase order numbers as indicated in Section 33. After sixty (60) days from the date a correct invoice is received by the appropriate State official, the Contractor may assess interest on overdue, undisputed account charges up to the interest rate paid by the IRS on refund claims, plus two percent, computed in accordance with Section 15-6-3, Utah Prompt Payment Act of Utah Code, as amended.

    b. The contract costs may be changed only by written amendment. All payments to Contractor will be remitted by mail, by electronic funds transfer, or by the Eligible User's purchasing card (major credit card). The Division will not pay electronic payment fees of any kind.

    c. Any written protest of the final contract payment must filed with the Eligible User within ten (10) working days of receipt of final payment. If no protest is received, the Eligible User, the Division, and the State of Utah are released from all claims and all liability to Contractor for fees and costs pursuant to this Contract.

d.  Overpayment: If during or subsequent to the Contract an audit determines that payments were incorrectly reported or paid by the Eligible User to Contractor, then Contractor shall, upon written request, immediately refund to the Eligible User any such overpayments.

35.  **CONTRACTOR'S INSURANCE RESPONSIBILITY:** The Contractor shall maintain the following insurance coverage:

a.  Workers' compensation insurance during the term of this Contract for all its employees related to this Contract. Workers' compensation insurance shall cover full liability under the workers' compensation laws of the jurisdiction in which the work is performed at the statutory limits required by said jurisdiction. Should Contractor use on-site subcontractors, Contractor shall require such subcontractor to procure the same level of insurance.

b.  Commercial general liability [CGL] insurance from an insurance company authorized to do business in the State of Utah. The limits of the CGL insurance policy will be no less than one million dollars ($1,000,000.00) per person per occurrence and three million dollars ($3,000,000.00) aggregate.

c.  Commercial automobile liability [CAL] insurance from an insurance company authorized to do business in the State of Utah. The CAL insurance policy must cover bodily injury and property damage liability and be applicable to all vehicles used in your performance of Services under this Agreement whether owned, non-owned, leased, or hired. The minimum liability limit must be $1 million per occurrence, combined single limit. The CAL insurance policy is required if Contractor will use a vehicle in the performance of this Contract.

d.  Other insurance policies specified in the Solicitation.

Certificate of Insurance, showing up-to-date coverage, shall be on file with the State before the Contract may commence. Failure to provide proof of insurance as required will be deemed a material breach of this Contract.

Contractor's failure to maintain this insurance requirement for the Contract Period will be grounds for immediate termination.

36.  **ADDITIONAL INSURANCE REQUIREMENTS:**

a.  Professional liability insurance in the amount as described in the Solicitation for this Contract, if applicable.

b.  Any other insurance policies described or referenced in the Solicitation for this Contract.

c.  Any type of insurance or any increase of limits of liability not described in this Contract which the Contractor requires for its own protection or on account of any federal, Utah, or local statute, rule, or regulation shall be its own responsibility, and shall be provided at Contractor's own expense.

d.  The carrying of insurance required by this Contract shall not be interpreted as relieving the Contractor of any other responsibility or liability under this Contract or any applicable law, statute, rule, regulation, or order. Contractor must provide proof of the above listed policies within thirty (30) days of being awarded this Contract.

37.  **ASSIGNMENT/SUBCONTRACT:** Contractor will not assign, sell, transfer, subcontract or sublet rights, or delegate responsibilities under this Contract, in whole or in part, without the prior written approval of the Division, except in connection with the sale of all or substantially all outstanding assets or equity of Contractor.

38.  **TERMINATION:** This Contract may be terminated for cause by either party upon written notice being given by the other party. The party in violation will be given ten (10) calendar days, or as otherwise agreed upon in writing, after notification to correct and cease the violations, after which this Contract may be terminated for cause immediately and subject to the remedies below. This Contract may also be terminated without cause (for convenience) by the Division, upon thirty (30) calendar days written termination notice being given to the Contractor. The Division and the Contractor may agree to terminate this Contract, in whole or in part, at any time by mutual written agreement.

Contractor shall be compensated for the Services properly performed and goods properly provided pursuant to this Contract up to the effective date of termination as stated in the notice. Contractor agrees that in the event of termination for cause or without cause, Contractor's sole remedy and monetary recovery from the Division, the Eligible User, or the State of Utah is limited to payment for all work properly performed as authorized under this Contract up to the date of termination, and any reasonable pro-rated monies that may be owed as a result of Contractor having to terminate other contracts necessarily and appropriately entered into by Contractor pursuant to this Contract, after receipt and verification of documented evidence of those terminated contracts.

