**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **M.C. 1, et al.,** <br> **Plaintiffs,** <br> **v.** <br> **CURRICULUM ASSOCIATES, LLC,** <br> **Defendant.** | ) | **Civil Action No. 25-13942-FDS** |

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION TO DISMISS**

**SAYLOR, J.**

This is a putative class action alleging unlawful collection and sharing of the private information of schoolchildren by Curriculum Associates, a provider of learning and assessment software to K-12 schools across the country. Jurisdiction is based on the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The complaint alleges that Curriculum Associates unlawfully shares students' sensitive demographic, behavioral, and academic data with third parties without the consent of students or authorized parties. It asserts nine counts under federal and state law. Curriculum Associates has moved to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

This case is an example of a recurring phenomenon: the application of statutes enacted in a different era, for different purposes, to modern technological problems. *See, e.g., Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482 (1st Cir. 2016) (addressing the application of the Video Privacy Protection Act, 18 U.S.C. § 2710, enacted to regulate the disclosure of information concerning videotape rentals, to software applications that permit

mobile access to news and entertainment media content). Regulation inevitably lags behind the development of technology, and the use of earlier statutes often tends to involve an effort to fit a proverbial square peg into a round hole. Nonetheless, those statutes must be interpreted as written, and if their language is sufficiently broad, they may be read to encompass technological developments that did not exist at the time of their enactment. And because their purpose, broadly speaking, is often the same—the protection of privacy interests from unwarranted intrusion—the statutory language does occasionally provide the necessary fit.

For the following reasons, the motion to dismiss will be granted in part and denied in part.

## I. Background

### A. Factual Background

The facts are set forth as alleged in the complaint except as otherwise noted.

Curriculum Associates is a Massachusetts corporation that develops and provides educational software. (Compl., Dkt. No. 1, ¶¶ 2, 33). Thousands of K-12 schools purchase the digital tools of Curriculum Associates, specifically the "i-Ready" product suite, to aid instruction and assess student progress in math and reading. (*Id.* ¶¶ 43-44).

Plaintiffs are minor children identified as M.C. 1, M.C. 2, M.C. 3, and M.C. 4, all of whom are citizens of California. (Compl. ¶¶ 27-31). M.C. 1 and M.C. 2 have filed suit through their mother, Nicole Reisberg, and M.C. 3 and M.C. 4 have filed suit through their mother, Lila Byock. (*Id.* ¶¶ 29, 32). Reisberg and Byock are also citizens of California. *Id.*

According to the complaint, plaintiffs are required by their schools to use i-Ready products to complete assignments, which results in the collection, use, and sharing of their data by Curriculum Associates without their consent. (*Id.* ¶¶ 37, 49-116). The data allegedly includes personal identifying information, demographics, school and grade level, and IP addresses of

students, in addition to information about their assessment outcomes and progress. (*Id.* ¶ 118). The complaint alleges that Curriculum Associates creates data profiles on students that include analyses of students' learning trends and predictions about students' progress. (*Id.* ¶¶ 163-64).

According to the complaint, Curriculum Associates uses the data it collects to "develop, market, support, and improve its products for commercial purposes," reserving a license in its terms and conditions to use the data for its purposes. (*Id.* ¶¶ 138, 146-47). It further alleges that Curriculum Associates shares student data with third parties who perform hosting, information technology, customer support, data security, consumer research, educational research, and analytics services. (*Id.* ¶ 167).

According to the complaint, Curriculum Associates did not obtain informed consent from plaintiffs because it failed to provide its terms and policies to parents; to offer students a voluntary choice of whether to use i-Ready products; and to seek consent from parties authorized to provide it. (*Id.* ¶ 257). It alleges that Curriculum Associates made "false and misleading statements" about its legal compliance and disclosure practices so that schools would avoid seeking parental consent. (*Id.* ¶¶ 286-99).

The complaint alleges that those data-collection and sharing practices have harmed plaintiffs by invading their privacy, compromising the security of their private information, creating algorithmic profiles that affect student access to opportunities, and forcing students to choose between their right to an education and their right to privacy. (*Id.* ¶¶ 302-29).

**B. <u>Procedural Background</u>**

On December 22, 2025, plaintiffs filed a complaint individually and on behalf of "[a]ll persons in the United States who attend or attended a K-12 school who used one or more Curriculum Associates Products." (*Id.* ¶ 334). Plaintiffs also filed suit on behalf of a state-only

subclass under California law consisting of "[a]ll persons in California who attend or attended a K-12 school who used one or more Curriculum Associates Products." (*Id.* ¶ 335).

The complaint asserts claims for violation of the Federal Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq.* (Count 1); violations of the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code §§ 631, 632, and § 638.51 (Counts 2, 3, and 4); violations of the California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502 *et seq.* (Count 5); violation of the Massachusetts Right to Privacy Act ("MRPA"), Mass. Gen. Laws ch. 214, § 1B (Count 6); unjust enrichment (Count 7); negligence (Count 8); and violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A (Count 9).

Defendant has moved to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of Article III standing and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II. <u>Standard of Review</u>

On a motion to dismiss made pursuant to Rule 12(b)(1), "the party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (quoting *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993) (internal quotation marks omitted)). A court "must credit the plaintiff's well-[pleaded] factual allegations and draw all reasonable inferences in the plaintiff's favor." *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).

Article III standing is a prerequisite for subject-matter jurisdiction, and "the plaintiff bears the burden of pleading facts necessary to demonstrate standing." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). "The heartland of constitutional standing is composed of the familiar amalgam of injury in fact, causation, and redressability." *Id.* at 731 (citing *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560-61 (1992)). Each element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof," *Lujan*, 504 U.S. at 561, which here is "the plausibility standard applicable under Rule 12(b)(6)," *Hochendoner*, 823 F.3d at 730.

To survive a motion to dismiss under Rule 12(b)(6), the complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). When determining whether a complaint satisfies that standard, a court must "take the complaint's well-pleaded facts as true, and . . . draw all reasonable inferences in the plaintiff's favor." *Lowe v. Mills*, 68 F.4th 706, 713 (1st Cir. 2023) (quoting *Frese v. Formella*, 53 F.4th 1, 5 (1st Cir. 2022)) (citation modified). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III. Analysis

### A. Electronic Communications Privacy Act (Count 1)

The federal Electronic Communications Privacy Act, often called the Wiretap Act, "provides a private right of action against one who 'intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication.'" *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003) (quoting 18

U.S.C. § 2511(a)). The statute "defines 'intercept' as 'the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.'" *Pharmatrak*, 329 F.3d at 9 (quoting 18 U.S.C. § 2510(4)). It exempts a person from liability for intercepting a communication if the person "is a party to the communication." 18 U.S.C. § 2511(2)(d). Nevertheless, if the party intercepted the communication "for the purpose of committing any criminal or tortious act in violation of the Constitution of laws of the United States or of any State," that exception does not apply and the party may be subject to liability. *Id.*

A plaintiff seeking to invoke the crime-tort exception must "plead sufficient facts to support an inference that the offender intercepted the communication for the purpose of a tortious or criminal act that is *independent* of the intentional act of recording or interception itself." *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 145 (3d Cir. 2015) (quoting *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010)). The commission of the independent criminal or tortious act must be the "primary motivation" or "determinative factor" behind the alleged interception. *See, e.g.*, *Goulart v. Cape Cod Healthcare, Inc.*, 2025 WL 1745732, at *3 (D. Mass. June 24, 2025); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 797 (N.D. Cal. 2022); *United States v. Dale*, 991 F.2d 819, 841 (D.C. Cir. 1993).

Here, Curriculum Associates was a party to the communications at issue. The complaint alleges that Curriculum Associates intercepted "contents of electronic communications made in the form of detailed URL requests, webpage browsing histories, search queries, and other information that Plaintiffs and Nationwide Class members sent to Curriculum Associates and for which Plaintiffs and Nationwide Class members received communications in return from Curriculum Associates." (Compl. ¶ 360). As the recipient of the communications, Curriculum

Associates was a party to them. Although plaintiffs contend that Curriculum Associates "was not an authorized party to the communications because Plaintiffs and Nationwide Class members were unaware of Curriculum Associates' interceptions" and subsequent disclosures to third parties, a party cannot "intercept" communications sent to themselves.[1] Therefore, as a party to the communications, Curriculum Associates is exempt from liability under the statute unless the crime-tort exception applies.