39.  **TERMINATION UPON DEFAULT:** In the event this Contract is terminated for default by Contractor, Contractor shall provide a prorated refund for any Services prepaid but not used through the date of termination. .

40.  **SUSPENSION OF WORK:** The Division may suspend Contractor's responsibilities under this Contract without terminating this Contract by issuing a written notice. Contractor's responsibilities may then be reinstated upon written notice from the Division.

41.  **DEFAULT AND REMEDIES:** Any of the following events will constitute cause for the Division to declare Contractor in default of this Contract for nonperformance of contractual requirements or a material breach of any term or condition of this Contract. The Division will issue a written notice of default and may provide a fourteen (14) day period in which Contractor will have an opportunity to cure. Time allowed for cure will not diminish or eliminate Contractor's liability for damages. If the default remains, after Contractor has been provided the opportunity to cure, the Division may exercise any remedy provided by law; terminate this Contract and any related contracts or portions thereof; (c) receive a pro rata refund for Services prepaid but not used through the date of termination; or (d) suspend or debar Contractor from receiving future solicitations.

42.  **FORCE MAJEURE:** Neither party to this Contract will be held responsible for delay or default caused by fire, riot, acts of God, or war which is beyond that party's reasonable control. The Division may immediately terminate this Contract after determining such delay will reasonably prevent successful performance of this Contract.

43. **CONFLICT OF TERMS:** Contractor terms and conditions must be attached to this Contract. No other terms and conditions will apply to this Contract, including terms listed or referenced on a Contractor's website, quotation/sales order, purchase orders, or invoice. In the event of any conflict in the contract terms and conditions, the order of precedence is: (a) This Attachment A; (b) the Division's Contract Signature Page(s); (c) State of Utah's Additional Terms and Conditions, if any; and (d) Contractor Terms and Conditions, if any. Attachment A will be given precedence over any provisions including, limitation of liability, indemnification, standard of care, insurance, or warranty, and will not be nullified by or exception created by more specific terms elsewhere in this Contract.

44. **SURVIVORSHIP:** The contractual provisions that will remain in effect after expiration or termination of this Contract are: (a) Contract Jurisdiction, Choice of Law, and Venue; (b) Secure Protection and Handling of State Data; (c) Data Breach Responsibilities; (d) Ownership in Custom Deliverables; (e) Ownership, Protection, and Use of Records, including Residuals of such records; and (f) Ownership, Protection, and Use of Confidential Federal, Utah, or Local Government Internal Business Processes, including residuals of such confidential business processes; (g) Ownership, Protection, and Return of Documents and Data Upon Contract Termination or Completion; (h) Confidentiality; (i) Conflict of Terms; and (j) any other terms that by their nature would survive the expiration, completion, or termination of this contract.

45. **RELEVANT STATE AND FEDERAL LAWS**

   a. **Conflict of Interest with State Employees:** Contractor shall comply and cooperate in good faith with all conflict of interest and ethic laws, including Section 63G-6a-2404, Utah Procurement Code, as amended.

   b. **Procurement Ethics:** Contractor understands that a person who is interested in any way in the sale of any supplies, services, products, construction, or insurance to the State of Utah is violating the law if the person gives or offers to give any compensation, gratuity, contribution, loan, or reward, or any promise thereof to any person acting as a procurement officer on behalf of the State of Utah, or who in any official capacity participates in the procurement of such supplies, services, products, construction, or insurance, whether it is given for their own use or for the use or benefit of any other person or organization (63G-6a-2304.5, Utah Procurement Code, as amended).

   c. **Contact Information:** Per Utah Code §§63G-6a-110 and 35A-2-203, the State shall make Contractor's contact information available to the State of Utah Department of Workforce Services. The State of Utah Department of Workforce Services may post information regarding Contractor's job vacancies on its website.