Plaintiffs contend that the crime-tort exception applies because the alleged nonconsensual collection, use, and disclosure of their data was for the purpose of engaging in tortious conduct. (Plaintiffs' Opposition to Defendant Curriculum Associates, LLC's Motion to Dismiss, Dkt. No. 39, at 8 ("Pl. Opp.")). Specifically, the complaint alleges that "Curriculum Associates disclosed the contents of those communications with third parties for the purpose of committing a crime or tort, including but not limited to, the tort of invasion of privacy, including but not limited to, intrusion upon seclusion and public disclosure of private facts." (Compl. ¶ 367).

The alleged wrongful conduct meets the independence requirement because the disclosure of the data is separate from the interception of the data. *See Doe v. Baystate Health Sys., Inc.*, 835 F. Supp. 3d 259, 269 (D. Mass. 2026) ("Unlike a claim for intrusion upon seclusion, Doe's invasion of privacy claim is premised on Baystate's intent to disclose confidential medical information to Meta and Google without her consent, not merely its intent to intercept her communications."); *R.S. v. Prime Healthcare Servs., Inc.*, 2025 WL 103488, at

[1] Plaintiffs' opposition to defendant's motion to dismiss focuses on the crime-tort exception and does not dispute defendant's contention that it is a party to the communications. (Pl. Opp. at 6-7).

*6 (C.D. Cal. Jan. 13, 2025) ("[T]he intent to disclose private information predates and is distinct from the interception itself.").[2]

The next issue is whether the complaint plausibly alleges facts from which it could be reasonably inferred that committing the tort of invasion of privacy supplied the "primary motivation" for the interception. *See Goulart*, 2025 WL 1745732, at *3.[3]

The complaint alleges that Curriculum Associates intercepted communications, and collected private data, both for its own in-house purposes (for example, to improve its products) and to market and sell that data at a profit to third parties, who exploited the data for their own financial gain. (Compl. ¶¶ 173-76). It further alleges that Curriculum Associates did so "for the purpose of committing a crime or tort, including but not limited to, the tort of invasion of privacy, including but not limited to, intrusion upon seclusion and public disclosure of private facts." (Compl. ¶ 367). And the complaint specifically alleges that "Curriculum Associates intentionally misleads Parents, educators, and others by omitting the companies, including Google, with which it does indeed share the information." (Compl. ¶ 298). Moreover, as discussed below, plaintiffs have asserted claims for violations of CIPA and invasion of privacy under MRPA, which further supports a reasonable inference of tortious intent. *See R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 901–02 (C.D. Cal. 2024) ("Here, the Court concludes that

---

[2] In *Caro*, the Second Circuit reasoned that "Invasion of privacy through intrusion upon seclusion . . . is a tort that occurs through the act of interception itself," and therefore "cannot satisfy the Wiretap Act's requirement of a separate and independent tortious intent." 618 F.3d at 101. There, the problem was that plaintiff "specifically pl[eaded] invasion of privacy by unreasonable intrusion upon the seclusion of another, as opposed to a general claim of invasion of privacy." *Id.* If plaintiff had invoked one of "[t]he remaining three categories of invasion of privacy," all of which "cannot be accomplished simply by intercepting one's communications," he might have successfully pleaded independent tortious conduct. *Id.*

[3] The complaint also alleges that Curriculum Associates "violated the interests protected by COPPA, ECPA, Massachusetts Right to Privacy Law . . . , and Massachusetts' common-law protections against conversion and trespass to chattels. (*Id.* ¶ 486.) And the other counts in the complaint alleges violations of various state statutes, as well as negligence and unjust enrichment.

Plaintiffs have stated a claim for invasion of privacy. Accordingly, viewing the allegations in the light most favorable to Plaintiffs, the Court concludes that the SAC pleads Defendant's tortious intent."); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021) (finding that plaintiffs plausibly pleaded the crime-tort exception where "Plaintiffs have adequately alleged that Google's association of their data with preexisting user profiles violated state law").

Under the circumstances, the complaint plausibly alleges facts sufficient to fit within the crime-tort exception to the Wiretap Act. Whether defendant's alleged tortious motive was the "primary motivation" or "determinative factor" for the interceptions is an issue that is best resolved on a factual record, not from the bare allegations of the complaint. *See Baystate*, 835 F. Supp. 3d at 268 ("Whether Baystate was primarily or determinatively motivated to intercept and share Doe's communications with Meta and Google for a lawful purpose (marketing, analytics, and financial gain), an unlawful purpose (violating M.G.L. c. 214, § 1B), or both is a question of fact not fit for resolution at the pleading stage.").

Finally, the Court respectfully disagrees with the reasoning of courts that have concluded that a financial motive insulates a defendant from the application of the crime-tort exception. *E.g.*, *In re Meta Pixel*, 647 F. Supp. 3d at 797; *Goulart*, 2025 WL 1745732, at *4. The statute contains no such language, and many crimes and torts, such as fraud and conversion, are normally committed solely for monetary gain. *See Baystate*, 835 F. Supp. 3d at 268 (holding that "allegations that Baystate installed the tracking technologies . . . 'for marketing and/or analytics purposes' as well as for 'financial gain'" do not exempt defendant from liability because "the existence of a lawful purpose does not mean that the interception is not also for a tortious or unlawful purpose") (quoting *Sussman v. American Broad Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999)); *Doe v. Lawrence Gen. Hosp.*, 2025 WL 2808055, at *20 (D. Mass. Aug. 29,

2025), *report and recommendation adopted in part, rejected in part*, 2025 WL 2807673 (D. Mass. Sept. 30, 2025) (concluding that the "broad theory that the presence of a primary financial motive inoculates a defendant from liability under the ECPA is wrong," noting that the "underlying motivation for many crimes and torts is to make money") (quoting *Cooper v. Mount Sinai Health Sys., Inc.*, 742 F. Supp. 3d 369, 382 (S.D.N.Y. 2024)).

Accordingly, the complaint states a claim under the Wiretap Act fails because it plausibly alleges facts supporting an application of the crime-tort exception. The motion to dismiss Count 1 will therefore be denied.

**B. <u>CIPA § 631 (Count 2)</u>**

Section 631 of the California Invasion of Privacy Act "is the state-law corollary to the Wiretap Act." *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 848 (N.D. Cal. 2014). It imposes liability on anyone who (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument"; (2) "willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state"; (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained"; or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above." Cal. Penal Code § 631(a). Parties injured by a violation of § 631 may bring a civil suit seeking damages or an injunction. *Id.* § 637.2.

**1. <u>First-Party Interception</u>**

As to CIPA's first clause, "Courts have uniformly interpreted this clause as applying only to communications transmitted over telephones and not those transmitted over the internet."

*Swarts v. Home Depot, Inc.*, 689 F. Supp. 3d 732, 743 (N.D. Cal. 2023); *see Greenley v. Kochava*, 684 F. Supp. 3d 1024, 1051 (S.D. Cal. 2023). The first clause thus cannot sustain plaintiff's claims, none of which involve telephonic wiretapping.

As to the second and third clauses, the CIPA "contain[s] an exemption from liability for a person who is a 'party' to the communication," which is subject to the "same analysis" as the Federal Wiretap Act. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020). For the reasons provided above, Curriculum Associates was party to the communications, but the party exception is inapplicable because plaintiffs have plausibly pleaded the crime-fraud exception. *See R.C. v. Walgreen Co.*, 733 F. Supp. 3d at 901-02 (finding that plaintiff satisfied the crime-tort exception for both Wiretap Act and CIPA claims); *Zarif v. Hwareh.com, Inc.*, 789 F. Supp. 3d 880, 896 (S.D. Cal. 2025) (stating that, because "Section 631 is analogous to the Wiretap Act claim . . . [t]he overlap between these claims covers many of [defendant's] arguments under Section 631" and can be "reject[ed] . . . for the same reasons explained above for the Wiretap Act claim"). Here, the party exception is the only basis advanced by defendant for rejecting the first-party interception claim. (*See* Def. Memorandum in Support of Motion to Dismiss, Dkt. No. 38, at 4-5 ("Def. Memo"); Def. Reply in Support of Motion to Dismiss, Dkt. No. 40, at 1-2 ("Def. Reply")). Therefore, the motion to dismiss the first-party interception claim under Count 2 will be denied.