   d. **Employment Practices:** Contractor shall abide by the following employment laws: (i)Title VI and VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e) which prohibits discrimination against any employee or applicant for employment or any applicant or recipient of services, on the basis of race, religion, color, or national origin; (ii) Executive Order No. 11246, as amended, which prohibits discrimination on the basis of sex; (iii) 45 CFR 90 which prohibits discrimination on the basis of age; (iv) Section 504 of the Rehabilitation Act of 1973, or the Americans with Disabilities Act of 1990 which prohibits discrimination on the basis of disabilities; and (v) Utah's Executive Order 2019-1, dated February 5, 2019, which prohibits unlawful harassment in the work place. Contractor shall abide by any other laws, regulations, or orders that prohibit the discrimination of any kind of any of Contractor's employees.

   e. **Compliance with Accessibility Standards:** Contractor shall comply with the Accessibility Standards of Section 508 Amendment to the Rehabilitation Act of 1973. Contractor shall comply with Utah Administrative Code R895-14-3(3), which states that contractors developing new websites or applications for State agencies are required to meet accessibility guidelines subject to rule R895 and correct any items that do not meet these guidelines at no cost to the agency. Contractor shall comply with Utah Administrative Code R895-14-4(2), which states that contractors proposing IT products and services shall provide Voluntary Product Accessibility Template® (VPAT™) documents. Contractor has worked to follow ADA Recommendations throughout the development of its online materials. Contractor's online materials include a number of accessibility features, such as the ability to be used with a screen reader and supporting audio for students with visual impairments. However, some areas of Contractor's web platform are not in full compliance with these recommendations. Contractor shall disclose these areas to Eligible Users before entering into respective contracts with them. Contractor shall make commercially reasonable efforts to obtain full compliance under the ADA as quickly as possible.

46. **RIGHT TO MONITOR PERFORMANCE AND AUDIT**

   a. **Audit:** Contractor shall, upon written notification permit the Division, or a third party designated by the Division, to perform an assessment, audit, examination, or review of all of Contractor's sites and environments - including physical, technical, and virtual sites and environments - in order to confirm Contractor's compliance with this Contract; associated scopes of work; and applicable laws, regulations, and industry standards. Contractor shall fully cooperate with such assessment by providing access to knowledgeable personnel; physical premises; records; technical and physical infrastructures; and any other person, place, or object which may assist the Division or its designee in completing such assessment. Upon request, Contractor shall provide the results of any audit performed by or on behalf of Contractor that would assist the Division or its designee in confirming Contractor's compliance with this Contract; associated scopes of work; and applicable laws, regulations, and industry standards. Any audits will be subject to Contractor's bona fide confidentiality obligations to its other customers.

   b. **Monitor Performance**: The Division and Eligible Users reserve the right to monitor Contractor's performance, perform plan checks, plan reviews, other reviews, and/or comment upon the Services of Contractor. This includes Contractor's Subcontractors, if any. Results of any evaluation may be made available to the Contractor upon Contractor's request. Any performance evaluation of Contractor's services must be performed in accordance with the *i-Ready®* Terms of Use.

47. **TIME IS OF THE ESSENCE:** The Services shall be completed and Goods and Custom Deliverables delivered by any applicable deadline stated in this Contract. Time is of the essence.

48. **STANDARD OF CARE:** For Services of Contractor which require licenses and certifications, such Services shall be performed in accordance with the standard of care exercised by licensed members of their respective professions having substantial experience providing similar services which similarities include the type, magnitude, and complexity of the Services that are the subject of this Contract.

49. **LARGE VOLUME DISCOUNT PRICING:** Eligible Users may seek to obtain additional volume discount pricing for large orders provided Contractor is willing to offer additional discounts for large volume orders.  No amendment to this Contract is necessary for Contractor to offer discount pricing to an Eligible User for large volume purchases.

50. **ELIGIBLE USER PARTICIPATION:** Participation under this Contract by Eligible Users is voluntarily determined by each Eligible User. Contractor agrees to supply each Eligible User with Goods based upon the same terms, conditions and prices of this Contract for those entities purchasing the same products directly from Contractor under the same terms and in the same quantities as provided under this Contract.

51. **INDIVIDUAL CUSTOMERS:** Each Eligible User that purchases Goods from this Contract will be treated as if they were individual customers. Each Eligible User will be responsible to follow the terms and conditions of this Contract.  Contractor agrees that each Eligible User will be responsible for their own charges, fees, and liabilities. Contractor shall apply the charges to each Eligible User individually. The Division is not responsible for any unpaid invoice.