**2. <u>Aiding and Abetting Third-Party Interception</u>**

To state an aiding-and-abetting claim under the fourth clause of § 631(a), the complaint must first plausibly allege that the third party violated one of the first three "operative" clauses. *D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1196, 1200 (S.D. Cal. 2024). That is, "in order to plead Defendant's liability for aiding and abetting, [plaintiffs] must first adequately plead [the third party's] underlying violations of the statute." *Cody v. Boscov's, Inc.*, 658 F. Supp. 3d 779,

782 (C.D. Cal. 2023). The complaint alleges that "Curriculum Associates aided and abetted third parties, including but not limited to, Google, to unlawfully intercept protected communications . . . and use the contents of those communications for their own commercial benefit, including the development and improvement of proprietary technologies, independent of the services those parties provide Curriculum Associates." (Compl. ¶ 378).

Again, the first clause of the statute cannot furnish a basis for the underlying violation because it does not cover internet communications. The underlying violations must therefore be based in the second or third clauses of the statute. And because "a finding of a violation under clause three is contingent upon a finding of a violation of either clause one or two," the inquiry here boils down to whether the third parties have violated the second clause. *Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1122 (S.D. Cal. 2024).

The second clause "has three requirements relevant here: (1) the absence of consent; (2) the party exception; and (3) the 'while . . . in transit' requirement." *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 756 (N.D. Cal. 2023). The complaint adequately alleges that plaintiffs did not consent to the disclosure of their data to third parties such as Google, specifically maintaining that they had no notice of defendant's data practices or access to its terms and conditions, and that parties with authority to consent were not provided an opportunity to refuse consent. (Compl. ¶¶ 254-85); *see Keurig*, 674 F. Supp. 3d at 756-57; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022).

To fall outside the "party" exception, plaintiffs contend that the third party must only be "capable" of using the communication for another purpose, while defendant contends that the third party must actually "use" the data for other purposes. (*See* Pl. Opp. at 8; Def. Reply at 3). Courts are divided on that issue, although "a growing number of district courts" have adopted the

"capability" test for the reasons set forth in *Javier v. Assurance IQ, LLC.*, 649 F. Supp. 3d 891 (N.D. Cal. 2023). *Turner v. Nuance Comm'ns, Inc.*, 735 F. Supp. 3d 1169, 1183 (N.D. Cal. 2024).[4] In any case, the complaint here satisfies even the more stringent "use" test, as it alleges that third-party companies "commercially benefit[]" by "monetiz[ing] the data in numerous ways, such as by using it to develop and enhance their own products, facilitate greater data analytics and 'user insights,' improve internal operations, or more effectively target their marketing efforts and attract new customers." (Compl. ¶ 181).

To meet the "in transit" requirement, plaintiffs must show that "a party intercepted the communication during its transmission, rather than once it was placed in electronic storage." *Heiting v. Taro Pharms. USA, Inc.*, 728 F. Supp. 3d 1112, 1125 (C.D. Cal. 2024). In other words, the interception must occur "before" or "at the time" the communication reached the intended recipient. *Id.* And the complaint must allege facts concerning "the method, or nature, of interception." *Id.*

Here, the complaint cites forensic analysis of M.C. 3's Chromebook showing that "when M.C. 3 accessed i-Ready, Google Analytics transmitted two categories of data packets to Google," one "containing multiple unique user identifiers, including the 'cid' (Client ID), the '_gid' (Google Analytics identifier), the 'jid' (Join ID), and the 'a' parameter" and the other "containing the Google Tag Manager Tag ID associated with the i-Ready implementation." (Compl. ¶ 234). And the complaint alleges that the data included "persistent identifiers, device and browser characteristics, URLs, lesson metadata, instructional events, engagement metrics,

[4] *Compare Keurig*, 674 F. Supp 3d at 758 ("[T]he question is whether the third party has 'the *capability* to use its record of the interaction for [another] purpose'") (quoting *Javier*, 649 F. Supp. 3d at 900), *with Graham v. Noom*, 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021) (holding that without "allegations here that [the third party] intercepted and used the data itself," the third party falls within the party exception as "an extension" of the party to the communication).

and performance outcomes" that were "transmitted to Google in real time." (*Id.* ¶ 253). Therefore, as to M.3, the complaint sufficiently alleges the in-transit requirement. *See Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 978 (C.D. Cal. 2023) ("Valenzuela did not simply recite that there was real time interception, she added detail on how it occurs (through the code Nationwide paid Akamai to embed) and pointed to statements from Akamai regarding '[r]eal-time insights' and '[d]ata from every use event *collected as it happens*.'"); *Valenzuela v. Kroger Co.*, 2024 WL 1336959, at *2 (C.D. Cal. Mar. 28, 2024) (finding that allegations that a third party used automatic routing software satisfied the in-transit requirement); *Yockey v. Salesforce, Inc.*, 745 F. Supp. 3d 945, 953 (N.D. Cal. 2024) ("The reasonable inference here, because Salesforce 'apparently receives the chat messages either before or simultaneously with' its clients—the intended recipients, is that Salesforce intercepts these messages.") (quoting *D'Angelo v. Penny OpCo, LLC*, 2023 WL 7006793, at *8 (S.D. Cal. Oct. 24, 2023)).

It is less clear whether the complaint plausibly alleges in-transit interception as to the other plaintiffs. There is no forensic analysis of devices used by M.C. 1 or M.C. 2, and while forensic testing was conducted on M.C. 4's iPad, the results are not disclosed in the complaint. (Compl. ¶ 187). However, the complaint does allege that the four children "all have Google profiles because their schools require that they use Google Classroom," (*id.* ¶ 227), which means that "Google's Pixels . . . acquire information from the browser without notifying the user," which is "relayed contemporaneously." (*id.* ¶ 223). And it is a reasonable inference that each time an individual accessed i-Ready, the same types of data were transmitted. Drawing all reasonable inferences in plaintiffs' favor, as the Court is required to do at this stage, the complaint plausibly alleges the in-transit requirement for M.C. 1, M.C. 2, and M.C. 4. *See Nationwide*, 686 F. Supp. 3d at 977-79.

Therefore, the complaint plausibly alleges all three elements required to show that a third party has violated the second clause of § 631(a).[5] Once a showing is made that there was an underlying violation of § 631(a), the complaint must then plausibly allege that the defendant aided-and-abetted the underlying violation. To state a claim for aiding and abetting, the statutory language implicitly requires "both knowledge of the conduct that will violate the statute and a purpose of aiding, agreeing with, or employing the third party to commit those acts." *Smith v. YETI Coolers*, LLC, 754 F. Supp. 3d 933, 942 (N.D. Cal. 2024).[6]

The complaint alleges that defendant has entered into "expansive data-sharing agreements with numerous third-party companies," (Compl. ¶ 172). In particular, it alleges that "Curriculum Associates . . . has chosen to prioritize its marketing efforts and profits over the privacy of the minor students using its Products by installing Google's Tracking Tools on its Products." (*Id.* ¶ 197). According to the complaint, "Curriculum Associates . . . [is] essentially choosing to participate in Google's mass surveillance network, and in return, they benefit from Google's collection of user data at the expense of their website users' privacy." (*Id.* ¶ 207). According to the complaint, "Curriculum Associates intentionally misleads Parents, educators, and others by omitting the companies, including Google, with which it does indeed share the information." (*Id.* ¶ 298). While some of those allegations are largely conclusory, it is reasonable to infer that Curriculum Associates was aware that Google tracking software was installed on its platforms, and that Google was using that software to collect private data for

[5] The complaint also alleges sufficient facts to plead an underlying violation of the third clause of § 631, which prohibits the use of information gained through a violation of the second clause. Cal. Penal Code § 631(a). That is because third parties like Google allegedly use the data to sell targeted advertising services. (Compl. ¶ 204).

[6] Some courts have read the fourth clause to impose a less stringent scienter requirement. *See, e.g.*, *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1130 (S.D. Cal. 2023). But for the reasons provided below, the complaint alleges facts that satisfy even the stricter standard.

financial gain. Such allegations of data-sharing agreements support an inference that defendant "agreed with" third parties like Google to violate the statute. Again, the extent to which the evidence supports those allegations is an issue to be resolved on a complete record, not in the context of a motion to dismiss.