52. **QUANTITY ESTIMATES:** The Division does not guarantee any purchase amount under this Contract.  Estimated quantities are for Solicitation purposes only and are not to be construed as a guarantee. Any reduction in quantity may, within reason, affect the unit price(s) of the Services offered herein.

53. **ORDERING:** Orders will be placed by the using Eligible User directly with Contractor. All orders will be shipped promptly in accordance with the terms of this Contract.

54. **REPORTS AND FEES**:

   a. **Administrative Fee:** Contractor agrees to provide a quarterly administrative fee to the State in the form of a check, EFT or online payment through the Division's Automated Vendor Usage Management System.  Checks will be payable to the "State of Utah Division of Purchasing" and will be sent to State of Utah, Division of Purchasing, Attn: Cooperative Contracts, PO Box 141061, Salt Lake City, UT  84114-1061.  The Administrative Fee will be the amount listed in the Solicitation and will apply to all purchases (net of any returns, credits, or adjustments) made under this Contract.

   b. **Quarterly Reports:** Contractor agrees to provide a quarterly utilization report, reflecting net sales to the State during the associated fee period. The report will show the dollar volume of purchases by each Eligible User. The quarterly report will be provided in secure electronic format through the Division's Automated Vendor Usage Management System found at: https://statecontracts.utah.gov/Vendor.

   c. **Report Schedule:** Quarterly utilization reports shall be made in accordance with the following schedule:

| Period End | Reports Due |
|---|---|
| March 31 | April 30 |
| June 30 | July 31 |
| September 30 | October 31 |
| December 31 | January 31 |

   d. **Fee Payment:** After the Division receives the quarterly utilization report it will send Contractor an invoice for the total quarterly administrative fee owed to the Division. Contractor shall pay the quarterly administrative fee within thirty (30) days from receipt of invoice.

55. **Timely Reports and Fees:** If the quarterly administrative fee is not paid by thirty (30) days of receipt of invoice or quarterly utilization reports are not received by the report due date, then Contractor will be in material breach of this Contract.

56. **ANTI-BOYCOTT ISRAEL**: In accordance with Utah Statute 63G-27-101, Contractor certifies that it is not currently engaged in a boycott of the State of Israel and agrees not to engage in a boycott of the State of Israel for the duration of the contract.

(Revision Date: 11 August 2022)

**Attachment B: SCOPE OF WORK**

K-12 Mathematical Personalized Learning Software

**BACKGROUND:**

This contract is responding to Utah House Bill 139, Science, Technology, Engineering, and Mathematics Action Center (STEM AC) (http://le.utah.gov/~2013/bills/static/HB0139.html).

**VENDOR RESPONSIBILITIES:**

1. The vendor shall provide a computer-assisted math instructional learning and assessment software program that meets the following criteria:

    a. Aligns with the K-12 Utah Core State Standards for Mathematics;

    b. Provide software-based instruction in math, to be used as a supplement to core instruction. This program should not replace core instruction given by the teacher but should be available for use either during school or at home for additional practice or re-teaching areas of need;

    c. Provide this instruction at a level appropriate for use by all K-12 students;

    d. Assess student performance by providing automatic feedback, real-time assessment and real-time monitoring;

    e. Generate reports of student performance, including student progress reports, class summaries, and class grouping for instruction;

    f. Provide empirical evidence that participation in the program increases student

    achievement (provide evidence in table format and also cite relevant studies);

    g. Provide evidence of the minimum number of minutes (or other measure of usage appropriate for the product) students must complete, per week, on the program necessary to achieve that impact;

    h. Provide details about how the software is hosted (e.g., individual stations, server-based, web-based, etc.) Be explicit about technical specifications for individual stations, servers, bandwidth, etc;

    i. Provide onsite professional development for educators so they can understand the technology and determine how to best integrate software and technology into their instruction;

    j. Provide a plan demonstrating the ability to begin work without delay and work effectively and efficiently with LEAs to implement installation and professional development. This plan should also identify ways the product provider will work with LEAs to achieve fidelity usage of the program;

    k. Programs that focus on fact fluency such as multiplication tables, and do not cover significant portions of the Utah Core State Standards for Mathematics will not be considered;

l. Demonstrate capability of program to read text and/or provide feedback in English and Spanish.

m. Provide demonstrated experience with statewide math initiatives that have deployed instructional math technology tools to local LEAs.