Accordingly, the complaint states a claim under the CIPA § 631(a) for first-party interception and aiding and abetting third-party interception. The motion to dismiss Count 2 will therefore be denied.

**C. CIPA § 632 (Count 3)**

Section 632 of CIPA makes it unlawful to "intentionally and without the consent of all parties to a confidential communication, use[] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication." Cal. Penal Code § 632(a). The complaint alleges that "Curriculum Associates aided and abetted third parties, including but not limited to, Google, to unlawfully intercept protected communications belong to Plaintiffs and California Subclass members and use the contents of those communications for their own commercial benefit." (Compl. ¶ 378).

As with § 631, the analysis for aiding-and-abetting liability under § 632 begins with the underlying violation. "To state a claim under § 632, Plaintiff must show there was (1) an electronic recording of (2) a confidential communication and (3) all parties did not consent." *YETI Coolers*, 754 F. Supp. 3d at 943. Because the consent analysis "under § 632 is identical to the analysis under § 631(a)," *id.*, the complaint plausibly alleges lack of consent for the reasons stated above. Likewise, the eavesdropping/recording requirement is met for the reasons stated

above in the analysis of in-transit interception.[7] The inquiry as to the underlying violation therefore reduces to whether the communications at issue are confidential.

The statute defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes . . . circumstance[s] in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal Code § 632(c). Courts are divided as to reasonable expectation of confidentiality that attaches to internet communications. Some courts "have developed a presumption that Internet communications do not reasonably give rise to that expectation." *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *3 (N.D. Cal. Oct. 23, 2019); *see Yockey*, 745 F. Supp. 3d at 955. Those courts require plaintiffs to show that "there is something unique about these particular internet communications which justify departing from the presumption." *In re Meta Pixel*, 647 F. Supp. 3d at 799. Other courts have arrived at the opposite conclusion. *See, e.g.*, *Brown v. Google LLC*, 685 F. Supp. 3d 909, 937 (N.D. Cal. 2023) ("Google's narrower argument, that California courts have developed a presumption that users do not have an expectation of privacy over internet communications, fails on examination.").

It appears that plaintiffs have a reasonable expectation of confidentiality in the data allegedly shared by defendant, even under an application of the presumption. The court in *In re Meta Pixel* found that internet communications between patients and their medical providers were confidential because such communications "are protected by federal law" and are "uniquely personal"—unlike, for example, the "communications made while inquiring about items of

[7] Defendant incorporated its arguments that the in-transit requirement for § 631 is not met into its brief contention that the eavesdropping requirement of § 632 is not met. (Def. Memo at 7-8).

clothing on a retail website" that were at issue in *Revitch*. 647 F. Supp. 3d at 799. Both characteristics apply here. First, the data is "uniquely personal," as it includes demographic information, disability or special-education status, performance and progress on academic assessments, behavior while taking assessments, and evaluations and predictions about proficiency. (Compl. ¶ 118); *see Champa v. Weston Pub. Schs.*, 473 Mass. 86, 97 (2015) ("[I]nformation about the child's disability, progress, and needs . . . is highly personal, and disclosure may result in embarrassment and potentially lead to stigma . . . .").[8] Second, such "sensitive information about students, including their identities, academics, health, behavior, and web-browsing habits" is a "privacy interest . . . expressly recognized in federal and California state law." *Cherkin v. PowerSchool Holdings, Inc.*, 2025 WL 844378, at *2 (N.D. Cal. Mar. 17, 2025).[9] The complaint therefore plausibly alleges a confidential communication. *See YETI Coolers*, 754 F. Supp. 3d at 943 (describing the question of whether plaintiff had a reasonable expectation of confidentiality as "a 'fact-intensive' inquiry that is often too difficult to resolve at the pleadings stage" (quoting *Brown*, 685 F. Supp. 3d at 937).

Once the complaint has adequately pleaded the underlying violation, as is the case here, it must then plausibly allege an aiding-and-abetting claim. Because § 632 does not independently provide for derivative liability, "courts have imputed the civil liability standard for aiding and

---

[8] The complaint does not specify whether, when defendant allegedly shared plaintiffs' data, it shared data concerning disability or special-education status. However, as discussed below, it is a reasonable inference to draw in plaintiffs' favor at this stage of litigation.

[9] Defendant emphasizes that the complaint does not plead claims under FERPA and COPPA and that those statutes do not provide a private right of action. (Def. Reply at 1, 5). But statutes routinely protect interests without providing for a private right of action. *See Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 368 (2025) (distinguishing between "a statute [that] secures an enforceable right, privilege, or immunity" and a statute that "just provide[s] a benefit or protect[s] an interest"). Nor do those statutes "alone make their interactions with CA's products 'confidential,'" as defendant characterizes plaintiffs' position. (Def. Reply at 5). Rather, the statutes are simply a factor the court considers in its "fact-intensive inquiry" into the reasonable expectation of confidentiality. *Brown*, 685 F. Supp. 3d at 937.

abetting to determine the scope of derivative liability" under § 632. *YETI Coolers*, 754 F. Supp. 3d at 944. Common-law liability for aiding and abetting attaches when the defendant "(a) know[s] the other's conduct constates a breach of duty and give[s] substantial assistance or encouragement to the other to so act or (b) give[s] substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." *Id.* (quoting *Esparza v. UAG Escondido A1 Inc.*, 2024 WL 559241 (S.D. Cal. Feb. 12, 2024)).

Here, the complaint alleges that Curriculum Associates "install[ed] and configure[ed] tracking software to permit Google, Clever, Munetrix, and other third parties to eavesdrop upon and record the content of Plaintiffs' and California Subclass members' confidential communications with Curriculum Associates." (Compl. ¶ 385). Those allegations are sufficient to plausibly allege that the substantial-assistance requirement has been met. *See Rodriguez v. Ford Motor Co.*, 722 F. Supp. 3d 1104, 1124 (S.D. Cal. 2024) ("Plaintiff asserts facts to support the substantial assistance prong of a common law aiding and abetting claim by alleging that Defendant plugged LivePerson's Application Programming Interface into its website."). And the complaint pleads facts sufficient to satisfy the scienter requirement for the reasons stated above.

Accordingly, the complaint states an aiding-and-abetting claim under CIPA § 632. The motion to dismiss Count 3 will be denied.

**D. <u>CIPA Pen Register Provision (Count 4)</u>**

Section 638.51(a) of CIPA provides that "a person may not install or use a pen register or a trap and trace device without first obtaining a court order pursuant to Section 638.52 or 638.53." Cal. Penal Code § 638.51(a). Defendant has moved to dismiss both for lack of Article III standing and for failure to state a claim.

As the party invoking federal jurisdiction, plaintiffs bear the burden of establishing Article III standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To satisfy the "irreducible constitutional minimum" of standing, a party must show that he or she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Defendant contends that Count 4 fails to sufficiently allege an injury in fact. Article III requires that the "plaintiff's injury in fact be 'concrete'—that is, 'real, and not abstract.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo*, 578 U.S. at 340 (2016)). Concrete harms can be traditional tangible harms, such as physical harms or monetary harms, or they can be intangible. *TransUnion*, 578 U.S. 413 at 424. To assess the concreteness of an intangible harm, courts ask "whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* Congress may also "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law" to confer standing. *Spokeo*, 578 U.S. at 341 (quoting *Lujan*, 504 U.S. at 578). However, a statutory violation does not automatically satisfy the injury-in-fact requirement. *Spokeo*, 578 U.S. at 341.

CIPA was passed "to protect the right of privacy of the people of [California]." Cal. Penal Code § 630. The Ninth Circuit has interpreted CIPA to "codify a substantive right to privacy, the violation of which gives rise to a complete injury sufficient to confer standing." *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589, 598 (9th Cir. 2020). Plaintiffs allege that their § 638.51 claim "is based solely on Curriculum Associates' capture of noncontent signaling data, such as IP addresses and routing metadata, regardless of whether content was also intercepted." (Compl. ¶ 398). The First Circuit has recognized that there is no reasonable

expectation of privacy in IP addresses, which on their own do not provide information concerning location. *United States v. Morel,* 922 F.3d 1, 6 (1st Cir. 2019) (citing *United States v. Hood*, 920 F.3d 87, 92-93 (1st Cir. 2019)). However, the complaint also alleges the use of "routing information," such as "persistent unique identifiers that Google uses to create longitudinal profiles about individual students, including M.C. 3." (Compl. ¶ 233). An individual's right to privacy, both as to certain personal information and private locations, has long 'been regarded as providing a basis for a lawsuit in English or American courts.'" *Yershov v. Gannet Satellite Information Network, Inc.,* 204 F.Supp.3d 353, 362 (D. Mass 2016) (quoting *Spokeo*, 578 U.S. at 341)). Therefore, at this stage, the plaintiffs have demonstrated injury in fact sufficient to establish Article III standing to assert their claim.