2. The vendor shall provide all required data reporting to the STEM Action Center's contracted third-party evaluation team by the 5th of each month.

3. The vendor shall provide summary reports of license usage to the STEM Action Center no later than October 5th, November 5th, and February 5th. Licenses that are not used within the first 60 days at any school will be reallocated to schools that have license shortages. Any licenses not used within the first 120 days of the school year must be credited back to the STEM Action Center by vendors for use in the following school year (also referred to as the "true up" process in the minimum mandatory requirements).

**STEM ACTION CENTER RESPONSIBILITIES:**

1. The STEM AC will award licenses to Eligible Users. Only vendors with awarded contracts will be able to participate in the LEA application process. Eligible Users will submit requests to the STEM Action Center, following the steps listed below. Eligible Users will work with vendors to determine what will best meet their needs and perform their own cost/benefit analysis to determine which vendor and product will meet their needs. Eligible Users should work with their IT Departments in implementing the services.

   When requesting a product eligible users must adhere to the following steps:
   - Step 1: The STEM Action Center will provide a list of vendors on contract. Eligible Users (such as schools) must review this list.
   - Step 2: Schools may look at the approved vendors and their products, and select the product that suits their needs.
   - Step 3: Schools may request up to two products based on strategic plans, and must demonstrate buy-in from District or LEA-level administration, school-level administrators, and Information Technology Directors. School enrollment data, and prior year usage data, and survey response rate data are used to determine the level at which each school will be supported based on available funding.
   - Step 4: Because licenses are in short supply, licenses that are not used within the first 60-days at any school are reallocated to schools that have license shortages. Any licenses not used within the first 120 days of the school year must be credited back to STEM Action Center by vendors for use in the following school year.
   - Step 5: The STEM Action Center awards licenses to schools and vendors, based on the explanation in Step 3. The STEM Action Center's process also includes a cost analysis/price analysis of the license costs to decide

> where licenses can be awarded. The STEM Action Center will make the cost threshold determination, and then award licenses.
>   - Step 6: The Eligible User will keep all documents in a file for auditing purposes.

2. The STEM AC will facilitate communication and coordination with a third-party evaluation team to rigorously evaluate the efficacy of provided software.
3. The STEM AC will make payments via the payment schedule (addressed below).

**TIMELINE:**

1. Vendor shall receive their license allocation award from the STEM Action Center by June 30 of each year.
2. Vendor shall distribute software licenses to awarded LEAs by August 15 of each year.
3. Vendor shall attempt and/or make contact with every awarded LEA by September 30 of each year.
4. Online, in-person, and/or a hybrid approach of software mentorship and training shall be scheduled with awarded LEAs by October 31 of each year.

**PAYMENT SCHEDULE:**

Payment will be distributed according to the following schedule

- 50% of the annual award will be paid, once the STEM AC receives evidence that all licenses have been distributed to awarded LEAs.
- 45% of the annual award will be paid once the STEM AC receives evidence that all training has been scheduled and/or attempted with all awarded LEAs.
- 5% of the annual award will be paid by June 1 of each year.

Invoices shall be emailed:

> Sue Redington, STEM Action Center Program Director
> sredington@utah.gov
> 3848 S. West Temple, Suite 105, South Salt Lake, Utah 84115

1. Payment will be processed after the required documentation is received.

2. Vendor acknowledges that receipt of the payment is contingent upon the vendor performing its deliverables.

**JK23-17 K-12 Mathematical Personalized Learning Software RFP**
**Cost Sheet**

| | |
|---|---|
| Offeror Name | Curriculum Associates |
| Contact Name, if different | Erin Rush \| AVP, Bids & Proposals |
| Contact Phone Number | 800-225-0248 |
| Contact Email | RFPs@cainc.com |
| | |

**Any deviation from this format may result in a disqualification of proposal**

| | Enter total cost per license | |
|---|---|---|
| **Cost per License\*** | $35.00 | *(Annual/1 Year Term Price)* |

**\*Professinal learning opportunities, tech support, and any other costs must be calcuated as part of the license price.**



## CERTIFICATE OF SERVICE

I, Matthew D. Brown, hereby certify that on this 7th day of July 2026, the foregoing document, filed through the ECF system, will be sent electronically to the registered participants on the Notice of Electronic Filing, and paper copies will be sent to any non-registered participants.

/s/  Matthew D. Brown
Matthew D. Brown