CIPA defines "pen register" as "[a] device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).[10] "Electronic communication," in turn, is defined as "any transfer of signs, signals, writings, images, sounds, data, or intelligence of any nature in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo-optical system" with several exceptions. *Id.* § 629.51(a)(2).

Defendant emphasizes that CIPA never mentions the terms "IP address" or "metadata," and therefore should be read narrowly under the rule of lenity only to apply to telephonic communications. (Def. Memo at 11). Some courts have reasoned that because CIPA is a criminal statute, "the rule of lenity applies—even when the statute is being invoked in a civil

[10] The exclusion of the "contents" of communications is presumably why plaintiffs base their claim solely on signaling data such as IP addresses and routing metadata.

action." *Doe v. Eating Recovery Center LLC*, 806 F. Supp. 3d 1109, 1112 (N.D. Cal. 2025). But the rule of lenity cannot be invoked for every criminal statute, for it "only applies if 'there is a *grievous* ambiguity or uncertainty in the statute," given that "most statutes are ambiguous to some degree." *United States v. Councilman*, 418 F.3d 67, 83 (1st Cir. 2005) (quoting *Muscarello v. United States*, 524 U.S. 125, 138-39 (1998)). That is, the rule of lenity should be applied "only if, after seizing everything from which aid can be derived, a court can make no more than a guess" as to the meaning of the statute." *Id.* (quoting *Reno v. Koray*, 515 U.S. 50, 65 (1995) (citation modified)).

Several of those traditional tools of statutory interpretation are available here. The California Supreme Court has established that, in applying the statute to new technologies, "[a]ll CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA." *Javier*, 2022 WL 1744107, at *1-2 (citing *Ribas v. Clark*, 696 P.2d 637, 640-41 (Cal. 1985)). That principle is based on the broad purpose of CIPA "to protect the right of privacy of the people of this state" given that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications." Cal. Penal Code § 630.

In addition, the pen register section of CIPA addresses the type of data to be collected but not the collection tool (that is, "device or process"). Cal. Penal Code § 638.50(b); *see Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal.) ("[C]ourts should focus less on the form of the data collector and more on the result."). In contrast, other sections of CIPA include telephone-specific language. *See, e.g.*, Cal. Penal Code § 631(a) ("telegraph or telephone wire, line, cable, or instrument"); *id.* § 632.7 ("a communication transmitted between two cellular radio telephones, a cellular radio telephone and a landline telephone, two cordless telephones, a

cordless telephone and a landline telephone, or a cordless telephone and a cellular radio telephone").

Thus, federal courts in California have widely applied the pen register statute to cover electronic processes and devices. *See, e.g., Gabrielli v. Haleon US Inc.*, 815 F.Supp.3d 852, 871-72 (N.D. Cal. 2025) (third-party trackers collecting IP addresses); *Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 931 (N.D. Cal. 2024) (same); *Mirmalek v. Los Angeles Times Commc'ns LLC*, 2024 WL 5102709, at *3 (N.D. Cal. Dec. 12, 2024) (same); *Greenley*, 684 F.Supp.3d at 1050 (data collection software).[11] In sum, CIPA § 638.51 applies to IP addresses and metadata, not just telephonic communications.

The final issue is whether the Curriculum Associates has installed a pen register within the meaning of the statute. "[T]he statute's definition of 'pen register' necessarily applies only to a device or process separate from the source of the transmitted communications." *In re Apple Data Priv. Litig.*, 824 F. Supp. 3d 888, 895–96 (N.D. Cal. 2026). Thus, if "first-party apps and their underlying processes are a part of the source of the transmitted communications, [that] is enough to disqualify them from being pen registers." *Id.* at 896. On the one hand, the complaint alleges that defendant installed its own products on plaintiffs' browsers to collect their IP addresses, metadata, and other "addressing" information. (Compl. ¶¶ 402-03). On the other

[11] A California state trial court recently construed "pen register" and "trap and trace device" narrowly, holding that the statute "applies to telephonic communications and not to software on a commercial website." *Blaker v. NetScout Sys., Inc.*, 2026 WL 1709143, at *4 (Cal. Super. Ct. May 27, 2026). That court focused on the provision governing court orders authorizing pen registers and trap-and-trace devices, which does specifically mention "telephone line," and emphasized that "the internet was in widespread use" when the court-order provisions were enacted; that "[if] the Legislature had intended for section 638.51 to apply to commercial websites, it would have so stated." *Id.* at *3. But section 630.50, the provision defining pen registers, was enacted long before the invention of the internet, and the California Supreme Court instructs that "legislative inaction supplies only a weak reed upon which to lean in inferring legislative intent." *California Cap. Ins. Co. v. Hoehn*, 17 Cal. 5th 207, 222 (2024). In any case, district courts faced with this split of authority have been "inclined to follow what is currently the majority rule in federal district courts," which applies the statute to internet communications. *In re Apple Data Priv. Litig.*, 824 F. Supp. 3d 888, 897 (N.D. Cal. 2026).

hand, the complaint alleges that i-Ready "cause[s] information about the student and the student's activity to be *generated*, recorded, and instantaneously transmitted to third parties," (Compl. ¶ 189) (emphasis added). Installing third-party tracking tools, (*see* Compl. ¶ 197), to transmit information generated by i-Ready indicates that the products of Curriculum Associates are the source of the communications.

Plaintiffs nonetheless contend that those allegations refer to "the recording of non-content signaling data." (Pl. Opp. at 14). But the complaint itself alleges that "i-Ready causes student information to be sent to Google," which "includes . . . addressing and routing information." (Compl. ¶ 233). Likewise, it alleges that Curriculum Associates has installed tracking tools such as "Google Pixels," which "can acquire information about the user's device and browser, such as their . . . IP address." (*Id.* ¶ 229). Therefore, the complaint does not allege that the products alleged to be pen registers are distinct from the source of the transmitted communications (defendant's products themselves). *See Finnegan v. Haaland*, 2021 WL 11660436, at *3 (D. Mass. Sept. 1, 2021) ("[I]t is well established that 'the complaint may not be amended by the briefs in opposition to a motion to dismiss.'") (quoting *LaCasse v. Aurora Loan Servs., LLC*, 2016 WL 4535338, at *6 n.7 (D. Mass Aug. 30, 2016)).

In summary, plaintiffs have Article III standing to assert a claim under Section 638.51(a) of CIPA because there is an injury-in-fact. Furthermore, CIPA's pen register statute covers the collection of IP addresses. However, because the complaint alleges that Curriculum Associates is both the source of the data and the pen register, the motion to dismiss Count 4 will be granted.

**E. <u>California CDAFA (Count 5)</u>**

The California Comprehensive Computer Data Access and Fraud Act, or "CDAFA," provides a cause of action against anyone who "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer

network." Cal. Penal Code § 502(c)(2). CDAFA's express purpose is to expand protection from "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). CDAFA provides that only "the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss" may bring a civil action for compensatory damages and injunctive relief or other equitable relief. Cal. Penal Code § 502(e)(1).

Federal district courts have disagreed about whether CDAFA supports claims of intangible injuries, such as unjust profits, diminished value of data, and/or loss of privacy.[12] This Court is persuaded by a narrower reading of the statute. Although the statute does not define "damage or loss," it does provide that "[c]ompensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access." *Id.* That language indicates that "CDAFA's private right of action contemplates some damage to the computer system, network, program, or data contained on that computer, as opposed to data generated by a plaintiff." *Heiting*, 709 F. Supp. 3d at 1021. That analysis is bolstered by the statute's purpose, which a state court recently concluded was to target "conduct such as hacking into and tampering with computer systems and data, and the disruptions and costs of such conduct to the business of public and private entities." *Teran v. Superior Court*, 112 Cal. App. 5th 371, 383 (Ct. App. 2025).

[12] *Compare Rodriguez v. Google LLC*, 772 F. Supp. 3d 1093, 1109-1110 (N.D. Cal. 2025) (allowing a CDAFA claim where plaintiffs alleged that defendant profited from misappropriation of plaintiffs' data), *with Heiting v. Taro Pharmaceuticals USA, Inc.*, 709 F. Supp. 3d 1007, 1021 (C.D. Cal. 2023) (collecting cases that reject the theory that a "loss of control over personal data may constitute an economic injury" as contemplated by CDAFA).

Here, the complaint alleges that Curriculum Associates "was unjustly enriched by acquiring the valuable personal information of Plaintiffs and California Subclass members without permission and using it for [its] own financial benefit to advance its business interests." (Compl. ¶ 414). It does not allege damage to plaintiffs' computer systems, networks, programs, or data beyond what plaintiffs themselves generated while using defendant's products. *See Heiting*, 709 F.Supp.3d at 1021. The complaint therefore fails to state a claim under CDAFA.

Accordingly, the motion to dismiss Count 5 will be granted.

**F. Mass. Gen. Laws ch. 214, § 1B (Count 6)**

The Massachusetts Right to Privacy Act ("MRPA") provides that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." Mass. Gen. Laws ch. 214, § 1B. To establish a claim under MRPA, a plaintiff must show that there was "(1) a gathering and dissemination of facts of a private nature that (2) resulted in an unreasonable, substantial or serious interference with his privacy." *Church v. United States*, 772 F. Supp. 3d 223, 234 (D. Mass. 2025) (citing *Branyan v. Southwest Airlines Co.*, 105 F. Supp. 3d 120, 126 (D. Mass. 2015)). That standard is met when disclosure is of a "highly personal or intimate nature" and there "exists no legitimate countervailing interest." *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 383 (2005) (quoting *Bratt v. International Bus. Machines Corp.*, 392 Mass. 508, 518 (1984)).

Under MRPA, "[m]atters that have been determined to be intimate details of a highly personal nature include 'marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcohol consumption, family fights, and reputation.'" *Greenspan v. MasMarques*, 2024 WL 1258062, at *16 (D. Mass. Mar. 25, 2024) (quoting *Georgiou v. Comm'r of the Dep't of Indus. Accidents*, 67 Mass. App. Ct. 428, 433 (2006)). On the other hand, "Massachusetts courts have generally concluded that names and home addresses

are not inherently private or personal in nature." *Georgiou*, 67 Mass. App. Ct. at 433. The Massachusetts Supreme Judicial Court has found that information associated with a child's disability status is "highly personal" such that "disclosure may result in embarrassment" and "amount[] to an unwarranted invasion of the student's personal privacy." *Champa*, 473 Mass. at 97.

Here, the complaint alleges a claim for relief under MRPA on the theory that defendant engaged in the "systematic and pervasive collection, accessing, downloading, transferring, selling, storing and use of Plaintiffs' and Nationwide Class members' highly sensitive personal information." (Compl. ¶ 424). That information allegedly included information on students' performance, progress, proficiency, online searches, file uploads and downloads, and online content consumption. (*Id.*). The complaint alleges that defendant *collected* plaintiffs' personally identifiable information, demographic data, enrollment data, and disability status. (*Id.* ¶¶ 117-119). But it is unclear whether the complaint alleges that defendant *disseminated* that information. It alleges that the information Curriculum Associates sends to Google includes "(a) content of student communications and interactions with the instructional software—such as lesson content, grade level, subject matter, activity status, and assessment results—and (b) addressing and routing information, such as persistent unique identifiers." (*Id.* ¶ 233). On its face, that does not include the information about special-education or disability status. Nevertheless, the Court must draw all reasonable inferences in favor of plaintiffs at this stage, so the Court finds that the complaint sufficiently alleges that defendant collected and disseminated information concerning students' disability status, in addition to the well-pleaded facts about students' academic progress and online behavior.

That information does not fit squarely within the categories deemed outside of the statute's protection, nor does it fall neatly within the types of matters courts have determined to be "highly personal or intimate," with the potential exception of the information concerning students' special-education or disability status. Therefore, "[w]hether a privacy interest is implicated in these circumstances requires a somewhat more nuanced examination" than can be conducted when evaluating a motion to dismiss. *Greenspan*, 2024 WL 1258062, at *17 (quoting *Georgiou*, 67 Mass. App. Ct. at 433).

The next issue is whether the dissemination was an unreasonable interference with student privacy. "Generally, whether an intrusion qualifies as unreasonable, as well as either substantial or serious, presents a question of fact." *Polay v. McMahon*, 468 Mass. 379, 383 (2014). In particular, the issue of whether defendant "acted for [a] legitimate purpose . . . in a way that outweighs any incidental intrusion on the plaintiffs' privacy interests is . . . a question of fact not suitable for resolution on a motion to dismiss." *Id.* at 384. Therefore, the business purposes that defendant describes, and that plaintiffs even concede, are best considered and balanced at a later stage of litigation. (*See* Compl. ¶ 47 (alleging that Curriculum Associates uses its i-Ready products to collect and share student data and that "[t]hese functions are core to Curriculum Associates' business model")).

Defendants cite cases where courts have granted motions to dismiss based on legitimate countervailing interests, (Def. Reply at 11), but those cases are inapt. In *Burns v. City of Worcester*, the court reasoned that "Massachusetts courts have consistently recognized that employers have heightened interests in maintaining a drug-free workplace in safety-sensitive positions" in finding that the interference was not unreasonable. 772 F. Supp. 3d 109, 145 (D. Mass. 2025). In other words, drug tests in safety-sensitive positions were considered reasonable

as a matter of law.[13] At issue here, however, is an unsettled balancing of EdTech companies' business models and students' privacy interests. In *Portnoy v. Insider, Inc.*, the communications at issue were "matters of public concern" with First Amendment implications such that "plaintiff had no reasonable expectation of privacy" in them. 2022 WL 16748583, at *10-*11 (D. Mass. Nov. 7, 2022). Defendants make no similar contention here. And in *Squeri v. Mount Ida College*, the transfer of student records "was indisputably conducted in accordance with the Massachusetts Attorney General's May 15, 2018 guidance letter . . . and Massachusetts regulations." 2019 WL 2249722, at *2 (D. Mass May 24, 2019). Here, plaintiffs allege that Curriculum Associates has violated COPPA and FERPA, creating at least a dispute about defendant's regulatory compliance. (Compl. ¶¶ 287-95).

Plaintiffs have plausibly alleged an invasion of privacy under MRPA. Defendant's motion to dismiss Count 6 will accordingly be denied.

**G. Unjust Enrichment (Count 7)**

Massachusetts law defines unjust enrichment as the "retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 82 (1st Cir. 2020) (quoting *Santagate v. Tower*, 64 Mass. App. Ct. 324, 329 (2005)). To state a claim for unjust enrichment, a complaint must plausibly allege "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit under the circumstances would be inequitable without payment for its value." *Id.* (quoting *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009)). However, "[a]s unjust enrichment is an equitable remedy, under Massachusetts law, a

[13] That is also true as a matter of Fourth Amendment doctrine. *See Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 633 (1989); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 679 (1989).

plaintiff's claim is properly dismissed when there is an adequate legal remedy available." *Schuster v. Wynn Ma, LLC*, 118 F.4th 30, 38 (1st Cir. 2024). And "Chapter 93A provides an adequate legal remedy" when the "unjust enrichment claim seeks to redress the same injury as that alleged under Chapter 93A." *Id.*

Plaintiffs maintain that there is a split of authority, and that some courts allow plaintiffs to plead unjust enrichment claims in the alternative to Chapter 93A claims. (Pl. Opp. at 22-23). The First Circuit explicitly rejected that argument in *Tomasella*, stating its "disagree[ment]" with the contention that allowing alternative pleading of unjust enrichment is "controlling." 962 F.3d at 83. The court emphasized that it was "bound by *Shaulis*" and distinguished *Lass*, a case on which plaintiffs rely, because the issue there was "that the ambiguity in the mortgage contract casts doubt on whether a breach of contract claim was indeed available as a legal remedy." *Id*. at 84. Therefore, under controlling authority, an unjust-enrichment claim cannot be pleaded in the alternative where there is an available legal remedy.

Here, the unjust-enrichment count alleges that plaintiffs have suffered harms, including "gross and protracted invasion of privacy" and "fail[ure] to [be] compensate[d]," arising from the alleged "improper collection, use, and disclosure of Plaintiffs' and Nationwide Class members' data." (Compl. ¶¶ 440, 445). The negligence count alleges "privacy harms arising from the unauthorized or exploitative use of children's data" and "improper collection, exposure, exploitation, and diminution in value of their intimate personal information." (Compl. ¶¶ 458, 477). The Chapter 93A count alleges that plaintiffs have suffered "intrusion into their privacy" and "diminution of the value of their private and personally identifiable data and content." (Compl. ¶¶ 488, 494). Therefore, plaintiffs' "unjust enrichment claim seeks to redress the same injury as that alleged under Chapter 93A" and their negligence count. It is "irrelevant" whether

those claims are likely to succeed, for "[i]t is the availability of a remedy at law, not the viability of that remedy, that prohibits a claim for unjust enrichment." *Schuster*, 118 F.4th at 38 (quoting *Tomasella*, 962 F.3d at 82-83); *see also Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017) ("Plaintiff's negligence and chapter 93A claims thus preclude a claim for unjust enrichment. The disposition of those claims is irrelevant.") (quoting *Fernandes v. Havkin*, 731 F. Supp. 2d 103, 114 (D. Mass. 2010)).[14]

Because there are adequate remedies at law, the complaint does not plausibly allege an unjust-enrichment claim. The motion to dismiss Count 7 will be granted.

**H. Negligence (Count 8)**

To prevail on a negligence claim, a plaintiff must prove by a preponderance of the evidence "(1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; (3) causation; and (4) actual loss by the plaintiff." *Delaney v. Reynolds*, 63 Mass. App. Ct. 239, 241 (2005). Under the "long-standing" economic-loss doctrine, Massachusetts courts have held that "purely economic losses are unrecoverable in tort . . . in the absence of personal injury or property damage." *FMR Corp. v. Boston Edison Co.*, 415 Mass. 393, 395 (1993). "Electronic data can have value and the value can be lost, but the loss . . . is not a result of physical destruction of property." *In re TJX Companies Retail Sec. Breach Litig.*, 564 F.3d 489, 498 (1st Cir. 2009). However, the economic-loss rule does not apply if there is a "special relationship," such as a fiduciary relationship, between the parties. *Portier v. NEO Tech. Solutions*, 2019 WL 7946103, at *21 (D. Mass. Dec. 31, 2019).

Plaintiffs concede that the alleged losses are purely economic, but contend that the special-relationship exception applies. (Pl. Opp. at 24-25). The complaint alleges that defendant

[14] Moreover, the Court has concluded that some of plaintiffs legal claims are viable at this stage.

"owed a heightened duty of care due to its contracts with schools and school districts" because it "establish[ed] a relationship of trust and dependency." (*Id.* ¶ 460). But a key rationale behind the economic-loss rule was "to prevent the progression of tort concepts from undermining contract expectations." *Wyman v. Ayer Props., LLC*, 469 Mass. 64, 70 (2014); *see also Indus. Gen. Corp. v. Sequoia Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995) ("Massachusetts courts have stated that, though business transactions conducted at arm's length generally do not give rise to fiduciary relationships, such a relationship can develop where one party reposes its confidence in another."). Therefore, the allegations of contractual relationships marshalled in support of a special relationship instead counsel in favor of application of the economic-loss rule.

Plaintiffs rely on *Shedd*, where the Massachusetts Superior Court declined to apply *TJX* and instead found that there was a "special relationship" where "patients are required to provide highly sensitive PII to a hospital to obtain medical care, are powerless to protect that information but rely on the hospital to do so consistent with state and federal law, and the hospital should reasonably have foreseen and guarded against the risk of disclosure." *Shedd v. Sturdy Mem'l Hospital, Inc.*, 2022 WL 1102524, at *8 (Mass Super. Ct. Apr. 5, 2022); *see also Portier*, 2019 WL 7946103, at *20-*22 (finding that a special relationship exists between an employer and employee concerning the PII the employee has entrusted to the employer). Likewise, the court in *Doe v. Tenet Healthcare Corporation* found the economic-loss rule inapplicable to allegations that a hospital system mishandled patient data because, "[u]nder Massachusetts law, a fiduciary relationship exists between a healthcare provider and a patient." 731 F. Supp. 3d. 142, 148 (D. Mass. 2024).

Those cases, while instructive, are not persuasive. Patients have a direct relationship with their healthcare providers, as do employees with their employers. In such relationships, the

healthcare provider and the employer may have a duty to protect the patients and employees in their care. *Portier*, 2019 WL 7946103, at *20-*21. Thus, at best, those cases would support an analogy between a school and its students, although even that is unclear.[15] Regardless, the case here is one layer removed, involving an independent contractor and the students served by the school it contracts with. The Court is not aware of any Massachusetts authority supporting a special or fiduciary relationship in those circumstances. Therefore, the Court will not extend the special-relationship exception, as developed in cases of data breaches affecting information entrusted to hospitals and employers, to fit the distinct facts here. That conclusion is supported by caselaw rejecting claims of a special relationship in data-breach cases. *See, e.g.*, *Eggiman v. Bank of Am., N.A.*, 2023 WL 2647071, at *4 (D. Mass. Mar. 27, 2023); *In re LastPass Data Sec. Incident Litig.*, 742 F. Supp. 3d 109, 124-25, 128 (D. Mass. 2024); *Zoll Med. Corp. v. Barracuda Networks, Inc.*, 565 F. Supp. 3d 101, 106-07 (D. Mass. 2021).

Plaintiffs nonetheless contend that "Curriculum Associates also had independent duties under state and federal laws that required it to ensure that personal information of children was not collected without parental consent." (Compl. ¶ 476). As a general matter, it is unclear whether FERPA or COPPA create such duties.[16] In any case, "[t]he Commonwealth does not

---

[15] *C.f. Brum v. Town of Dartmouth*, 428 Mass. 684, 702-04 (1999) (surveying due-process caselaw and concluding that there is likely no special relationship between schools and students despite compulsory education laws); *Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 227 (D. Mass. 2015) ("Although the First Circuit has not held outright that a 'special relationship' can never arise between a school and a child, it has expressed skepticism, because 'circuits that have confronted this issue have uniformly rejected' the argument and the U.S. Supreme Court has come 'pretty close to rejecting it in a recent dictum.'") (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 71 (1st Cir. 1999)). Nevertheless, universities and students have a special relationship giving rise to a duty to prevent suicide and serious harm resulting from intoxication, for example. *Helfman v. Northeastern Univ.*, 485 Mass. 308, 321 (2020); *Dzung Duy Nguyen v. Massachusetts Inst. of Tech.*, 479 Mass. 436, 453 (2018).

[16] *See, e.g.*, *Doe v. Trs. of Dartmouth Coll.*, 615 F. Supp. 3d 47, 64–65 (D.N.H. 2022) ("FERPA does not create a private right of action, but if a school violates the records policy that it adopts in accordance with FERPA, that violation can support *a breach of contract* claim.") (emphasis added); *Pinders v. Vermont Agency of Educ.*, 2025 WL 3259945, at *3 (Vt. Super. Ct. Nov. 13, 2025) ("[T]he Court cannot discern from the statutory language any intent to create a duty that would be owed to private individuals, as opposed to the relevant governmental regulatory bodies. Thus, FERPA creates a duty of compliance by agencies and institutions towards the federal government, but

follow the doctrine of negligence per se, whereby . . . violation of a statute, without more, may establish a breach of duty." *Juliano v. Simpson*, 461 Mass. 527, 532 (2012). Other sessions of this Court have thus rejected the argument that "the duties at issue are independently 'imposed by several state and federal laws,'" citing *Juliano* for the proposition that such "statutes do not establish a duty cognizable in negligence." *LastPass*, 742 F. Supp. 3d at 124; *see also Eggiman*, 2023 WL 2647071, at *5 (reasoning that, while violations of federal banking statutes "may support a tort claim" in some states, they do not in Massachusetts without a further "independent basis for a tort duty"). This Court does so as well.

Because the alleged injuries are purely economic in nature and the complaint has not adequately pleaded a special relationship, the economic-loss rule applies. And the complaint's allegations of statutory violations do not provide an independent basis to establish tort liability. Defendant's motion to dismiss Count 8 will be granted.

**I. Mass. Gen. Laws ch. 93A (Count 9)**

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. "To prevail on a Chapter 93A claim, [a] plaintiff 'must prove that a person who engaged in trade or business committed an unfair or deceptive trade practice and that the [plaintiff] suffered a loss of money or property as a result.'" *Morris v. BAC Home Loans Serv., L.P.,* 775 F. Supp. 2d 255, 259 (D. Mass. 2011) (quoting *Brandon Assocs., LLC v. FailSafe Air Safety Sys. Corp.,* 384 F. Supp. 2d 442, 446 (D. Mass. 2005)). Massachusetts courts have interpreted "unfair or deceptive" to include acts that fall "'within at

---

it does not impose any such duty owed to private individuals."); *Hubbard v. Google LLC*, 508 F. Supp. 3d 623, 629 (N.D. Cal. 2020) (noting that "Congress did not include a private right of action" in COPPA); *Zoll*, 565 F. Supp. 3d at 107 ("Although the Court is not aware of any case addressing the issue of whether HIPAA creates a duty under tort law, the Court finds it instructive that federal courts have declined to recognize the existence of a private statutory right of action under the statute.").

least the penumbra of some common-law, statutory, or other established concept of unfairness,' '[are] immoral, unethical, oppressive, or unscrupulous'; and 'cause[] substantial injury to consumers.'" *Walsh v. TelTech Sys., Inc.*, 821 F.3d 155, 160 (1st Cir. 2016) (quoting *PMP Assocs. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975)).

Plaintiffs allege that they have suffered injury in the form of "unauthorized disclosure and taking of [plaintiffs'] personal information which has value as demonstrated by its use and sale by Curriculum Associates." (Compl. ¶ 494). Plaintiffs contend that this conduct has diminished the value of their private and personally identifiable data. (*Id.*).

Section 9 of Chapter 93A provides a cause of action to "[a]ny person . . . who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two." Mass. Gen. Laws ch. 93A, § 9. A plaintiff must identify a "'distinct injury or harm,' either economic or non-economic, that 'arises from the claimed unfair or deceptive act itself.'" *Nightingale v. National Grid USA Service Company, Inc*, 107 F.4th 1, 5 (1st Cir. 2024) (quoting *Tyler v. Michaels Stores, Inc.*, 464 Mass. 492, 503 (2013)). The First Circuit has recognized invasion of privacy as a cognizable injury under Chapter 93A where defendants initiated excessive debt-collection calls. *Nightingale*, 107 F.4th at 9. The Supreme Judicial Court has also recognized invasions of consumers' personal privacy as violative of Chapter 93A where a merchant unlawfully recorded a consumer's zip code and used it to send unwanted marketing materials. *Tyler*, 464 Mass. at 504.

The complaint here similarly alleges that defendant improperly and surreptitiously collected plaintiffs' personal information and private data and transferred that data to third parties without their informed or effective consent. (Compl. ¶ 485). According to the complaint, the data included plaintiffs' personal identifying information, demographics, school and grade level,

IP addresses, assessment outcomes, and progress. (Compl. ¶ 118). Contrary to defendant's contention, plaintiffs need not show how they would sell their data in order to establish injury. *Lionetta v. InMarket Media, LLC*, 798 F. Supp. 3d 139, 154 (D. Mass. 2025).[17] The complaint also sufficiently alleges a harm separate from the violation of the statute and a causal connection between plaintiffs' injury and defendant's conduct, (Compl. ¶¶ 139, 330), insofar as defendant used and shared plaintiff's data for its own business purposes. *See Tyler*, 464 Mass. at 504 ("[W]hen a merchant acquires personal identification information in violation of § 105(a) and uses the information for its own business purposes, . . . the merchant has cause the consumer an injury that is distinct from the statutory violation itself and cognizable under G.L. c. 93A, § 9."); *see also Nightingale*, 107 F.4th at 8 ("[W]e do not read *Tyler* to say that there is no chapter 93A liability in cases where a section 2 violation inexorably causes a section 9 injury, such as when a call is only 'initiated' upon the debtor's decision to answer it. Rather, we read *Tyler* as holding that no liability attaches in cases where a bare section 2 violation causes no injury at all, such as when the debtor does not know about the unlawful call in the first place.").

Defendant next contends that the conduct at issue did not occur in "trade or commerce" because defendant's business relationship was with plaintiffs' schools, not plaintiffs. (Def. Memo at 20). The statute explicitly provides that "'[t]rade' and 'commerce' shall include . . . any trade or commerce directly or *indirectly* affecting the people of this commonwealth." Mass. Gen. Laws ch. 93A, § 1(b). Thus, "contractual privity is not required to sustain a Chapter 93A claim," although "some business, commercial, or transactional relationship is required."

[17] Defendant cites *Priddy v. Zoll Medical Corp.* for the proposition that the complaint's diminution-of-value theory is not a cognizable injury under the statute. (Def. Memo at 19; Def. Reply at 11-12). However, the relevant analysis in *Priddy* concerned Article III standing. *Priddy v. ZOLL Med. Corp.*, 2025 WL 975234, at *8 (D. Mass. Mar. 31, 2025). For the reasons discussed in the CIPA analysis, the Court finds that there is an injury-in-fact that establishes standing.

*Steinmetz v. Coyle & Caron, Inc.*, 862 F.3d 128, 141 (1st Cir. 2017); *see Ciardi v. F. Hoffmann-La Roche, Ltd.*, 436 Mass. 53, 60 (Mass. 2002). *Id.* Indeed, the Supreme Judicial Court has clarified that to establish 93A liability, a plaintiff "need not have purchased the product directly from the defendant" as long as he or she "used the product, even if it was sold to another, and was injured as a result of the defendant's failure to warn." *Rafferty v. Merck & Co., Inc.*, 479 Mass. 141, 161 (Mass. 2018).

Here, plaintiffs have established use of defendant's products, and they need not show a direct purchase to make out a viable Chapter 93A claim. (Compl. ¶¶ 49-135).[18] The failure-to-warn context is somewhat different, though the complaint's allegations concerning defendant's failures to disclose sound in a similar register. (*See* Compl. ¶ 168). In any case, as with the other counts that will be allowed to proceed, the Chapter 93A claim is best assessed with the aid of additional factual development. *See Massachusetts Eye & Ear Infirmary*, 552 F.3d at 69 ("Because '[t]here is no limit to human inventiveness in this field,' Massachusetts courts evaluate unfair and deceptive trade practice claims based on the circumstances of each case.") (quoting *Kattar v. Demoulas*, 433 Mass. 1, 13 (2000)).

Because the complaint plausibly alleges a cognizable injury arising from an unfair or deceptive trade practice, the motion to dismiss Count 9 will be denied.

---

[18] Defendant contends that "[p]laintiffs cite no authority for their theory that they can bring a 93A claim as mere 'third-party beneficiaries' to contracts." (Def. Reply at 12). However, one of the cases on which defendant relies cites to such a case. *See John Boyd Co. v. Bos. Gas Co.*, 775 F. Supp. 435, 440 (D. Mass. 1991) ("Another judge in this district has extended the coverage of Section 11 [of ch. 93A] to intended third party beneficiaries. *See Chestnut Hill Development Corp. v. Otis Elevator Co.*, 653 F. Supp. 927, 933 (D. Mass. 1987) (Caffrey, S.D.J.)."). *Chestnut Hill* emphasized that "there was an active, three-way negotiation" between the parties; however, it distinguished prior caselaw on the ground that "[t]here was no allegation that the buyer was a third party beneficiary," as is the case with plaintiffs here. 653 F. Supp. at 933. Regardless, the application of those principles is better analyzed at a later stage of litigation, with the aid of a full factual record.

## IV. Conclusion

For the foregoing reasons, defendant's motion to dismiss is GRANTED as to Counts 4, 5, 7, and 8 and DENIED as to Counts 1, 2, 3, 6, and 9.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
United States District Judge

Dated: September 30, 2026